T.C. Memo. 2001-240


UNITED STATES TAX COURT


ZINOVY BRODSKY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18571-98.                    Filed September 14, 2001.


<u>Martin A. Schainbaum</u> and <u>David B. Porter</u>, for petitioner.

<u>Allan D. Hill</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


Table of Contents

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 7

The Accounts of Petitioner and/or Ms. Brodsky . . . . . . . . 8
    Identification of the Accounts of
       Petitioner and/or Ms. Brodsky . . . . . . . . . . . 8
    Certain Activity With Respect to
       Petitioner's Accounts . . . . . . . . . . . . . . . 9

Petitioner's Income-Producing Activities . . . . . . . . . .  14
    University Video Wholesale . . . . . . . . . . . . . . .  15
    MZ Trading Company . . . . . . . . . . . . . . . . . . .  15
    Felix Vulis  . . . . . . . . . . . . . . . . . . . . . .  17
    Nikolas Kiritopoulos . . . . . . . . . . . . . . . . . .  21
    Vladimir Syelsky . . . . . . . . . . . . . . . . . . . .  22
    M.P. Electronics . . . . . . . . . . . . . . . . . . . .  24
    New Age Electronics  . . . . . . . . . . . . . . . . . .  25
    Church Street Property . . . . . . . . . . . . . . . . .  26
    Sanchez Street Property  . . . . . . . . . . . . . . . .  27

Interest and Telephone Expenses . . . . . . . . . . . . . .  30

Tax Returns . . . . . . . . . . . . . . . . . . . . . . . .  30
    Joint Returns of Petitioner and
        Ms. Brodsky for 1991 through 1993 . . . . . . . .  30
    MZ Trading's Return for 1993 . . . . . . . . . . . . . .  37

Respondent's Examination of Certain Returns . . . . . . . .  37

Notices of Deficiency . . . . . . . . . . . . . . . . . . .  48

Amendment to Answer and Reply to that Amendment . . . . . .  51

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . .  52

Evidentiary Issues  . . . . . . . . . . . . . . . . . . . .  52

Issues Relating to the Burden of Proof  . . . . . . . . . .  65

The Court's Evaluation of Evidence
    in the Record on Which the Parties Rely . . . . . . .  70
    Testimonial Evidence . . . . . . . . . . . . . . . . . .  70
        The Testimony of Ms. Rodegeb,
            Ms. Martin, and Mr. Oliveras . . . . . . . .  71
        Petitioner's Testimony  . . . . . . . . . . . . .  71
        Mr. DiBernardo's Testimony  . . . . . . . . . . .  71
        Mr. Jordan's Testimony  . . . . . . . . . . . . .  71
        Mr. Raja's Testimony  . . . . . . . . . . . . . .  74
        Mr. Syelsky's Testimony . . . . . . . . . . . . .  75
        Mr. Vulis' Testimony  . . . . . . . . . . . . . .  75
        Mr. Dubrovsky's Testimony . . . . . . . . . . . .  75
        Mr. Sutton's Testimony  . . . . . . . . . . . . .  76
        Mr. Guterman's Testimony  . . . . . . . . . . . .  76
    Documentary Evidence . . . . . . . . . . . . . . . . . .  77

Unreported Income . . . . . . . . . . . . . . . . . . . . .  77
    Alleged Personal Loans . . . . . . . . . . . . . . . . .  81

        Alleged Business Loans to UVW . . . . . . . . . . . .  88
        Alleged Reimbursements . . . . . . . . . . . . . . . 100
        Alleged Advances To Purchase Personal Items  . . . . 101
        Alleged Rental Payments  . . . . . . . . . . . . . . 104
        Alleged Items of MZ Trading  . . . . . . . . . . . . 105
        Alleged Repayments of Loans  . . . . . . . . . . . . 117

Claimed Cost of Goods Sold  . . . . . . . . . . . . . . . . 119

Claimed Schedule C Deductions . . . . . . . . . . . . . . . 122
        Claimed Interest Deductions  . . . . . . . . . . . . 125
        Claimed Telephone Expense Deductions . . . . . . . . 127
        Claimed Bad Debt Deduction . . . . . . . . . . . . . 132

Claimed Capital Loss:  Church Street Property . . . . . . . 134

Claimed Capital Gain:  Sanchez Street Property  . . . . . . 138

Claimed Schedule E Deductions . . . . . . . . . . . . . . . 142

Fraud Penalty Under Section 6663(a) . . . . . . . . . . . . 149
        Underpayment . . . . . . . . . . . . . . . . . . . . 149
        Fraudulent Intent  . . . . . . . . . . . . . . . . . 150

Accuracy-Related Penalty Under Section 6662(a)  . . . . . . 153

Addition to Tax Under Section 6651(a)(1)  . . . . . . . . . 156

CHIECHI, _Judge_:  Respondent determined the following deficiencies in, addition under section 6651(a)(1)[1] to, and fraud penalties under section 6663(a) on petitioner's[2] Federal income

---

[1]All section references are to the Internal Revenue Code (Code) in effect for the years at issue.  Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent issued to both petitioner and his former wife, Natalya Brodsky (Ms. Brodsky), a notice of deficiency (notice) for 1991 and 1992 and a separate notice for 1993.  Ms. Brodsky did not join in the petition that petitioner filed and is not a party in the present case.

tax (tax):

| Year | Deficiency | Addition to Tax Under Sec. 6651(a)(1) | Fraud Penalty Under Sec. 6663(a) |
|------|-----------|---------------------------------------|----------------------------------|
| 1991 | $60,952   | ---       | $45,714  |
| 1992 | 155,798   | ---       | 116,849  |
| 1993 | 397,861   | $98,365   | 298,396  |

Respondent determined in the alternative to the determinations under section 6663(a) that petitioner is liable for each of the years at issue for the accuracy-related penalty under section 6662(a).

The issues remaining for decision are:

(1)  Does petitioner have unreported income for each of the years at issue?  We hold that he does to the extent stated herein.

(2)  Is petitioner entitled to reduce for each of the years at issue his Schedule C gross receipts by certain claimed cost of goods sold?  We hold that he is not.

(3)  Is petitioner entitled to deduct for each of the years 1991 and 1992 certain claimed Schedule C expenses?  We hold that he is not.

(4)  For 1992, did petitioner realize a loss from the sale of certain real property located at 1020 Church Street, San Francisco, California (Church Street property), or did he realize a gain from that sale in the amount determined by respondent?  We hold that he did not realize a loss, but that he realized, and is required to recognize, the gain determined by respondent.

(5)  Is petitioner required to recognize for 1993 gain from the sale of certain real property located at 287 Sanchez Street, San Francisco, California (Sanchez Street property), in excess of the amount that he reported?  We hold that he is.

(6)  Is petitioner entitled to deduct for each of the years 1991 and 1992 certain claimed Schedule E expenses?  We hold that he is not.

(7)  Is petitioner liable for each of the years at issue for the fraud penalty under section 6663(a)?  We hold that he is not.

(8)  Is petitioner liable for each of the years at issue for the accuracy-related penalty under section 6662(a)?  We hold that he is.

(9)  Is petitioner liable for 1993 for the addition to tax under section 6651(a)(1)?  We hold that he is.

The Court held the trial in this case on October 19, 1999. At that trial, petitioner appeared pro se.  Sometime after the trial in this case, and before the posttrial briefs were due, petitioner retained counsel.  On December 16, 1999, petitioner, through that counsel, filed, inter alia, a motion to open the record in order to receive additional evidence (petitioner's motion).  By Order dated March 31, 2000 (March 31, 2000 Order), the Court granted petitioner's motion and calendared a further trial in this case to commence on August 21, 2000.  The March 31, 2000 Order directed the parties in pertinent part, as follows:

After due consideration, it is

\*     \*     \*     \*     \*     \*     \*

ORDERED that each expert witness shall prepare a written report, a copy of which shall be submitted by counsel for the party who is proffering such report directly to the undersigned and served on the other party on or before June 30, 2000. \* \* \*

\*     \*     \*     \*     \*     \*     \*

ORDERED that any documents or materials that are not part of the existing record in this case and that a party expects to use at the further trial in this case (except for impeachment), but which are not stipulated, shall be identified in writing and exchanged by the parties on or before July 20, 2000.  The Court may refuse to receive into evidence any document or material not stipulated or exchanged, unless otherwise agreed by the parties or allowed by the Court for good cause shown. \* \* \*

\*     \*     \*     \*     \*     \*     \*

ORDERED that each party shall prepare a further trial memorandum which shall be served and submitted directly to the undersigned on or before August 4, 2000.  The further trial memorandum shall contain--

\*     \*     \*     \*     \*     \*     \*

(2)  A statement of issues (statement of issues) in which each party shall set forth separately (a) each issue of fact (including any issue subsidiary to an ultimate issue) and (b) each issue of law (including any issue subsidiary to an ultimate issue) to be resolved by the Court.  Each such issue shall be set forth in the statement of issues in sufficient detail so as to enable the Court to decide the case in its entirety by addressing each of the issues listed.

(3)  A statement of positions and theories (statement of positions and theories) in which each party shall set forth separately a clear and full but concise exposition of such party's position and the theory underlying that position with re-

spect to each of the issues that are separately set forth in such party's statement of issues required by (2) above.

*  *  *  *  *  *  *

ORDERED that the statement of issues required to be included in each party's further trial memorandum, as ordered above, shall govern the admissibility of evidence at the further trial in this case in that evidence offered at such further trial by a party shall be deemed irrelevant unless it pertains to one or more of the issues set forth in such party's statement of issues.  It is further

ORDERED that neither party shall be allowed to advance a position or theory underlying that position with respect to any of the issues required to be included in the statement of issues, as ordered above, which is different from the position and theory as to each such issue required to be included in the statement of positions and theories, as ordered above. * * *

The Court held the further trial in this case on August 21 through 23, 2000.

FINDINGS OF FACT

Some facts have been stipulated and are so found except as stated herein.

At the time the petition was filed, petitioner resided in San Rafael, California.

Petitioner, who was born in Russia, immigrated to the United States in June 1979.  During the years at issue, petitioner and Ms. Brodsky were married.  They divorced sometime after 1993.

The Accounts of Petitioner and/or Ms. Brodsky

Identification of the Accounts
of Petitioner and/or Ms. Brodsky

During the taxable years indicated, petitioner and/or Ms. Brodsky maintained at least the following bank accounts, credit card accounts, and loan accounts with the financial institutions shown below (collectively, petitioner's banks):

| Taxable Year | Financial Institution | Type of Account | Account No. | Account Holder |
|---|---|---|---|---|
| 1991-1993 | Bank of America | Checking | 11804-10677 | Petitioner |
| 1991-1993 | Bank of America | Checking | 11801-10725 | UVW Department[1] |
| 1991-1993 | Bank of America | Checking | 12493-03650 | Petitioner and Ms. Brodsky |
| 1991-1993 | Bank of America | Bank[2] | 1249-9-01004 | Ms. Brodsky |
| 1991-1993 | Bank of America | Line of credit[3] | 1396118294 | Petitioner and Ms. Brodsky |
| 1991-1993 | McKesson Employees' Federal Credit Union | Checking | 105500/S | Ms. Brodsky |
| 1992-1993 | McKesson Employees' Federal Credit Union | Checking | 105500/D | Ms. Brodsky |
| 1991-1992 | American Savings | Bank[4] | 4/003-4971259 | Ms. Brodsky |
| 1991-1993 | American Savings | Savings | 4/004-0384497 | Ms. Brodsky as Custodian for Victoria Brodsky |
| 1991-1992 | Bank of America | Automobile loan | 1389-6-56940 | Petitioner |
| 1991-1993 | Citibank | Credit card | 220-72-38214-0 | Ms. Brodsky |
| 1991-1993 | Bank of America | Master Card | 5273-0298-7013-4366 | Petitioner |
| 1991-1993 | Bank of America | Master Card | 5273-0298-0010-0917 | Petitioner and Ms. Brodsky |
| 1991-1993 | Bank of America | Visa[5] | 4019-0121-0086-4798 | Petitioner and Ms. Brodsky |

[1]The letters "UVW" stand for University Video Wholesale, which, as discussed below, was a name under which petitioner operated a sole proprietorship during the years at issue. The record does not disclose the reason why account No. 11801-10725 over which petitioner had signature authority refers

to UVW Department rather than merely to UVW.

[2]The record does not disclose whether account No. 1249-9-01004 was a checking, a savings, or some other type of account.

[3]Account No. 1396118294 was a revolving loan account which had a credit limit of $22,000.

[4]The record does not disclose whether account No. 4/003-4971259 was a checking, a savings, or some other type of account.

[5]The parties stipulated that account No. 4019-0121-0086-4798 was a Master Card account that petitioner maintained during the years indicated. That stipulation is clearly contrary to the facts that we have found are established by the record, and we may, and we shall, disregard it. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989). The record establishes, and we have found, that account No. 4019-0121-0086-4798 was a Visa account in the names of both petitioner and Ms. Brodsky.

(For convenience, we shall refer (1) to Bank of America account No. 11801-10725 as petitioner's UVW account, (2) to Bank of America account No. 1396118294 as petitioner's equity line account, (3) collectively to petitioner's equity line account, petitioner's Bank of America automobile loan account No. 1389-6-56940, and all credit card accounts listed above as petitioner's credit accounts, (4) collectively to all banking, checking, and savings accounts listed above as petitioner's bank accounts, and (5) collectively to all the accounts listed above as petitioner's accounts.)

Certain Activity With Respect to Petitioner's Accounts

During the years at issue, the total amounts shown below were deposited into petitioner's bank accounts, including petitioner's UVW account, or were deposited into petitioner's credit accounts, including petitioner's equity line account, i.e., were paid against the balances due on such credit accounts:

| Account No. | Type of Account | 1991 | 1992 | 1993 |
|---|---|---|---|---|
| 11804-10677 | Bank | [1]$21,147.00 | [1]$12,205.00 | [1]$48,589.00 |
| 11801-10725 | Bank | [1]382,284.00 | [1]373,748.00 | [1]317,727.00 |
| 12493-03650 | Bank | 49,490.00 | [1]30,310.00 | 5,077.00 |
| 1249-9-01004 | Bank | --- | --- | --- |
| 1396118294 | Line of credit | 182,947.00 | 299,225.00 | [1]538,471.00 |
| 105500/S | Bank | 8,225.00 | 14,320.00 | 17,906.00 |
| 105500/D | Bank | --- | 45,544.00 | 50,230.00 |
| 4/003-4971259 | Bank | --- | --- | --- |
| 4/004-0384497 | Bank | 120.00 | --- | 350.00 |
| 1389-6-56940 | Bank | 227.00 | 10,427.43 | --- |
| 220-72-38214-0 | Credit card | 15,898.00 | 1,880.00 | 1,307.00 |
| 5273-0298-7013-4366 | Master Card | 5,166.00 | 24,626.00 | 2,772.00 |
| 5273-0298-0010-0917 | Master Card | 19,445.00 | 9,516.00 | 4,039.00 |
| 4019-0121-0086-4798 | Visa | 1,813.00 | 1,522.00 | 1,099.00 |
| | | [1]686,762.00 | [1]823,323.43 | [1]987,567.00 |

[1]The total amounts of the various deposits into certain of petitioner's accounts which the parties stipulated contained mathematical errors. Such stipulations of such total amounts are clearly contrary to the facts that we have found are established by the record in this case. We have disregarded such incorrect total amounts and have listed above the correct total amounts of deposits that we have found are established by the record. See Cal-Maine Foods, Inc. v. Commissioner, supra.

During the years at issue, petitioner received the amounts of cash shown below when certain deposits were made into certain of petitioner's bank accounts, including petitioner's UVW account, and certain payments were made against the balances due on certain of petitioner's credit accounts, including petitioner's equity line account:

| Account No. | Type of Account | 1991 | 1992 | 1993 |
|---|---|---|---|---|
| 11804-10677 | Bank | $120 | $130 | $801 |
| 11801-10725 | Bank | 1,725 | 1,904 | 1,129 |
| 12493-03650 | Bank | 17 | 60 | --- |
| 1249-9-01004 | Bank | --- | 900 | --- |
| 1396118294 | Line of credit | --- | 250 | 210 |
| 105500/S | Bank | --- | 126 | 200 |
| 105500/D | Bank | --- | --- | 409 |
| 5273-0298-7013-4366 | Master Card | --- | 288 | --- |
| 5273-0298-0010-0917 | Master Card | --- | --- | 70 |
| | | 1,862 | 3,658 | 2,819 |

On December 4, 1991, petitioner cashed a cashier's check payable to him in the amount of $15,000 that was issued by Home Savings of America.

Included within the total deposits during 1992 into petitioner's UVW account were the following deposits:

| Date of Deposit | Description and Payor of Item Deposited | Amount of Deposit |
|---|---|---|
| 3/23/92 | Check for $50,000 from Vladimir Kroma[1] | $50,000 |
| 4/28/92 | Bank of America cashier's check for $12,000 purchased by UVW and made payable to Marcel Feldberg[2] | 12,000 |

[1]The last name of Vladimir Kroma (Mr. Kroma) also appears in the record as "Khoma".

[2]UVW purchased the $12,000 cashier's check by tendering to Bank of America (1) a $4,090 check dated Apr. 7, 1992, payable to the order of UVW, and drawn on the account of RAD Tronics, Inc., (2) a $5,910 check dated Apr. 28, 1992, payable to cash, and drawn on petitioner's UVW account, and (3) a $2,000 check dated Apr. 28, 1992, payable to cash, and drawn on petitioner's UVW account.

Included within the total deposits during the years at issue into petitioner's equity line account were the following deposits, which included one check, a portion of which was deposited into that account and a portion of which was negotiated for cash:

| Date of Deposit | Description and Payor of Item Deposited | Amount of Deposit | Amount Negotiated for Cash |
|---|---|---|---|
| 3/19/91 | Not disclosed by credible evidence in the record | $20,119 | --- |
| 4/30/92 | Great Western Bank cashier's check No. 1610058213 for $15,000 payable to petitioner | 15,000 | --- |
| 4/26/93 | Check for $77,580 from Old East-West Trading Co. (East-West) | 77,580 | --- |
| 5/3/93 | Check for $30,000 from East-West | 30,000 | --- |
| 5/12/93 | Check for $41,950 from East-West | 41,950 | --- |
| 5/25/93 | $30,000 in cash from East-West and Mikhail Guterman | 30,000 | --- |
| 6/1/93 | Check for $3,414 from First Marin Realty, Inc. | 3,344 | $70 |
| 6/11/93 | Check for $2,025 from First Marin Realty, Inc. | 2,025 | --- |
| 6/15/93 | $5,000 in cash from East-West | 5,000 | --- |
| 8/30/93 | $22,000 in cash from East-West | 22,000 | --- |
| 9/14/93 | $17,700 in cash from Roman Kirdan | 17,700 | --- |

During 1992, certain checks, including the following, were drawn on petitioner's UVW account:

| Date of Check | Check No. | Payee | Amount |
|---|---|---|---|
| 1/8/92 | 0628 | Konstantin Reingatch | $5,000 |
| 1/28/92 | 0650 | Igor Dubrovsky | 990 |
| 4/15/92 | 0750 | Cash | 12,000 |
| 5/18/92 | 0781 | Cash | 14,000 |
| 8/30/92 | 0868 | Cash | 2,850 |

During 1992 and 1993, certain checks, including the following, were drawn on petitioner's equity line account:

| Date of Check | Check No. | Payee | Amount |
|---|---|---|---|
| 3/20/92 | 0551 | Cash | $1,000.00 |
| 5/19/92[1] | 0538 | Not disclosed by credible evidence in the record | 31,167.50 |
| 6/30/92 | 0562 | Cash | 20,000.00 |
| 7/13/92 | 0568 | Mr. Kroma[2] | 1,250.00 |
| 12/16/92 | 0522 | K. Reingatch | 7,500.00 |
| 3/27/93 | 8663 | K. Reingatch | 1,742.00 |
| 5/4/93[3] | 0589 | Not disclosed by credible evidence in the record | 37,680.00 |
| 8/24/93 | 8829 | YLB East West Trading Co. | 41,500.00 |

[1]Check No. 0538 is not part of the record.  The date of check No. 0538 shown above is the date on which that check was posted to petitioner's equity line account.

[2]The record includes only a copy of the front of check No. 0568. Although we are satisfied from that copy that check No. 0568 was negotiated, we are not satisfied from the copy of the front of check No. 0568 or from any other evidence in the record that Mr. Kroma deposited and/or cashed that check, nor do we know from the record the date on which check No. 0568 was negotiated.  For example, Mr. Kroma could have endorsed check No. 0568 to petitioner, who in turn deposited and/or cashed it.

[3]Check No. 0589 is not part of the record.  The date of check No. 0589 shown above is the date on which that check was posted to petitioner's equity line account.

The following check was drawn on checking account No. 12493-03650 that petitioner and Ms. Brodsky maintained at Bank of America during the years at issue:

| Date of Check | Check No. | Payee | Amount |
|---|---|---|---|
| 3/2/92 | 2901 | Cash | $7,000 |

During 1992, the following purchases were made from Carvis Discount and charged to Master Card account No. 5273-0298-0010-0917:

| Transaction Date | Amount |
|---|---|
| 2/10/92 | $2,133.59 |
| 3/2/92 | 2,550.83 |

On the dates shown below, petitioner purchased from Bank of

America the following cashier's checks payable to the payees

indicated:

| Date | Payee | Amount |
|------|-------|--------|
| 3/2/92[1] | Macy's California | $3,000 |
| 3/3/92 | Macy's California | 10,000 |
| 5/18/92 | Macy's California | 14,000 |
| 6/30/92 | Mr. Kroma[2] | 20,000 |
| 7/20/92 | Carvis Discount[3] | 16,000 |

[1]The copy of the $3,000 cashier's check payable to Macy's California is not totally legible, but it appears that the date in March 1992 appearing on that check is 3/2/92.

[2]The record includes only a copy of the front of the purchaser's copy of the cashier's check payable to Mr. Kroma. We are not satisfied from that copy or from any other evidence in the record that that cashier's check was ever negotiated. Even if we were satisfied that that cashier's check was negotiated, we are not satisfied from that copy or from any other evidence in the record that Mr. Kroma deposited and/or cashed the cashier's check payable to him, nor do we know from the record the date on which that check was negotiated. For example, Mr. Kroma could have endorsed that cashier's check to petitioner, who in turn deposited and/or cashed it.

[3]The record includes only a copy of the front of the purchaser's copy of the cashier's check payable to Carvis Discount. We are not satisfied from that copy or from any other evidence in the record that that cashier's check was ever negotiated. Even if we were satisfied that that cashier's check was negotiated, we are not satisfied from that copy or from any other evidence in the record that Carvis Discount deposited and/or cashed the cashier's check payable to it, nor do we know from the record the date on which that check was negotiated. For example, Carvis Discount could have endorsed that cashier's check to petitioner, who in turn deposited and/or cashed it.

Petitioner's Income-Producing Activities

As discussed in more detail below, during each of the years

at issue, petitioner operated one or more sole proprietorships

and engaged in certain income-producing activities with certain

individuals and entities. In addition, during part of 1993,

petitioner was a partner in a partnership operating under the

name MZ Trading Company (MZ Trading).

On January 1, 1991, January 1, 1992, and January 1, 1993,

petitioner and Ms. Brodsky did not have a cash hoard or other

substantial accumulation of cash.

University Video Wholesale

During the years at issue, petitioner operated a sole proprietorship under the name University Video Wholesale[3] that engaged in various activities relating to the sale of video equipment to small retail stores and the purchase for resale of certain other types of consumer goods such as shoes and handbags.

MZ Trading Company

Around April 1, 1993, petitioner and Mikhail Guterman (Mr. Guterman) formed a partnership known as MZ Trading Company. MZ Trading engaged in various activities relating to the purchase in the United States of certain types of merchandise and the sale of such merchandise to customers located in Russia and the Ukraine. During at least part of 1993, a checking account over which petitioner had signature authority was maintained at Bank of America in the name of MZ Trading (MZ Trading account).

Included within the total deposits during 1993 into petitioner's checking account 11804-10677 were the following deposits, which included two checks, a portion of each of which was deposited into that account and a portion of each of which was

_____

[3]As discussed below, the joint tax returns of petitioner and Ms. Brodsky for 1991 and 1992 indicated that the name under which petitioner operated the Schedule C business that he reported in those returns was Zinovy Brodsky, and their joint tax return for 1993 did not provide the names under which petitioner operated the two Schedule C businesses that he reported in that return.

negotiated for cash:

| Date of Deposit | Description and Payor of Item Deposited | Amount of Deposit | Amount Negotiated for Cash |
|---|---|---|---|
| 3/23/93 | Check for $200 from MZ Trading | $200 | --- |
| 4/14/93 | Check for $346 from MZ Trading | 346 | --- |
| 9/21/93 | Check for $422 from Mr. Guterman | 400 | $22 |
| 10/13/93 | Check for $4,000 from MZ Trading | 4,000 | --- |
| 10/14/93 | Check for $4,000 from MZ Trading | 4,000 | --- |
| 10/22/93 | Check for $1,000 from MZ Trading | 950 | 50 |
| 11/22/93 | Check for $511 from Mr. Guterman | 511 | --- |

Included within the total deposits during 1993 into petitioner's UVW account were the following deposits, which included four checks, a portion of each of which was deposited into that account and a portion of each of which was negotiated for cash:

| Date of Deposit | Description and Payor of Item Deposited | Amount of Deposit | Amount Negotiated for Cash |
|---|---|---|---|
| 3/30/93 | Check for $3,000 from MZ Trading | $3,000 | --- |
| 4/12/93 | Check for $4,000 from MZ Trading | 4,000 | --- |
| 4/14/93 | Check for $5,000 from MZ Trading | 5,000 | --- |
| 4/23/93 | Check for $99 from MZ Trading | 70 | $29 |
| 4/27/93 | Check for $410 from MZ Trading | 410 | --- |
| 5/3/93 | Check for $98 from Mr. Guterman | 98 | --- |
| 5/14/93 | Check for $190 from MZ Trading | 150 | 40 |
| 6/3/98 | Check for $81 from Mr. Guterman | 81 | --- |
| 8/25/93 | Check for $1,000 from MZ Trading | 900 | 100 |
| 8/31/93 | Check for $1,000 from MZ Trading | 880 | 120 |
| 10/7/93 | Check for $1,000 from Mr. Guterman | 1,000 | --- |

Included within the total deposits during 1993 into petitioner's equity line account were the following checks:

| Date of Deposit | Description and Payor of Check | Amount of Deposit |
|---|---|---|
| 6/22/93 | Check for $977.41 from the MZ Trading account, payable to "B/A Custom Line", and signed by petitioner | $977.41 |
| 9/7/93 | Check for $3,000 from Mr. Guterman payable to petitioner | 3,000.00 |

Petitioner signed a check dated December 17, 1993, in the amount of $140 that was drawn on the MZ Trading account and made payable to "B/A" and negotiated it to make a payment against the balance due on his Master Card account No. 5273-0298-7013-4366.

At a time after the year 1993 that is not disclosed by credible evidence in the record, petitioner and Mr. Guterman prepared most, if not all, of a handwritten document dated August 5, 1999, that lists a series of transactions in which petitioner claims MZ Trading engaged during 1993. (We shall refer to the handwritten document dated August 5, 1999, as MZ Trading's purported 1993 transaction summary.) For each transaction listed on MZ Trading's purported 1993 transaction summary, entries appeared under columns headed "cost", "sold", "profit", and "expenses". Numbers and handwriting that is largely illegible appeared under each of those columns.

<u>Felix Vulis</u>

During at least the years at issue, petitioner participated in various income-producing activities with Felix Vulis (Mr. Vulis) and certain organizations with which Mr. Vulis was associated.

During at least 1992 and 1993, Mr. Vulis was chief executive officer of Amuke[4] Group of Companies (Amuke Group), and Slava Averbach (Mr. Averbach) and Alex Ferrer (Mr. Ferrer) also partic-

---

[4]The word "Amuke" stood for "America Ukraine".

ipated in operating those companies.  During those years, Amuke Group, which had an undisclosed relationship with an entity known as America-Ukraine Professional Business Association and Chamber of Commerce (Amuke Business Association), engaged in various activities relating to the purchase of certain merchandise and the sale of such merchandise to customers located in the former Soviet Union.  (We shall refer collectively to Amuke Group and Amuke Business Association as the Amuke organizations.)

During 1992 and 1993, petitioner engaged in certain income-producing activities with the Amuke organizations, which consisted of petitioner's locating for those organizations certain merchandise that they believed they would be able to sell at a profit to their customers.  In general, if petitioner located certain merchandise that the Amuke organizations wanted to purchase for resale, they advanced petitioner the funds to acquire that merchandise.  Over the course of their business relationship, petitioner located, and the Amuke organizations purchased, various kinds of merchandise such as sweatshirts, water filters, candies, lighters, men's suits, and canned fruit.

The Amuke organizations compensated petitioner for locating certain merchandise on their behalf by paying him a portion of the profit from the resale of such merchandise.  Petitioner received Form 1099, Miscellaneous Income (Form 1099), from Amuke Group for 1992.  That form showed that petitioner received from

Amuke Group during 1992 "Nonemployee compensation" of $5,872. The record does not disclose whether Amuke Group issued Form 1099 to petitioner for 1993.

At a time that is not disclosed by the record, Mr. Vulis guarantied repayment of a $15,000 loan that Mr. Ferrer, who was a business associate of Mr. Vulis at Amuke Group, made to petitioner (Mr. Ferrer's $15,000 loan). At a time that also is not disclosed by the record, Mr. Vulis, as the guarantor of Mr. Ferrer's $15,000 loan, repaid that loan.

During at least 1993, petitioner participated in certain income-producing activities with Commonwealth Enterprises, another business with which Mr. Vulis was associated. Commonwealth Enterprises, like the Amuke organizations, was engaged in the purchase of certain merchandise for resale to customers located in the former Soviet Union. Petitioner conducted business with Commonwealth Enterprises in a manner similar to the manner in which he conducted business with the Amuke organizations; that is to say, in general, petitioner located certain merchandise on behalf of Commonwealth Enterprises that it believed it would be able to resell at a profit to its customers, and Commonwealth Enterprises compensated petitioner for his work by paying him a portion of the profit from the resale of such merchandise.

Included within the total deposits during 1992 into peti-

tioner's UVW account were the following deposits, which included one check, a portion of which was deposited into that account and a portion of which was negotiated for cash:

| Date of Deposit | Description and Payor of Item Deposited | Amount of Deposit | Amount Negotiated for Cash |
|---|---|---|---|
| 8/7/92 | Check for $7,870 from Amuke Group | $7,720 | $150 |
| 8/28/92 | Check for $1,150 from Amuke Group payable to UVW and Bank of America cashier's check for $14,746 purchased by petitioner and payable to L.F. Banks Co.[1] | 15,896 | --- |
| 9/11/92 | Check for $3,850 from Commonwealth Enterprises | 3,850 | --- |
| 12/16/92 | Check for $10,500 from Commonwealth Enterprises | 10,500 | --- |

[1]Petitioner purchased the $14,746 cashier's check by tendering to Bank of America, inter alia, a $3,000 check dated Aug. 27, 1992, from Commonwealth Enterprises payable to petitioner.

Included within the total deposits during 1992 and 1993 into petitioner's equity line account (i.e., payments against the balance due on that account) were the following checks, including one check, a portion of which was deposited into that account (i.e., paid against the balance due on that account) and a portion of which was negotiated for cash:

| Date of Payment | Description and Payor of Check | Amount of Payment | Amount Negotiated for Cash |
|---|---|---|---|
| 5/12/92 | Bank of America cashier's check for $36,000 purchased by petitioner payable to Star Electronics | [1]$36,000 | --- |
| 6/26/92 | Check for $6,000 from Amuke Business Association payable to petitioner and check for $1,000 from Amuke Business Association payable to UVW | 7,000 | --- |
| 6/30/92 | Check for $26,250 from Amuke Business Association payable to petitioner | 26,000 | $250 |
| 9/23/92 | Check for $30,375 from Amuke Group payable to UVW with "Water Systems" written on the memorandum line | [2]30,000 | --- |
| 1/14/93 | Check for $5,000 from Amuke Group payable to petitioner | 5,000 | --- |
| 2/10/93 | Check for $23,891 from Commonwealth Enterprises payable to petitioner | 23,891 | --- |
| 4/26/93 | Check for $22,500 from Mr. Vulis payable to cash | 22,500 | --- |
| 5/3/93 | Check for $37,680 from Mr. Vulis payable to cash | 37,680 | --- |
| 7/9/93 | Check for $6,450 from Commonwealth Enterprises payable to petitioner | 6,450 | --- |

[1]Petitioner purchased the $36,000 cashier's check by tendering to Bank of America, inter alia, a $31,167.50 check dated May 11, 1992, from Amuke Business Association that was payable to cash.

[2]The record does not disclose what happened to the remaining $375 of the $30,375 check that was not used to make a payment against the balance due on petitioner's equity line account.

The proceeds of the check for $30,375 from Amuke Group that is listed above constituted an advance or loan from Amuke Group to petitioner in order for him to purchase certain water filters.

In 1992, the following check payable to Commonwealth Enterprises was drawn on petitioner's UVW account:

| Date of Check | Check No. | Amount |
|---|---|---|
| 12/18/92 | 0988 | $20,000 |

Nikolas Kiritopoulos

During at least part of 1993, petitioner participated in certain income-producing activities with Nikolas Kiritopoulos

(Mr. Kiritopoulos).  During at least part of that year, Mr. Vulis had signature authority over a bank account maintained by Mr. Kiritopoulos (Kiritopoulos' account).  Pursuant to that authority, on the date shown below, Mr. Vulis signed the following check that was drawn on Mr. Kiritopoulos' account, payable to petitioner, and deposited into petitioner's equity line account:

| Date of Deposit | Description and Payor of Item Deposited | Amount of Deposit |
|---|---|---|
| 8/25/93 | Check for $41,500 from Mr. Kiritopoulos payable to petitioner | $41,500 |

Vladimir Syelsky

During 1992, petitioner engaged in certain income-producing activities with Vladimir Syelsky (Mr. Syelsky), an immigrant to the United States who was born in the former Soviet Union.

On August 12, 1992, Mr. Syelsky filed a "NOTICE OF COMMENCE-MENT OF CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, MEETING OF CREDITORS, AND FIXING OF DATES" with the United States Bankruptcy Court for the Northern District of California (Bankruptcy Court). On September 15, 1992, Mr. Syelsky filed a document with the Bankruptcy Court that was entitled "DECLARATION CONCERNING DEBTOR'S SCHEDULES" (Mr. Syelsky's declaration).  In that document, Mr. Syelsky declared under penalties of perjury that the debtor's schedules and summary of schedules that he filed with that Court were true and correct.  Attached to Mr. Syelsky's declaration was a "SUMMARY OF SCHEDULES" in which he reported to the Bankruptcy Court that he had $100 of total assets and

$129,186 of total liabilities.  On December 29, 1992, Mr. Syelsky filed a document entitled "REPORT OF TRUSTEE IN NO ASSET CASE" dated September 11, 1992, which was signed by the trustee of Mr. Syelsky's bankruptcy estate, and which stated, inter alia:

> that the trustee has made diligent inquiry into the whereabouts of property belonging to the estate and that there is no property available for distribution from the estate over and above that exempted by the debtor(s).

On December 29, 1992, the Bankruptcy Court filed a "FINAL DECREE" which ordered, inter alia, Mr. Syelsky's case under chapter 7 of the U.S. Bankruptcy Code closed.

On December 15, 1992,[5] a check for $30,000, which Mr. Syelsky signed and on which the words "1099" and "Commission" were written (Mr. Syelsky's check), was deposited, along with a check for $100 from Eid's TV, into petitioner's UVW account.  The proceeds of Mr. Syelsky's check constituted an advance or loan from Mr. Syelsky to petitioner (Mr. Syelsky's $30,000 loan) in order for him to purchase on behalf of Mr. Syelsky certain merchandise that petitioner had located and that Mr. Syelsky wanted to resell to one of Mr. Syelsky's customers.  Mr. Vulis guarantied repayment of Mr. Syelsky's $30,000 loan.  Sometime after Mr. Syelsky gave petitioner Mr. Syelsky's check, Mr.

---

[5]The date of Dec. 15, 1993, appeared on the front of the check for $30,000 that Mr. Syelsky signed.  However, it is clear from the record that that check was actually signed and deposited on Dec. 15, 1992, and that the year 1993 was written on that check by mistake.

Syelsky canceled his order for the merchandise in question and asked petitioner to return the $30,000. Thereafter, Mr. Vulis, as the guarantor of Mr. Syelsky's $30,000 loan, repaid that loan.

Around December 15, 1992, Mr. Syelsky gave petitioner a $20,000 check that Mr. Syelsky signed and that represented a personal loan by Mr. Syelsky to petitioner. On that date, the proceeds of that $20,000 check were used to make a payment against the balance due on petitioner's equity line account.

M.P. Electronics

At certain times during 1991 and 1992, petitioner conducted certain business transactions with M.P. Electronics, a business operated by Hardit Chaudry (Mr. Chaudry) and Kishore Raja (Mr. Raja). At those times, M.P. Electronics engaged in the purchase for resale of various types of merchandise from retail stores, such as Circuit City, Macy's, and Good Guys (retail stores), which were overstocked, defective, damaged, and/or otherwise not salable by such stores. (We shall refer collectively to the types of merchandise that M.P. Electronics purchased from certain retail stores as nonsalable merchandise.) Generally, at those times, petitioner and M.P. Electronics jointly placed bids with certain retail stores for the purchase of certain of such stores' nonsalable merchandise.

On the dates shown below, the following checks were drawn on petitioner's UVW account and made payable to M.P. Electronics or

Fashions For Less[6]:

| Date of Check | Check No. | Payee | Amount of Check |
|---|---|---|---|
| 8/27/91 | 0485 | Fashions store | $212 |
| 8/28/91 | 0487 | Fashions store | 584 |
| 9/2/91 | 0499 | Fashions store | 1,100 |
| 9/5/91 | 0491 | Fashions store | 334 |
| 4/22/92 | 0757 | M.P. Electronics | 200 |
| 4/22/92 | 0758 | M.P. Electronics | 5,000 |

On April 21, 1992, petitioner purchased a cashier's check for $11,400 from Bank of America that was payable to M.P. Electronics.

On December 17, 1991, a cashier's check for $9,900, which was signed by petitioner as the purchaser of the check and payable to Circuit City, was purchased from Bank of America. Although petitioner signed that cashier's check as the purchaser, the words "PURCHASER: M AND P ELECTRONICS" were typewritten on the purchaser's copy of that check.

New Age Electronics

During at least part of 1992, petitioner engaged in certain business transactions with New Age Electronics, Inc. (New Age) that are not disclosed by the record, which involved the purchase of certain merchandise for resale in Russia. New Age issued petitioner Form 1099 for 1992, which showed that petitioner received "Nonemployee compensation" of $2,400.

---

[6]During at least part of 1991, Mr. Raja's wife operated a ladies clothing store under the name Fashions for Less (Fashions store).

Church Street Property

From 1988 through at least 1992, Mr. Vulis, who at the time of the further trial in this case was a licensed real estate broker in the State of California, was the broker in charge of Markfel Property Management and Investment Corporation (Markfel). In general, during those years, Markfel served as a real estate investment vehicle for various individuals who wanted to invest in certain real properties. As such, Markfel identified a particular real property as a desirable investment, collected funds from those individuals who were interested in investing in that real property, and purchased that real property in the names of those interested individuals, and not in its own name. Any individual who chose to invest through Markfel in a particular real property was responsible for any expenditures with respect to that real property in proportion to such individual's invest- ment interest therein.

At times that are not disclosed by credible evidence in the record, petitioner paid Markfel amounts of money that are not disclosed by credible evidence in the record, which were to be used to invest in certain real properties, to increase his respective investment interests in such properties, and/or to pay his proportionate share of any respective expenditures with respect to such interests. Over the course of his dealings with Markfel, petitioner allocated the funds that he paid Markfel to

several real properties.

One of the real properties that Markfel had identified as a desirable investment was a property located at 1020 Church Street, San Francisco, California. Sometime around the end of September 1988, the Church Street property was purchased in the names of Mr. Vulis and Peter Kogan (Mr. Kogan). At a time not disclosed by credible evidence in the record, petitioner directed that an unspecified portion of the funds that he had paid Markfel be invested in the Church Street property. At least during part of 1991 and 1992 until the date of the sale of the Church Street property, Mr. Vulis, Mr. Kogan, and petitioner owned certain interests in that property. The extent of petitioner's interest in that property is not disclosed by credible evidence in the record. As an owner of an interest in the Church Street property, petitioner was responsible for paying a certain portion of any expenditures with respect to that property.

In 1992, the Church Street property was sold. Sometime thereafter, Mr. Vulis provided certain information with respect to that sale, which is not disclosed by the record, to Edward Sutton (Mr. Sutton), the preparer (return preparer) of Form 1040, U.S. Individual Income Tax Return, that petitioner and Ms. Brodsky jointly filed (joint return) for 1992.

Sanchez Street Property

During at least 1987, 1988, 1991, and 1992, petitioner, Ms.

Brodsky, Joseph Dubrovsky (Mr. Dubrovsky),[7] and certain other individuals invested in certain real properties, including a property located at Camino Del Mar, San Francisco, California (Camino property), and a property located at 287 Sanchez Street, San Francisco, California. On the dates shown below, petitioner and Ms. Brodsky paid the following amounts by check to acquire their interest in the Camino property:

| Date of Check | Amount of Check |
|---------------|-----------------|
| 5/12/87 | $30,000 |
| 6/2/87 | 20,000 |
| 7/10/87 | 7,000 |

On December 7, 1987, Mr. Dubrovsky and his wife, Bella Dubrovsky (Ms. Dubrovsky), transferred to petitioner and Ms. Brodsky a 10-percent interest in the Camino property. Around March 3, 1989, the Camino property was sold or exchanged.

Around June 6, 1988, petitioner deposited a $63,000 check dated June 3, 1988, from Mr. Dubrovsky.

Sometime in February 1989, Mr. Dubrovsky and Ms. Dubrovsky acquired the Sanchez Street property. During at least the period beginning sometime in 1991 and ending on the date of the sale of the Sanchez Street property in 1993, petitioner and Ms. Brodsky owned an interest in that property. No credible evidence in the record discloses the extent of that interest or how or when they acquired that interest. As owners of an interest in the Sanchez

---

[7]Mr. Dubrovsky's first name also appears in the record as "Josif" and "Josef".

Street property, petitioner and Ms. Brodsky were responsible for paying any expenditures with respect to that property in proportion to their investment interest therein.

Included within the total deposits during 1991 into petitioner's UVW account were the following deposits, which included one or two checks, a portion of which was deposited into that account and a portion of which was negotiated for cash:

| Date of Deposit | Description and Payor of Item Deposited | Amount of Deposit | Amount Negotiated for Cash |
|---|---|---|---|
| 2/12/91 | Check for $10,000 from Mr. Dubrovsky and Ms. Dubrovsky, check for $795 from Continental Video System, and 2 cash deposits totaling $3,400 | $14,195 | --- |
| 3/11/91 | Money order for $975 from Mr. Dubrovsky and 2 cash deposits totaling $1,540 | 2,515 | --- |
| 8/22/91 | Check for $1,224 from S&J Co.[1] and check for $1,580 from West Coast Video | 2,734 | $70 |

[1]During 1986 and as of the time of the further trial in this case, Mr. Dubrovsky was a part owner of S&J Co. The record does not disclose whether Mr. Dubrovsky owned any part of S&J Co. on Aug. 22, 1991.

On the dates shown below, the following checks that were payable to Mr. Dubrovsky were drawn on petitioner's UVW account:

| Date of Check | Check No. | Amount |
|---|---|---|
| 2/13/92 | 0671 | $1,000 |
| 4/16/92 | 0752 | 1,000 |

On the dates shown below, the following checks that were payable to Mr. Dubrovsky were drawn on petitioner's equity line account:

| Date of Check | Check No. | Amount |
|---|---|---|
| 10/20/92 | 0554 | $2,000 |
| 1/30/93 | 0574 | 1,675 |

Interest and Telephone Expenses

During 1991, 1992, and 1993, petitioner paid interest to Bank of America with respect to petitioner's equity line account in the respective amounts of $1,632.18, $1,176.48, and $1,217.63.

During the years at issue, petitioner maintained (1) separate home telephone lines, one of which was supposed to be used for personal purposes and one of which was supposed to be used for business purposes, and (2) separate cellular telephone lines, one of which was supposed to be used for personal purposes and one of which was supposed to be used for business purposes. He paid the charges with respect to all of those telephone lines by checks drawn on petitioner's UVW account and one or more of petitioner's other accounts.

During each of the years at issue, petitioner paid at least the following amounts for telephone expenses by checks drawn on petitioner's UVW account:

| Telephone Service Provider | 1991 | 1992 | 1993 |
|---|---|---|---|
| Pacific Bell | $1,393.24 | $1,059.27 | $328.29 |
| Cellular One | 729.28 | 903.92 | 1,352.68 |
| Nationwide Cellular Services, Inc. | --- | --- | 103.16 |

Tax Returns

Joint Returns of Petitioner and
Ms. Brodsky for 1991 through 1993

Petitioner and Ms. Brodsky filed joint returns for each of the years at issue.  The 1991 and 1992 joint returns identified

Mr. Sutton as the return preparer.  The 1993 joint return identi-
fied Richard J. DiBernardo, C.P.A. (Mr. DiBernardo), as the
return preparer.[8]  At the time the 1993 joint return was being
prepared, respondent was conducting an examination of certain of
petitioner's tax returns for years prior to 1993.

On page 1 of the 1991 joint return, petitioner and Ms.
Brodsky reported, inter alia, the following:

| Item of Income or (Loss) | Line on Page 1 of the 1991 Return | Amount Reported |
|---|---|---|
| Wages, salaries, tips, etc. | 7 | $66,852 |
| Taxable interest income | 8a | 590 |
| Dividend income | 9 | 642 |
| Taxable refunds of state and local income taxes | 10 | 1,428 |
| Business income or (loss) | 12 | 20,811 |
| Total pensions and annuities | 17a | [1]4,786 |
| Rents, royalties, partnerships, estates, trusts, etc. | 18 | (10,493) |
| Other income[2] | 22 | 883 |

[1]Petitioner and Ms. Brodsky reported on page 1, line 17b, that none of
the reported amount of pensions and annuities was taxable.
[2]Petitioner and Ms. Brodsky described their "Other income" as an
"INVESTMENT INTEREST ADJUSTMENT".

In their 1991 joint return, petitioner and Ms. Brodsky reported
"adjusted gross income" of $79,242, "Itemized deductions" of
$56,819, and "Taxable income" of $13,823.

The 1991 joint return included Schedule C, Profit or Loss
From Business (Schedule C).  The 1991 Schedule C indicated that
petitioner operated an audio-video sales business under the name

[8]Mr. DiBernardo first met petitioner in 1995, sometime prior
to May 14, 1995, the date on which respondent received the 1993
joint return in question.

Zinovy Brodsky. In Part I, Income, of the 1991 Schedule C, petitioner and Ms. Brodsky reported "Gross receipts or sales" of $380,364, "Cost of goods sold" of $317,429, "Other income" of $700, and "gross income" of $63,635. In Part II of the 1991 Schedule C, Expenses, petitioner and Ms. Brodsky claimed deductions for, inter alia, "Other Interest" of $3,000 and "Other expenses" of $3,877.[9] Petitioner and Ms. Brodsky reported in the 1991 Schedule C "total expenses before expenses for business use of your home" of $33,183, "Expenses for business use of your home" of $9,641, and "Net profit or (loss)" of $20,811.

The 1991 joint return also included Schedule E, Supplemental Income and Loss (Schedule E), in which petitioner and Ms. Brodsky reported the Church Street property and the Sanchez Street property as rental properties. In Part I of the 1991 Schedule E, petitioner and Ms. Brodsky claimed only "Rental and Royalty Expenses" with respect to the Church Street property and both "Rental and Royalty Income" and "Rental and Royalty Expenses" with respect to the Sanchez Street property. In Part I of the 1991 Schedule E, petitioner and Ms. Brodsky claimed "Total expenses" of $8,461 and a "Deductible rental loss" of $2,115 with respect to the Church Street property. In that part of that

---

[9]According to a statement attached to their 1991 joint return, petitioner and Ms. Brodsky reported that the deduction claimed for "Other expenses" included, inter alia, $1,058 for "CAR PHONE" and $1,445 for "PHONE".

schedule, they reported "Rents received" of $34,958 and claimed "Total expenses" of $62,884 and a "Deductible rental loss" of $8,378 with respect to the Sanchez Street property. In Part I of the 1991 Schedule E, petitioner and Ms. Brodsky claimed "Total rental or royalty income or (loss)" of ($10,493) with respect to the Church Street property and the Sanchez Street property.

On page 1 of the 1992 joint return, petitioner and Ms. Brodsky reported, inter alia, the following:

| Item of Income or (Loss) | Line on Page 1 of the 1992 Return | Amount |
|---|---|---|
| Wages, salaries, tips, etc. | 7 | $65,805 |
| Taxable interest income | 8a | 459 |
| Dividend income | 9 | 856 |
| Taxable refunds, credits, or off-sets of state and local income taxes | 10 | 1,626 |
| Business income or (loss) | 12 | 5,951 |
| Capital gain or (loss) | 13 | (3,000) |
| Total pensions and annuities | 17a | [1]9,157 |
| Rents, royalties, partnerships, estates, trusts, etc. | 18 | (3,167) |
| Other income[2] | 22 | (883) |

[1]Petitioner and Ms. Brodsky reported on page 1, line 17b, that only $354 of the reported amount of pensions and annuities was taxable.
[2]Petitioner and Ms. Brodsky described their "Other income" as an "INVESTMENT INTEREST CARRYOVER".

The 1992 joint return showed "adjusted gross income" of $67,580, "Itemized deductions" of $84,921, and no "Taxable income".

The 1992 joint return included Schedule C which indicated that petitioner operated an audio-video sales business under the name Zinovy Brodsky. In Part I, Income, of the 1992 Schedule C, petitioner and Ms. Brodsky reported "Gross receipts or sales" of $293,937, "Cost of goods sold" of $258,180, and "Gross income" of

$35,757. In Part II of the 1992 Schedule C, Expenses, petitioner and Ms. Brodsky claimed, inter alia, "Other Interest" of $9,000, "Travel" of $300, and "Other expenses" of $2,408.[10] The 1992 Schedule C showed "Total expenses before expenses for business use of home" of $22,617, "Expenses for business use of your home" of $7,189, and "Net profit or (loss)" of $5,951.

The 1992 joint return also included Schedule D, Capital Gains and Losses (Schedule D). Part II of the 1992 Schedule D, Long-Term Capital Gains and Losses, reported that on March 1, 1992, petitioner and Ms. Brodsky sold for $23,000 an interest in the Church Street property, which they claimed they acquired on March 1, 1990, that on the date of that sale they had a basis of $50,000 in that property interest, and that they realized a loss from that sale of $27,000. Part V of the 1992 Schedule D, Capital Loss Carryovers from 1992 to 1993, reported all of that claimed loss as a long-term capital loss carryover to 1993.

The 1992 joint return also included Schedule E in which petitioner and Ms. Brodsky reported the Church Street property and the Sanchez Street property as rental properties. In Part I of the 1992 Schedule E, petitioner and Ms. Brodsky reported no "Rental and Royalty Income" and claimed no "Rental and Royalty Expenses" with respect to the Church Street property. In that

---

[10]Petitioner and Ms. Brodsky reported that the amount claimed for "Other expenses" included, inter alia, $2,008 for "PHONE".

part of that schedule, they reported "Rents received" of $36,505 and claimed "Total expenses" of $68,174 and a "Deductible rental real estate loss" of $3,167 with respect to the Sanchez Street property. In Part I of the 1992 Schedule E, petitioner and Ms. Brodsky claimed "Total rental real estate and royalty income or (loss)" of ($3,167) with respect to the Sanchez Street property.

On May 14, 1995, respondent received the 1993 joint return. On page 1 of the 1993 joint return, petitioner and Ms. Brodsky reported, inter alia, the following:

| Item of Income or (Loss) | Line on Page 1 of the 1993 Return | Amount |
| --- | --- | --- |
| Wages, salaries, tips, etc. | 7 | $69,506 |
| Taxable interest income | 8a | 250 |
| Dividend income | 9 | 1,087 |
| Business income or (loss) | 12 | (9,360) |
| Capital gain or (loss) | 13 | (3,000) |
| Total IRA distributions | 16a | [1]8 |
| Rental real estate, royalties, partnerships, S corporations, trusts, etc. | 18 | 15,080 |

[1]Petitioner and Ms. Brodsky reported that the entire amount of the IRA distributions was taxable.

In the 1993 joint return, petitioner and Ms. Brodsky reported "adjusted gross income" of $73,118, "Itemized deductions" of $60,029, and "Taxable income" of $3,689.

The 1993 joint return included two Schedules C, one of which showed that petitioner operated a business as an "AUDIO/VIDEO COMPONENTS WHOLESALER" (wholesale business) and the other of which showed that petitioner operated a business described as

"CONSIGNMENT SALES - CD's" (consignment sales business).[11]  Part I, Income, of the 1993 Schedule C relating to the wholesale business reported "Gross receipts or sales" of $158,022, "Cost of goods sold" of $137,990, and "Gross income" of $20,032.  The 1993 Schedule C for the wholesale business showed "Total expenses before expenses for business use of home" of $23,025, "Expenses for business use of your home" of $4,867, and "Net profit or (loss)" of ($7,860).  Part I, Income, of the 1993 Schedule C relating to the consignment sales business reported no "Gross income", "Total expenses before expenses for business use of home" of $1,500, and "Net profit or (loss)" of ($1,500).

The 1993 joint return also included Schedule D.  Part II of the 1993 Schedule D, Long-Term Capital Gains and Losses, reported "Gain from Form 4797" of $11,315, "Long-term capital loss carry-over from 1992 Schedule D" of $27,000, and "Net long-term capital gain or (loss)" of ($15,685).

The 1993 joint return also included Form 4797, Sales of Business Property (Form 4797), that was referenced in Part II of the 1993 Schedule D.  In Part III of that form, Gain From Disposition of Property Under Sections 1245, 1250, 1252, 1254, and 1255, petitioner and Ms. Brodsky reported that on January 1, 1993, they sold for $48,000 an interest in the Sanchez Street

---

[11]The respective Schedules C for those two businesses did not list the names under which petitioner operated them.

property, which they claimed they acquired on February 9, 1989, that on the date of that sale they had a basis of $40,721 in that property interest, "Depreciation (or depletion) allowed or allowable" of $4,036, and an "Adjusted basis" of $36,685, and that they realized "Total gain" from that sale of $11,315.

The 1993 joint return also included Schedule E in which petitioner and Ms. Brodsky reported the Sanchez Street property as rental property. In Part I of the 1993 Schedule E, petitioner and Ms. Brodsky claimed only "Rental and Royalty Expenses" with respect to that property. In that part of that schedule, they claimed "Total expenses" and "Deductible rental real estate loss" of $688 and "Total rental real estate and royalty income and (loss)" of ($688) with respect to the Sanchez Street property. In Part II of the 1993 Schedule E, Income or Loss From Partnerships and S Corporations, petitioner and Ms. Brodsky claimed $15,768 of "Nonpassive income from Schedule K-1" from MZ Trading.

### MZ Trading's Return for 1993

MZ Trading filed Form 1065, U.S. Partnership Return of Income (Form 1065), for 1993, which reported that MZ Trading started business on April 1, 1993. In the 1993 Form 1065, MZ Trading reported "Gross receipts or sales" of $655,334, "Cost of goods sold" of $576,189, and "Total income" of $79,145.

### Respondent's Examination of Certain Returns

Sometime in 1990, respondent assigned Kathleen Rodegeb (Ms.

Rodegeb), one of respondent's revenue agents, to examine the joint returns that petitioner and Ms. Brodsky had filed for the taxable years 1987 through 1989. Sometime after she began the examination of those returns, Ms. Rodegeb commenced an examination of the joint return that petitioner and Ms. Brodsky had filed for the taxable year 1990. Mr. Sutton represented petitioner and Ms. Brodsky during the course of respondent's examination of their joint returns for 1987 through 1990.

During her examination of the joint returns of petitioner and Ms. Brodsky for 1987 through 1990, Ms. Rodegeb asked petitioner to send her all of his records with respect to those taxable years. In response to that request, petitioner provided Ms. Rodegeb with only limited records consisting of certain bank statements, certain purchase invoices, and certain canceled checks. Petitioner did not provide Ms. Rodegeb with any books of account, such as general ledgers, or other records with respect to his income-producing activities (books and records) for the taxable years 1987 through 1990 that she needed in order to conduct the examination of those taxable years. Consequently, Ms. Rodegeb issued summonses on behalf of respondent to the banks at which petitioner had informed her he and/or Ms. Brodsky had maintained accounts during 1987 through 1990.

Around October 8, 1991, Ms. Rodegeb held a conference (October 1991 conference) with petitioner and Mr. Sutton at which

she informed them that she did not believe that the limited books and records that petitioner had provided to her substantiated the various items that were claimed in the joint returns for 1987 through 1990. At that conference, Ms. Rodegeb made certain recommendations to petitioner with respect to the types of books and records that he should maintain. Ms. Rodegeb also informed both petitioner and Mr. Sutton at the October 1991 conference that, after she concluded the examination of the joint returns of petitioner and Ms. Brodsky for taxable years 1987 through 1990, she intended to recommend that respondent issue a so-called inadequate records notice (inadequate records notice) to them, which would require that they show respondent that they were keeping adequate books and records.

Sometime after the October 1991 conference, Ms. Rodegeb met with her manager regarding, inter alia, her recommendation that respondent issue an inadequate records notice to petitioner and Ms. Brodsky. The only effect of issuing such a notice would have been to trigger an examination of the joint returns of petitioner and Ms. Brodsky for taxable years after 1990, the last year examined by Ms. Rodegeb. Since Ms. Rodegeb's manager had already concluded that respondent should examine those joint returns, it was decided that respondent would not issue an inadequate records notice to petitioner and Ms. Brodsky at the conclusion of respon-dent's examination of their joint returns for taxable years 1987

through 1990.

At the conclusion of respondent's examination of the 1990 joint return of petitioner and Ms. Brodsky, respondent did not make any determinations with respect to the gross receipts reported in Schedule C of that return.

Around March 1994, respondent assigned another revenue agent, Theresa Martin (Ms. Martin), to examine the 1991 joint return of petitioner and Ms. Brodsky. In early March 1994, Ms. Martin mailed to petitioner and Ms. Brodsky a letter and a written request for 1991 documents (collectively, the March 1994 letter). The March 1994 letter asked petitioner and Ms. Brodsky to provide her with all of the statements, checks, and bank documents for all of the bank accounts, both personal and business, over which one or both of them had signature authority. In response to the March 1994 letter, petitioner provided Ms. Martin with certain statements and canceled checks with respect to petitioner's UVW account.

Sometime between the date in early March 1994 on which Ms. Martin sent the March 1994 letter to petitioner and Ms. Brodsky and the date in May 1994 on which Ms. Martin first met with petitioner and Ms. Brodsky (May 1994 conference), petitioner executed a power of attorney that authorized Mr. Sutton to represent him with respect to respondent's examination of the 1991 joint return that petitioner and Ms. Brodsky had filed.

Sometime after the May 1994 conference, Ms. Martin wrote Mr. Sutton a letter (Ms. Martin's second 1994 letter) in which she indicated that she believed that petitioner and/or Ms. Brodsky had maintained accounts during 1991 in addition to the accounts about which petitioner had previously informed her. Ms. Martin explained in Ms. Martin's second 1994 letter why she held that belief and enclosed a second written request for 1991 documents with that letter. That second request asked petitioner and Ms. Brodsky to provide Ms. Martin within one month all records pertaining to any such additional accounts. Ms. Martin received no response to Ms. Martin's second 1994 letter or to her second written request for 1991 documents. Consequently, Ms. Martin issued summonses on behalf of respondent to the banks at which she knew or believed petitioner and/or Ms. Brodsky had maintained accounts during 1991.

Sometime in August 1994, respondent, through Ms. Martin, decided to commence an examination of the 1992 joint return of petitioner and Ms. Brodsky. Around that time, Ms. Martin mailed Mr. Sutton a letter and a written request for documents for their taxable year 1992 (collectively, the August 1994 letter). The August 1994 letter asked that petitioner and Ms. Brodsky provide Ms. Martin with all records with respect to the accounts that one or both of them had maintained during 1992. Ms. Martin received no response to the August 1994 letter. Consequently, Ms. Martin

issued summonses on behalf of respondent to the banks at which she knew or believed petitioner and/or Ms. Brodsky had maintained accounts during 1992.

Based on certain information contained in the documents that Ms. Martin received as a result of the summonses that respondent issued, she concluded that petitioner and/or Ms. Brodsky had maintained additional accounts during 1991 and 1992 that they had failed to disclose to her. Consequently, Ms. Martin issued summonses on behalf of respondent to obtain information with respect to those additional accounts.

Based on certain information contained in the documents that Ms. Martin had received as a result of the summonses that respondent issued, she prepared a spreadsheet for 1991 and 1992. That spreadsheet showed each of the deposits that had been made into each of the accounts that Ms. Martin knew petitioner and/or Ms. Brodsky had maintained during those years, as well as the date and the amount of each such deposit (1991-1992 deposits analysis). After Ms. Martin completed the 1991-1992 deposits analysis, she mailed a copy of it to Mr. Sutton along with another written request for documents and a written request that petitioner and Ms. Brodsky identify any item listed in that analysis which they believed to be nontaxable and provide her with records to verify the source of any such item. Ms. Martin did not receive any response to those requests. Thereafter, in order to

schedule a meeting with petitioner and Ms. Brodsky, Ms. Martin attempted several times to reach Mr. Sutton by telephone and also sent him another letter. Mr. Sutton did not respond to those telephone calls or that letter.

Sometime in December 1994, Ms. Martin received a power of attorney authorizing Elizabeth Schwiff (Ms. Schwiff) to represent petitioner and Ms. Brodsky with respect to respondent's examination of their joint returns for 1991 and 1992. Thereafter, Ms. Martin telephoned Ms. Schwiff. During that telephone call, Ms. Schwiff asked Ms. Martin to mail her copies of (1) all of the requests for documents that Ms. Martin had issued with respect to 1991 and 1992, (2) the bank statements that Ms. Martin had reviewed for those years regarding accounts that petitioner and/or Ms. Brodsky had maintained during those years, and (3) the 1991-1992 deposits analysis that Ms. Martin had prepared. Ms. Martin complied with Ms. Schwiff's requests. Sometime after Ms. Martin mailed Ms. Schwiff the copies of all of the documents that Ms. Schwiff had requested, Ms. Schwiff informed Ms. Martin that petitioner and Ms. Brodsky intended to organize their records. Thereafter, Ms. Martin had no further contact with Ms. Schwiff.

Sometime between the end of May 1995 and the beginning of July 1995, respondent received a power of attorney authorizing Mr. DiBernardo to represent petitioner and Ms. Brodsky with respect to respondent's examination of their joint returns for

1991 and 1992. Mr. DiBernardo asked Ms. Martin to send him copies of (1) all of the requests for documents that Ms. Martin had issued with respect to 1991 and 1992, (2) the bank statements that Ms. Martin had reviewed for those years regarding accounts that petitioner and/or Ms. Brodsky maintained during those years, and (3) the 1991-1992 deposits analysis that Ms. Martin had prepared. Ms. Martin complied with Mr. DiBernardo's requests.

Sometime after Mr. DiBernardo began representing petitioner and Ms. Brodsky with respect to respondent's examination of their joint returns for 1991 and 1992, Ms. Martin attempted to schedule a conference with petitioner, Ms. Brodsky, and Mr. DiBernardo. Ms. Martin scheduled three separate conferences with petitioner, Ms. Brodsky, and Mr. DiBernardo, each of which petitioner canceled 1 to 2 days prior to the date on which it was scheduled to take place. Consequently, Ms. Martin issued summonses on behalf of respondent to petitioner and Ms. Brodsky in order to compel them to meet with her. Ms. Martin served the summons on petitioner at his home and sent a copy to Mr. DiBernardo. After having been served with the summons, petitioner informed Ms. Martin that he was not able to meet with her on the date stated in the summons and did not suggest another date on which he was able to meet with her. Ms. Martin rescheduled the conference date listed in the summons in order to accommodate petitioner.

Pursuant to respondent's summonses to petitioner and Ms.

Brodsky, they met with Ms. Martin on November 29, 1995 (November 1995 conference).  At that conference, petitioner and Ms. Brodsky made certain statements regarding the sources of certain deposits that were made into one or more of their accounts during 1991 and 1992 but did not provide any documentation to corroborate those statements.  After the November 1995 conference, Ms. Martin asked petitioner and Ms. Brodsky to provide her with documentation to corroborate the statements that they had made at that conference regarding the sources of certain deposits that were made into one or more of their accounts during 1991 and 1992.  Ms. Martin received no documents in response to that request.  Thereafter, Ms. Martin scheduled several more conferences with petitioner and Ms. Brodsky, all of which they canceled.

Sometime early in 1996, respondent, through Ms. Martin, commenced an examination of the joint return of petitioner and Ms. Brodsky for 1993, asked them for documents relating to that year, received no response to that request, and issued summonses on behalf of respondent to the banks at which petitioner and/or Ms. Brodsky had maintained accounts during 1993.  Sometime in the spring of 1996, Ms. Martin's manager directed her to complete the examination of the 1991 and 1992 joint returns of petitioner and Ms. Brodsky.

Thereafter, respondent transferred responsibility for the examination of the 1993 joint return of petitioner and Ms.

Brodsky to another revenue agent, Rafael Oliveras (Mr. Oliveras), who completed that examination. Mr. Oliveras, inter alia, reviewed the documents that respondent received in response to the summonses issued to the banks at which petitioner and/or Ms. Brodsky had maintained accounts during 1993. In connection with his examination of the 1993 joint return of petitioner and Ms. Brodsky, Mr. Oliveras had a number of telephonic conferences with their authorized representative (representative). Mr. Oliveras asked that representative whether during 1993 certain of the deposits into the accounts of petitioner and/or Ms. Brodsky represented items that are not taxable. Although the representative of petitioner and Ms. Brodsky suggested to Mr. Oliveras that there might be certain nontaxable items, that representative did not specify which deposits during 1993 are nontaxable, nor did such representative provide Mr. Oliveras with any documentation or other information showing that certain of such deposits are nontaxable. The representative of petitioner and Ms. Brodsky never informed Mr. Oliveras that petitioner had obtained any loans during 1993.

In addition to working on the examination of the 1993 joint return of petitioner and Ms. Brodsky, Mr. Oliveras conducted an examination of Form 1065 of MZ Trading for 1993. In connection with that latter examination, Mr. Oliveras performed a bank deposits analysis of MZ Trading's bank accounts for 1993 and

prepared a schedule dated January 7, 1997 (Mr. Oliveras' summary of MZ Trading's deposits during 1993). Mr. Oliveras' summary of MZ Trading's deposits during 1993 set forth, inter alia, Mr. Oliveras' conclusions with respect to certain information regarding each of the deposits that was made into MZ Trading's accounts during 1993, i.e., the date, the amount, and the payor of each such deposit. Mr. Oliveras' summary of MZ Trading's deposits during 1993 showed total deposits during that year into MZ Trading's accounts of $544,934 and "Total Taxable" deposits of $485,855. That summary also stated in pertinent part:

> The T/P did not provide an accurate reconciliation of the receipts received by the partnership [MZ Trading] during the 9312 period.

> The bank deposit analysis reflects less deposits than the gross receipts reported on the return [MZ Trading's 1993 Form 1065]. This is an indication of receipts being shifted to other accounts or kept on hand by the T/P. Based on the bank deposit analysis, gross receipts are accepted as reported per IRC Section 61 provisions.

By letter dated March 3, 1997, respondent issued an inadequate records notice to petitioner and Ms. Brodsky. That letter stated in pertinent part:

> Our review of your records shows they do not adequately verify your Federal tax liability * * *.

> You are required by law to keep permanent records and supporting documents * * *. These records may consist of documents such as invoices, bills, tapes, and receipts, or a timely kept account book, diary or statement of expenses and supporting receipts, paid bills, or cancelled checks. These must be sufficiently detailed and arranged so that your liability can be

accurately reported and verified.

Please send us, within the next 6 months, an explanation of how you are correcting your recordkeeping to meet the requirements of the law.

Notices of Deficiency

Respondent issued a notice to petitioner and Ms. Brodsky for 1991 and 1992 and a separate notice to them for 1993. In those respective notices, respondent determined that petitioner and Ms. Brodsky had unreported Schedule C gross receipts for 1991, 1992, and 1993 in the respective amounts of $121,771, $348,205, and $758,400. In order to make those determinations, respondent reconstructed under the bank deposits method petitioner's Schedule C gross receipts for each of the years 1991, 1992, and 1993 (respondent's bank deposits analysis). Respondent used that indirect method of reconstructing those gross receipts because petitioner and Ms. Brodsky had not maintained adequate books and records for those years.

Each of the notices included schedules in which respondent listed for each of the years at issue respondent's position regarding the sources of the deposits "Related to Schedule C Income" into petitioner's accounts during each such year and the total amount of such deposits during each such year from each such source. In reconstructing the income of petitioner and Ms. Brodsky for the years at issue, respondent added to the results produced by respondent's bank deposits analysis certain addi-

tional amounts, such as the amounts that petitioner received when he cashed, and did not deposit, in whole or in part certain checks or when he used certain checks to purchase certain cashier's checks.

In the notices, respondent disallowed the cost of goods sold claimed in Schedules C for 1991, 1992, and 1993 in the respective amounts of $12,849, $113,935, and $54,337.  In the notice for 1991 and 1992, respondent also disallowed for those two years claimed Schedule C deductions of $24,796 and $16,278, respectively.

In the notice for 1991 and 1992, respondent disallowed all of the claimed Schedule E rental expenses for 1991 and 1992 in the amounts of $20,980 and $6,817, respectively,

> because it has not been established that they were
> ordinary and necessary business expenses or were ex-
> pended for the purpose designated.  In addition, you
> have not established an ownership interest in these
> properties nor has it been established that you were at
> risk per section 465 of the Internal Revenue Code.
> * * *

As an alternative ground for disallowing the claimed Schedule E rental expenses for 1991 and 1992, respondent determined that

> the claimed losses are not allowable per Section 469 of
> the Internal Revenue Code because you did not actively
> participate in the management of the rental properties
> and because you have no other passive income to offset
> the passive losses.

In the notice for 1991 and 1992, respondent also determined that, instead of the $27,000 loss which petitioner and Ms.

Brodsky reported in their 1992 joint return with respect to the sale of the Church Street property, they have a gain of $23,000 from that sale, all of which must be recognized for 1992. Respondent made that determination with respect to the sale of the Church Street property because respondent determined that petitioner and Ms. Brodsky had not established their basis in that property when it was sold.[12]

In the notice for 1993, respondent determined that, instead of the $11,315 gain which petitioner and Ms. Brodsky reported in their 1993 joint return with respect to the sale of the Sanchez Street property, they have a gain from that sale of $48,000. Respondent made that determination because petitioner and Ms. Brodsky had not established their basis in that property when it was sold.[13]

In the notices, respondent further determined that petitioner and Ms. Brodsky are liable for each of the years at issue for the fraud penalty under section 6663(a) on the entire amount of the underpayment for each such year of the tax that was required to be shown in the return for each such year. In the alternative, respondent determined in the notices that petitioner

---

[12]Respondent also disallowed in the notice for 1991 and 1992 a claimed capital loss carryover to 1993.

[13]Respondent also determined in the 1993 notice that petitioner and Ms. Brodsky are not entitled to the $27,000 capital loss carryover from 1992 that they claimed in their 1993 joint return.

and Ms. Brodsky are liable for each of the years at issue for the accuracy-related penalty under section 6662(a) because of negligence or disregard of rules or regulations under section 6662(b)(1).

In the 1993 notice, respondent determined that petitioner and Ms. Brodsky are liable for 1993 for the addition to tax under section 6651(a)(1) because they did not timely file their 1993 joint return and did not show that that failure was due to reasonable cause.

Amendment to Answer and Reply to that Amendment

On October 7, 1999, the Court had filed respondent's amendment to answer, which respondent had lodged on September 24, 1999, when respondent filed a motion for leave to file amendment to answer. Respondent affirmatively alleged in the amendment to answer, inter alia, that, in addition to the amount of the cost of goods sold claimed in the 1993 Schedule C and disallowed in the notice for 1993, petitioner is not entitled for that year to $42,913 of the remaining amount of the cost of goods sold claimed in that Schedule C.

On October 7, 1999, petitioner submitted a document entitled "NOTICE OF OBJECTION", in which petitioner replied to certain affirmative allegations in respondent's amendment to answer. The Court had that document filed as a reply to the amendment to answer (petitioner's reply to respondent's amendment to answer).

In that reply, petitioner denied various affirmative allegations made by respondent in the amendment to answer but did not deny any of the affirmative allegations in that amendment to answer regarding the additional $42,913 of the cost of goods sold for 1993 that petitioner and Ms. Brodsky claimed in the 1993 Schedule C and that respondent alleged in respondent's amendment to answer should be disallowed.

OPINION

Evidentiary Issues

The first evidentiary issue involves certain entries listed in three separate workpapers prepared by certain of respondent's employees (respondent's workpapers), one for each of the years at issue. Each of those workpapers shows for each of those years certain information that is listed under various headings with respect to each of the deposits into petitioner's accounts, including each of the payments against the balances due on petitioner's credit accounts. One such heading is "Payor". (We shall refer to the persons listed in respondent's workpapers under the heading "Payor" as payors.)

Ms. Martin prepared the respective workpapers for 1991 and 1992, and one or more of respondent's other employees prepared the workpapers for 1993. Ms. Martin and one or more of respondent's other employees prepared respondent's workpapers by using information contained in certain documents that respondent

received in response to the summonses that respondent issued to petitioner's banks. Those documents included copies of (1) the statements of petitioner's accounts, (2) the deposit slips showing deposits into petitioner's bank accounts, and (3) the checks deposited into petitioner's bank accounts or used to make payments against the balances due on petitioner's credit accounts.

At the further trial in this case, petitioner offered respondent's workpapers into evidence and sought to rely on certain entries in those workpapers in order to establish the identity of the persons who petitioner claims were the payors of certain deposits into petitioner's accounts. Respondent objected under rule 1002 of the Federal Rules of Evidence (FRE) (the so-called best evidence rule) to the admission into evidence of those entries listed in respondent's workpapers under the heading "Payor" for which the underlying documents establishing the respective payors listed in such entries are not part of the record in this case (respondent's evidentiary objection). Respondent indicated at the further trial that, because petitioner notified respondent only several days prior to the date of the further trial that petitioner might offer respondent's workpapers as exhibits in this case, respondent had not had an opportunity to compare the entries in respondent's workpapers with the stipulations and evidence introduced at the trial and to

be introduced at the further trial in order to determine the entries to which respondent would object and the entries to which respondent would not object.

At the further trial in this case, respondent requested, and the Court granted, additional time in order for respondent to identify for the Court the entries in respondent's workpapers to which respondent was objecting. The Court advised the parties at the further trial that it would reserve ruling on the admissibility of the entries in respondent's workpapers to which respondent was objecting until respondent had the opportunity to identify such entries and that it would admit conditionally any testimony which the parties elicited at the further trial with respect to respondent's workpapers, subject to the Court's ruling on the admissibility of the entries in such workpapers to which respondent was objecting. At the conclusion of the further trial in this case, respondent had not had the opportunity to review respondent's workpapers in order to identify the entries in such workpapers to which respondent was objecting. Consequently, the Court permitted respondent to identify in respondent's opening brief any such entries and allowed the parties to present arguments on brief with respect to the admissibility of the entries in respondent's workpapers to which respondent was objecting.

It is our understanding that, of the 51 entries in respondent's workpapers which relate to deposits that petitioner

contends remain at issue in this case, respondent objects under FRE 1002 to 26 of them (the material entries that are the subject of respondent's evidentiary objection).[14]

FRE 1002 provides:  "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress."  For purposes of FRE 1001 through 1008, entitled "Contents of Writings, Recordings and Photo- graphs", an "original" of a writing is defined as "the writing * * * itself or any counterpart intended to have the same effect by a person executing or issuing it."  FRE 1001(3).  For those purposes, a "duplicate" of a writing is defined as "a counterpart produced by the same impression as the original, * * * or by other equivalent techniques which accurately reproduces the original."  FRE 1001(4).  A duplicate is admissible to the same extent as an original "unless (1) a genuine question is raised as

_____

[14]As indicated above, respondent objects to the admission of only those entries in respondent's workpapers for which the underlying documents establishing the respective payors listed in such entries are not part of the record in this case.  Respondent indicates on brief that respondent objects to 29 of the 51 entries that relate to deposits that petitioner contends remain at issue in this case.  However, three of those entries listed payors which the parties stipulated and with respect to which the underlying documents establishing the identities of such payors are part of the record.  We construe and shall treat respondent's evidentiary objection as pertaining to only 26 of the 51 entries which relate to deposits that petitioner contends remain at issue in this case.  Respondent also objects under FRE 1002 to certain other entries in respondent's workpapers that do not pertain to any of the deposits that petitioner contends remain at issue. We shall not specifically address those other entries.

to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."  FRE 1003.

The material entries that are the subject of respondent's evidentiary objection are not "originals" or "counterparts" within the meaning of FRE 1001(3), nor are they "duplicates" within the meaning of FRE 1001(4).  Rather, those entries reflect information that certain of respondent's employees obtained by reviewing certain other documents obtained pursuant to respondent's summonses to petitioner's banks.  Unless the Federal Rules of Evidence or an act of Congress provides an exception to FRE 1002 that is applicable to the material entries that are the subject of respondent's evidentiary objection, such entries are not admissible.

Petitioner relies on two exceptions to FRE 1002 to support his position that the material entries that are the subject of respondent's evidentiary objection are admissible to prove the identity of the payors during the years at issue of certain items that were deposited into petitioner's accounts.  The first exception on which petitioner relies is FRE 1004(3), which provides:

> The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if--
>
> *  *  *  *  *  *  *
>
> (3) Original in Possession of Opponent.  At a time when an original was under the control of the party against whom offered, that party was put on

>       notice, by the pleadings or otherwise, that the
>       contents would be a subject of proof at the hear-
>       ing, and that party does not produce the original
>       at the hearing; * * *

The advisory committee's notes accompanying FRE 1004 explain the purpose of the exception to FRE 1002 found in FRE 1004(3), as follows:

>       Basically, the rule requiring the production of
>   the original as proof of contents has developed as a
>   rule of preference: if failure to produce the original
>   is satisfactorily explained, secondary evidence is
>   admissible.  The instant rule specifies the circum-
>   stances under which production of the original is
>   excused.

It is petitioner's position that respondent was in control of the "originals" of the documents, i.e, 25 checks and 1 money order,[15] which certain of respondent's employees reviewed in preparing the material entries that are the subject of respondent's evidentiary objections and which listed the names of the payors during the years at issue of certain items that were deposited into petitioner's accounts.  According to petitioner, because respondent was in control of those "originals", FRE 1004(3) permits the use of other evidence, i.e., certain entries in respondent's workpapers, to prove the identity of those payors.  We disagree.

The "originals" of the documents that identify the payors during the years at issue of the items that relate to the mate-

---

[15]All but one of the items in question that were deposited into petitioner's accounts and that relate to the material entries that are the subject of respondent's evidentiary objection were checks of some type, and one of those items was a money order.

rial entries that are the subject of respondent's evidentiary objection are the items themselves, i.e., the 25 checks and the 1 money order themselves.  See United States v. Carroll, 860 F.2d 500, 506 n.13 (1st Cir. 1988).  Certain of respondent's employees prepared the material entries that are the subject of respondent's evidentiary objection by using copies, which respondent received after having issued summonses to petitioner's banks, of microfiche of such checks and money order, which microfiche those banks maintained.  For purposes of FRE 1001 through 1008, those copies of such microfiche constitute duplicates, and not originals.  See id. at 507.

On the record before us, we find that respondent was never in control, as required by FRE 1004(3), of the "originals" of the documents that identify the payors during the years at issue of the items that relate to the material entries that are the subject of respondent's evidentiary objection.[16]  We further find on the instant record that petitioner has not satisfactorily

[16]On the instant record, we also have a question about whether petitioner satisfies the requirement under FRE 1004(3) that respondent have been "put on notice" that the contents of respondent's workpapers were to be a subject of proof at the further trial in this case.  In this connection, respondent indicated at the further trial that petitioner did not notify respondent until Aug. 15, 2000, less than one week before the further trial in this case began, that petitioner might offer respondent's workpapers as exhibits in this case and that respondent did not have an opportunity to determine which entries in those workpapers are otherwise established by the stipulations and evidence introduced at the trial and to be introduced at the further trial and which entries he would object to at the further trial.

explained his failure to produce (1) the originals of the 25 checks and the 1 money order that relate to the material entries that are the subject of respondent's evidentiary objection or (2) the duplicates (i.e., copies) of the microfiche of such checks and money order, which microfiche petitioner's banks maintained.  If petitioner had obtained such originals and offered them at trial, they would have been admissible.  See FRE 1002.  If petitioner had obtained such duplicates and offered them at trial, they would have been admissible to the same extent as the originals.  See FRE 1003.  In either event, petitioner would not have had to resort to secondary evidence consisting of the material entries in respondent's workpapers that are the subject of respondent's evidentiary objection in order to establish who the checks and the money order in question showed the payors of such checks and money order to be.  On the record before us, we find that FRE 1004(3) does not permit petitioner to use those entries to prove the identity of the payors of the checks and the money order in question.

The second exception to FRE 1002 on which petitioner relies is FRE 1006, which provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.  The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place.  The court may order that they are produced in court.

Petitioner claims that under FRE 1006 the material entries that are the subject of respondent's evidentiary objection are admis-

sible to prove the identity of the payors during the years at issue of certain items that were deposited into petitioner's accounts. That is because, according to petitioner, the documents that showed those payors are voluminous and could not have been conveniently examined by the Court. We disagree.

Only 51 of the entries in respondent's workpapers relate to deposits that petitioner contends remain at issue in this case. Respondent objects to only 26 of those entries. See supra note 14. Respondent does not object to the remaining 25 entries because the payors listed in those entries are established by other evidence in the record without regard to the entries in respondent's workpapers. Of the 26 material entries that are the subject of respondent's evidentiary objection, only 25 actually list payors.[17] It appears that, instead of relying on those 25 material entries that are the subject of respondent's evidentiary objection, petitioner could have established the identity of the payors listed in those 25 entries by offering into evidence the originals or the duplicates of 24 checks and 1 money order. We believe that we could have conveniently examined at the further trial the originals or the duplicates of those 24 checks and 1 money order. In the instant case, we do not believe, and in any event petitioner has failed to show, that those originals or

_____

[17]One material entry that is the subject of respondent's evidentiary objection does not show the payor of the deposit relating to that entry. Instead of the name of the payor, the words "Unable to locate" appear with respect to a deposit of $20,119 made into petitioner's equity line account on Mar. 19, 1991.

those duplicates would have been voluminous.  On the record before us, we find that petitioner has failed to establish that the documents that certain of respondent's employees reviewed in preparing the material entries that are the subject of respondent's evidentiary objection are voluminous and could not have been conveniently examined in court.  On that record, we find that FRE 1006 does not permit petitioner to use those entries to show the payors of the checks and the money order in question.

Although petitioner does not advance any argument under FRE 1007, we believe that that rule is applicable in resolving respondent's evidentiary objection.  FRE 1007 provides:

> Contents of writings, recordings, or photographs may be proved by the testimony or deposition of the party against whom offered or by that party's written admission, without accounting for the nonproduction of the original.

On the record before us, we find that the material entries that are the subject of respondent's evidentiary objection constitute respondent's written admission that those entries reflect the information contained in the documents used to create such entries.[18]  On that record, we also find that other entries in respondent's workpapers to which respondent objects under FRE 1002 constitute respondent's written admission that those entries reflect the information contained in the documents used to create such entries.

---

[18]In this connection, we note that respondent does not contend that the information contained in those entries is inaccurate, nor do we question on the record before us the accuracy of such information.

On the record before us, we find that the material entries that are the subject of respondent's evidentiary objection are admissible under FRE 1007, and we overrule respondent's evidentiary objection to those entries. On that record, we also overrule respondent's evidentiary objection to other entries in respondent's workpapers which do not pertain to any of the deposits that petitioner contends remain at issue in this case. Accordingly, we admit respondent's workpapers into evidence and make them part of the record in this case. We also admit unconditionally into the record in this case the testimony elicited by the parties at the further trial with respect to such workpapers.

The next evidentiary issue before us involves petitioner's new position on brief as to the purpose for which he offered into the record at the further trial Mr. Oliveras' summary of MZ Trading's deposits during 1993 (Mr. Oliveras' summary). Mr. Oliveras prepared that summary in connection with respondent's examination of MZ Trading's Form 1065 for 1993. Mr. Oliveras' summary set forth, inter alia, Mr. Oliveras' conclusions with respect to certain information regarding each of the deposits that was made into MZ Trading's accounts during 1993, i.e., the date, the amount, and the payor of each such deposit, as well as the following statements of Mr. Oliveras (Mr. Oliveras' statements):

> The T/P did not provide an accurate reconciliation of the receipts received by the partnership during the 9312 period.

> The bank deposit analysis reflects less deposits than the gross receipts reported on the return. This is an

       indication of receipts being shifted to other accounts
       or kept on hand by the T/P.  Based on the bank deposit
       analysis, gross receipts are accepted as reported per
       IRC Section 61 provisions.

At the further trial, respondent objected under FRE 1002 to the admission into the record of Mr. Oliveras' summary.  Respondent further objected to the admission of Mr. Oliveras' summary because respondent claimed that Mr. Oliveras' statements are hearsay.

    At the further trial in this case, in response to respondent's evidentiary objections to Mr. Oliveras' summary, petitioner clarified that he was not offering Mr. Oliveras' summary into the record for the truth of its content, but rather for the limited purpose that it was a document prepared by Mr. Oliveras. On that limited basis, we admitted Mr. Oliveras' summary into evidence and made it part of the record in this case.

    On brief, petitioner asks us to allow him to change the purpose for which he offered Mr. Oliveras' summary into evidence and to reconsider our evidentiary ruling with respect to that summary.  Although not altogether clear, petitioner appears to take the position on brief that Mr. Oliveras' summary should be admitted into the record for the truth of its contents rather than for the limited purpose for which petitioner requested that that summary be admitted into the record at the further trial in this case.  Petitioner seeks on brief to have Mr. Oliveras' summary admitted into the record for the truth of its contents in order to establish through Mr. Oliveras' statements on the second page of that summary "that there were substantial deposits to

petitioner's line of credit account that had been included [in] MZ Trading Company's 1993 partnership taxable income."[19]

We shall not allow petitioner to change on brief the purpose for which he offered Mr. Oliveras' summary at the further trial in this case. Even if we were to admit Mr. Oliveras' summary into the record for the truth of its contents, that summary does not establish as facts what petitioner contends it establishes. Petitioner relies on the following statements of Mr. Oliveras that appear at the bottom of the second page of Mr. Oliveras' summary: "The bank deposit analysis reflects less deposits than the gross receipts reported on the return. This is an indication of receipts being shifted to other accounts or kept on hand by * * * [MZ Trading]". According to petitioner, the foregoing statements establish that certain deposits into one or more of petitioner's accounts were included in MZ Trading's taxable income for 1993. We disagree. The statements of Mr. Oliveras on which petitioner relies show only that Mr. Oliveras believed that, because the bank deposits analysis that he performed for 1993 with respect to MZ Trading showed less deposits of MZ

_____

[19]On brief, petitioner also relies on Mr. Oliveras' summary in order to support petitioner's contention that during 1993 he made a capital contribution of approximately $38,000 to MZ Trading. Mr. Oliveras' summary does not support petitioner's contention. Mr. Oliveras' summary identifies two amounts, i.e., $36,279 and $14,000, as capital contributions. That summary does not identify who made such capital contributions or when such capital contributions were made. Even if we were to admit Mr. Oliveras' summary into the record for the truth of its contents, that summary does not establish that during 1993 petitioner made a capital contribution of approximately $38,000 to MZ Trading.

Trading than gross receipts reported in its 1993 Form 1065, it was possible that some of MZ Trading's gross receipts for 1993 were deposited into bank accounts other than MZ Trading's bank account(s) or that MZ Trading did not deposit some of those gross receipts. The statements of Mr. Oliveras in Mr. Oliveras' summary on which petitioner relies do not establish that any of MZ Trading's gross receipts for 1993 were shifted or deposited into any of petitioner's accounts during that year.

Issues Relating to the Burden of Proof

It is petitioner's position that respondent has the burden of proving that for each of the years 1991, 1992, and 1993 each of the deposits into petitioner's accounts that remains at issue is taxable. In support of that position, petitioner asserts:

> Section 7522 requires the notice of deficiency to contain a description of the basis for the commissioner's tax determinations. Respondent's notices of deficiency are based on the bank deposits analysis, and do not contain a detailed description of the deposits. Specific items of deposit must be relied on to prove whether the deposits are nontaxable, which requires the presentation of different evidence to prove specific items not in the notices of deficiency. At the same time, respondent is the party objecting to the presentation of the documents that it prepared detailing the specific deposits. Therefore, it is respondent who should have the burden of proof on these specific deposit issues, as they are "new matters" within Rule 142(a), United States Tax Court Rules of Practice and Procedure, and pursuant to the holding of Shea v. Commissioner, 112 T.C. 14 (1999).

Section 7522(a) requires that a notice of deficiency "describe the basis" for the tax deficiency. A new matter is raised when the basis or the theory on which the Commissioner of Internal Revenue (Commissioner) relies was not stated or described in

the notice of deficiency and the new basis or the new theory

requires the presentation of different evidence.  Shea v. Commis-

sioner, 112 T.C. 183, 197 (1999); Wayne Bolt & Nut Co. v. Commis-

sioner, 93 T.C. 500, 507 (1989).  The rule for determining

whether the Commissioner has raised a new matter

> is consistent with, and supported by, the statutory
> requirement [in section 7522(a)] that the notice of
> deficiency "describe the basis" for the Commissioner's
> determination.  This rule also provides a reasonable
> method for enforcing the requirements of section 7522.

Shea v. Commissioner, supra.

In the notice for 1991 and 1992 and in the notice for 1993,

respondent determined that petitioner[20] had unreported Schedule C

gross receipts for each of the years at issue.  In making those

determinations, respondent reconstructed under the bank deposits

method petitioner's Schedule C gross receipts for each of those

years.  Each of the notices included schedules in which respon-

dent listed for each of the years at issue respondent's position

regarding the sources of the deposits into petitioner's accounts

during each such year and the total amount of such deposits

during each such year from each such source.  In reconstructing

the income of petitioner for the years at issue, respondent added

to the results produced by respondent's bank deposits analysis

certain additional amounts, such as the amounts that petitioner

received when he cashed, and did not deposit, in whole or in part

certain checks or when he used certain checks to purchase certain

---

[20]Although respondent issued the notice for 1991 and 1992 to
petitioner and Ms. Brodsky, for convenience, when referring to
that notice we shall refer only to petitioner.

cashier's checks.

On the record before us, we find that, as required by section 7522(a), the notices describe the basis for respondent's determination to increase petitioner's gross receipts for each of the years at issue. The bank deposits method that respondent used in order to determine whether petitioner had unreported gross receipts for each of those years assumes that all money deposited into a taxpayer's bank account during a given period constitutes taxable income, although the Commissioner must take into account any nontaxable source or deductible expense of which the Commissioner has knowledge. Clayton v. Commissioner, 102 T.C. 632, 645-646 (1994); DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Thus, bank deposits are prima facie evidence of income. Clayton v. Commissioner, supra at 645. The taxpayer has the burden of proving that the bank deposits were derived from nontaxable sources, see id., or constitute income that he previously reported, see Calhoun v. United States, 591 F.2d 1243, 1245 (9th Cir. 1978); Nicholas v. Commissioner, 70 T.C. 1057, 1064 (1978). Respondent is not required to prove a likely source of a taxpayer's bank deposits. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

In support of respondent's determinations in the notices that remain at issue with respect to petitioner's Schedule C gross receipts for 1991, 1992, and 1993, respondent is not relying on a basis or a theory that is not described in the notices. Respondent relied in the notices, at trial, and at

further trial and relies on brief on the bank deposits method of reconstructing income. We conclude that respondent is not relying on a new basis or a new theory in support of respondent's determinations in the notices that remain at issue with respect to petitioner's Schedule C gross receipts for 1991, 1992, and 1993. We further conclude that the evidence required to prove that for each of those years the total amount of deposits into petitioner's accounts from each source that remains at issue is or is not taxable to petitioner is the same evidence required to prove that the total amount of each deposit into petitioner's accounts that remains at issue is or is not taxable to him.

On the record before us, we reject petitioner's position that respondent has the burden of proving that each of the deposits that remains at issue for each of the years 1991, 1992, and 1993 is taxable. On that record, we find that petitioner has the burden of proving that each of those deposits was derived from a nontaxable source or constitutes income which he previously reported. See Rule 142(a); Calhoun v. United States, supra; Clayton v. Commissioner, supra at 645.

It is also petitioner's position that respondent has the burden of proof with respect to the affirmative allegations in respondent's amendment to answer that, in addition to the amount of the cost of goods sold claimed in the Schedule C for 1993 and disallowed in the notice for that year, petitioner is not entitled for that year to $42,913 of the remaining amount of the cost of goods sold claimed in that Schedule C. We need not decide

whether petitioner's position is correct.  That is because, pursuant to Rule 37(c), petitioner is deemed to have admitted, inter alia, each of the affirmative allegations in respondent's amendment to answer relating to the claimed cost of goods sold for 1993.

Rule 37(c) provides that, where a reply is filed, every affirmative allegation set out in the answer and not expressly admitted or denied in the reply is deemed to be admitted.[21]  In the instant case, petitioner filed a reply to respondent's amendment to answer which expressly denied certain of the affirmative allegations in that amendment to answer.  That reply did not expressly deny (or admit) the affirmative allegations in respondent's amendment to answer relating to the additional amount of the claimed cost of goods sold for 1993 that respondent alleged therein should be disallowed.[22]  We find that, pursuant to Rule 37(c), petitioner is deemed to have admitted the affirmative allegations in respondent's amendment to answer relating to the cost of goods sold for 1993.

We conclude that, except for the fraud penalty under section

---

[21]Where a reply is not filed, the affirmative allegations in the answer are deemed to be denied unless the Commissioner, within 45 days after the expiration of the time for filing the reply, files a motion that specified allegations in the answer be deemed admitted.  Rule 37(c).  Such a motion may be granted unless the required reply is filed within the time directed by the Court.  Id.

[22]In fact, petitioner's reply to respondent's amendment to answer did not contain any statement addressing any of the affirmative allegations in respondent's amendment to answer relating to the claimed cost of goods sold for 1993.

6663(a) on which respondent has the burden of proof, sec.
7454(a); Rule 142(b), petitioner has the burden of proof on the
determinations in the notices that remain at issue, see Rule
142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  In this
connection, with respect to the deductions claimed by petitioner,
deductions are strictly a matter of legislative grace, and
petitioner bears the burden of proving that he is entitled to any
deductions claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79,
84 (1992).

The Court's Evaluation of Evidence
in the Record on Which the Parties Rely

Both petitioner and respondent rely on certain testimonial
and documentary evidence to support their respective positions on
the various issues in this case.

Testimonial Evidence

At the trial, respondent called Ms. Rodegeb and Ms. Martin
as witnesses, and petitioner called himself and Mr. DiBernardo as
witnesses.  At the further trial, respondent called no witnesses,
and petitioner called himself, Dan J. Jordan (Mr. Jordan), Ms.
Rodegeb, Ms. Martin, Mr. Raja, Mr. Syelsky, Mr. Vulis, Mr.
Dubrovsky, Mr. Sutton, Mr. Oliveras, and Mr. Guterman as wit-
nesses.

We note initially that throughout much of the examination of
certain of petitioner's witnesses at the further trial peti-
tioner's counsel asked leading questions, to which respondent
objected on numerous occasions.  The pervasiveness of such
leading questions during the examination of certain of peti-

tioner's witnesses was such that the Court reminded petitioner's counsel on a number of occasions that the leading nature of the questions asked impacted the Court's evaluation of the testimony of such witnesses.

### The Testimony of Ms. Rodegeb, Ms. Martin, and Mr. Oliveras

We found Ms. Rodegeb, Ms. Martin, and Mr. Oliveras to be credible.

### Petitioner's Testimony

Based on our observation of petitioner both at the trial and at the further trial, including our observation of his demeanor, we did not find him to be credible.  In addition, we found petitioner's testimony to be general, vague, conclusory, implausible, inconsistent, and/or evasive in certain material respects.

### Mr. DiBernardo's Testimony

We found the testimony of Mr. DiBernardo to be largely irrelevant to our resolving any of the issues in this case.

### Mr. Jordan's Testimony

The testimony of Mr. Jordan, a certified public accountant who we concluded qualified as an accounting expert on behalf of petitioner, consisted of his direct testimony, including his expert report and an addendum to that report,[23] and his testimony

---

[23]In violation of the Court's March 31, 2000 Order, petitioner did not proffer the addendum to Mr. Jordan's expert report to the Court until Aug. 21, 2000, the first day of the further trial in this case, and did not provide a copy of that addendum to respondent until about 5 minutes before that addendum was marked for identification at that further trial.  Mr. Jordan

(continued...)

on voir dire, cross-examination, redirect examination, and recross-examination.

We evaluate the opinions of experts in light of the qualifications of each expert and all other evidence in the record.  See Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991).  We have broad discretion to evaluate "the overall cogency of each expert's analysis." Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part on another issue T.C. Memo. 1986-318).  We are not bound by the formulae and opinions proffered by an expert, especially when they are contrary to our own judgment.  Orth v. Commissioner, 813 F.2d 837, 842 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.  Instead, we may reach a decision based on our own analysis of all the evidence in the record.  Silverman v. Commissioner, supra at 933.  The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based. Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244.  While we may accept the opinion of an expert in its entirety, see Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in

[23](...continued)
prepared the addendum to his expert report on the day before the first day of the further trial in this case.

the use of any portion of such an opinion, see <u>Parker v. Commissioner</u>, 86 T.C. 547, 562 (1986).  Furthermore, we may reject the opinion of an expert in its entirety.  <u>Palmer v. Commissioner</u>, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974); <u>Parker v. Commissioner</u>, <u>supra</u> at 562-565.

In preparing his expert report and the addendum to that report, Mr. Jordan had no personal knowledge about any facts with respect to:  (1) The items reported in (a) the joint returns of petitioner and Ms. Brodsky for the years at issue and (b) MZ Trading's Form 1065 for 1993; (2) the accounts of (a) petitioner and/or Ms. Brodsky during the years at issue and (b) MZ Trading during 1993, including any deposits into and withdrawals from those accounts; and (3)(a) the personal dealings and business transactions of petitioner and/or Ms. Brodsky during the years at issue and (b) the transactions of MZ Trading during 1993.  During his testimony, Mr. Jordan acknowledged that he accepted as facts certain representations that petitioner, whom we did not find to be credible, had made to him (petitioner's representations) and accepted as accurate certain documents, which we did not find to be credible, that petitioner had provided to him (petitioner's documents) and that he based his analysis, opinions, and conclusions upon those representations and those documents.[24] Petiioner did not provide Mr. Jordan with general ledgers, books of account, receipts, or other business records of petitioner,

[24]We note that certain of petitioner's representations and petitioner's documents on which Mr. Jordan relied are not part of the record in this case.

UVW, and MZ Trading, or he provided him with a few documents that purported to be such types of records, which the Court did not find to be credible and reliable.[25]  According to Mr. Jordan, at least certain of his conduct in performing his analysis and reaching his opinions and conclusions was not acceptable conduct for him as an accountant, and the accounting profession would not find such conduct to be acceptable.  Mr. Jordan also admitted during his testimony that if he had not relied upon petitioner's representations and petitioner's documents, he would have reached opinions and conclusions different from those that he had reached in his expert report and the addendum to that report.

On the record before us, we did not find any of Mr. Jordan's testimony, including his analysis, opinions, and conclusions, to be reliable or helpful in understanding the evidence, determining the facts in dispute, or resolving the issues to which his testimony related.

### Mr. Raja's Testimony

We found the testimony of Mr. Raja to have been based largely upon his general business practices with petitioner, as opposed to his personal knowledge of the facts with respect to a particular transaction or activity about which he testified.  For

[25]For example, Mr. Jordan relied on a document that Mr. DiBernardo had prepared and that purported to be general ledger pages showing deposits during 1993 into MZ Trading's bank account of its receipts.  Mr. DiBernardo did not prepare those pages, which are not part of the instant record, until sometime after respondent commenced the examination of MZ Trading's Form 1065 for 1993.

example, Mr. Raja testified that he recognized a certain cashier's check payable to Macy's. However, Mr. Raja later admitted that, when he testified about that cashier's check, he was making an assumption that petitioner used that check to purchase certain goods for resale from Macy's. Mr. Raja testified that he made that assumption because M.P. Electronics and petitioner had purchased that type of merchandise from Macy's on other occasions. We also found Mr. Raja's testimony to be vague and/or inconsistent at times.

### Mr. Syelsky's Testimony

Although generally we found Mr. Syelsky to be credible, at times we found his testimony to be inconsistent and/or evasive.

### Mr. Vulis' Testimony

Although generally we found Mr. Vulis to be credible, at times we found his testimony to be general, vague, and/or conclusory. In addition, we found Mr. Vulis' testimony to have been sometimes based on his general business practices with petitioner, as opposed to his personal knowledge of the facts with respect to a particular transaction or activity about which he testified.

### Mr. Dubrovsky's Testimony

Based on our observation of Mr. Dubrovsky at the further trial, including our observation of his demeanor, we did not find him to be credible. We also found Mr. Dubrovsky's testimony to be general, vague, conclusory, and/or inconsistent in certain material respects.

### Mr. Sutton's Testimony

We do not believe that Mr. Sutton had personal knowledge of the facts surrounding the items which were reported in the joint returns of petitioner and Ms. Brodsky for the years at issue and about which he testified at the further trial in this case. In this connection, Mr. Sutton acknowledged that certain of the items that were reported in the joint returns for 1991 and 1992 were based upon summary documents that he did not prepare. In addition, Mr. Sutton misrepresented during his testimony what documents he had shown to respondent's counsel and one of respondent's revenue agents sometime during the week before the further trial in this case. It was only upon questioning by respondent's counsel and by the Court that Mr. Sutton acknowledged that he had made such a misrepresentation.

### Mr. Guterman's Testimony

Based on our observation of Mr. Guterman at the further trial, including our observation of his demeanor, we did not find him to be credible. In addition, although Mr. Guterman claimed to have personal knowledge with respect to each of the matters about which he testified, we have serious reservations about that claim.[26]

---

[26]Mr. Guterman admitted that his testimony with respect to at least one document was based upon the representations of petitioner as to that document, and not on his personal knowledge.

Documentary Evidence

The record contains a considerable number of documents.[27] In large measure, however, the record is devoid of any general ledgers, books of account, receipts, or other records supporting petitioner's claims, which the Court finds to be credible.[28] We infer from petitioner's failure to produce credible records to substantiate his claims with respect to the issues that remain in this case on which he has the burden of proof that such records do not exist and that, if such records do exist, they do not substantiate those claims. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1164-1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).[29]

Unreported Income

In the notices, respondent determined that petitioner has

_____

[27]The Court admitted certain of those documents into the record only for a limited purpose. For example, the Court admitted into evidence copies of the front sides of certain checks only as copies of the front sides of such checks, and not to show that those checks were in fact negotiated or, if negotiated, that those checks were deposited and/or cashed by the payees listed on the copies of the front sides of those checks.

[28]For example, petitioner claims that during the years at issue certain of the deposits into petitioner's accounts, including certain of the payments against the balances due on petitioner's credit accounts, were nontaxable loans or advances. However, the record contains no credible documentary evidence to support those claims, such as promissory notes.

[29]The principle that we may infer from the failure of a party, who has the burden of proof on a given matter, to offer evidence that exists regarding such a matter that such evidence would not have been favorable to that party's position regarding that matter is so well established that hereinafter we shall not cite the case law supporting that principle.

unreported Schedule C gross receipts for each of the years at issue by reconstructing such gross receipts for each of those years pursuant to the bank deposits method.  In reconstructing petitioner's income for each of the years at issue, respondent added to the results produced by respondent's bank deposit analysis certain additional amounts, such as the amounts that petitioner received when he cashed, and did not deposit, in whole or in part certain checks or when he used certain checks to purchase certain cashier's checks.

We address first what we understand to be petitioner's contention that respondent's bank deposits analysis for each of the years at issue is inherently flawed.  In support of that contention, petitioner points out that respondent has conceded as nontaxable certain deposits into petitioner's accounts during each of those years, including certain payments against the balances due on petitioner's credit accounts during each such year, which respondent had determined in the notices to be taxable.

On the record before us, we find respondent's bank deposits analysis for each of the years at issue to be reasonable. Although respondent was required in performing respondent's bank deposits analysis for each of those years to take into account any nontaxable source or deductible expense of which respondent had knowledge, Clayton v. Commissioner, 102 T.C. at 645-646; DiLeo v. Commissioner, 96 T.C. at 868, petitioner was generally uncooperative during the course of the examination of the joint

returns for the years at issue in that, inter alia, he provided respondent with relatively little documentation and other information. In this connection, after Ms. Martin completed the 1991-1992 deposits analysis, she mailed a copy of it to Mr. Sutton along with another written request for documents and a written request that petitioner and Ms. Brodsky identify any item listed in that analysis which they believed to be nontaxable and provide her with records to verify the source of any such item. Ms. Martin did not receive any response to those requests. Thereafter, Ms. Martin unsuccessfully attempted to meet with petitioner and Ms. Brodsky, and Ms. Martin was forced to issue summonses to them in order to compel them to meet with her. After rescheduling the date of the meeting stated in respondent's summonses in order to accommodate petitioner, Ms. Martin met with petitioner and Ms. Brodsky on November 29, 1995. Although petitioner and Ms. Brodsky made certain statements at that meeting regarding the sources of certain deposits that were made into one or more of their accounts during 1991 and 1992, they did not provide any documentation to corroborate those statements. After the November 1995 conference, Ms. Martin asked petitioner and Ms. Brodsky to provide her with documentation to corroborate the statements that they had made at that conference regarding the sources of certain deposits that were made into one or more of their accounts during 1991 and 1992. Ms. Martin received no documents in response to that request. Thereafter, Ms. Martin scheduled several more conferences with petitioner and Ms. Brodsky, all of

which they canceled. Mr. Oliveras[30] asked the representative of petitioner and Ms. Brodsky with respect to respondent's examination of their 1993 joint return whether there were any nontaxable sources for any of the deposits reflected in the deposits analysis prepared by respondent with respect to 1993. Although that representative suggested to Mr. Oliveras that there might be certain nontaxable items, that representative did not specify which 1993 deposits are nontaxable, nor did such representative provide Mr. Oliveras with any documentation or other information showing that certain of such deposits are not taxable.

As described in the Court's Order dated December 30, 1999, petitioner remained generally uncooperative in working with respondent in the stipulation process in preparing this case for the scheduled trial on October 19, 1999. It was not until the Court intervened at the request of respondent's counsel that petitioner finally participated in the stipulation process with respondent's counsel on October 13, 1999. After the trial in this case took place and after petitioner filed in mid-December 1999 a motion to open the record and a motion for leave to allow offer of proof, petitioner provided certain documentation and information to respondent that he had not previously provided, which enabled respondent to conclude that certain deposits into petitioner's accounts that remained at issue, including certain payments against the balances due on petitioner's credit ac-

---

[30]Mr. Oliveras completed respondent's examination of the 1993 joint return of petitioner and Ms. Brodsky after Ms. Martin had commenced and worked on that examination.

counts, are not taxable.

On the record before us, we reject petitioner's contention that respondent's bank deposits analysis for each of the years at issue is inherently flawed.

We turn now to the specific deposits that remain at issue for each of the years 1991, 1992, and 1993, including any payments against the balances due on petitioner's credit accounts that remain at issue for each of those years.[31]  Petitioner contends that each of the deposits at issue is not taxable because each such deposit constitutes one of the following: (1) Personal loan; (2) business loan to UVW; (3) reimbursement for certain expenses; (4) advance to purchase a personal item for an acquaintance; (5) rental payment attributable to Konstantin Reingatch (Mr. Reingatch); (6) income of, loan to, or reimbursement with respect to MZ Trading; or (7) repayment of a loan.

Alleged Personal Loans

Petitioner contends that, of the following total deposits, including total payments against the balance due on petitioner's equity line account, the amounts set forth below represented personal loans to him:

---

[31]Petitioner did not raise as an issue in petitioner's further trial memorandum, presented no evidence at trial and at further trial, and makes no argument on brief as to certain amounts of unreported income determined for 1991 and 1993 that petitioner placed in dispute in the petition and that respondent has not conceded.  We conclude that petitioner has abandoned contesting those amounts of unreported income.  See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).

| Date of Deposit | Account | Total Deposit | Amount of Alleged Loan | Alleged Lender |
|---|---|---|---|---|
| 2/12/91 | Petitioner's UVW account | $14,195 | $10,000 | Mr. Dubrovsky and Ms. Dubrovsky |
| 4/30/92 | Petitioner's equity line account | 15,000 | 15,000 | Mr. Ferrer |
| 6/26/92 | Petitioner's equity line account | 7,000 | 7,000 | Amuke Business Association |
| 8/28/92 | Petitioner's UVW account | 15,896 | 3,000 | Mr. Averbach |
| 12/15/92 | Petitioner's equity line account | 20,000 | 20,000 | Mr. Syelsky |
| 5/25/93 | Petitioner's equity line account | 30,000 | 30,000 | Roman Kirdan |

With respect to the February 12, 1991 deposit in question of $14,195, petitioner contends that $10,000 of that deposit, which we have found was derived from a $10,000 check from Mr. Dubrovsky and Ms. Dubrovsky,[32] represented a personal loan to him. In support of that contention, petitioner relies on his self-serving testimony, Mr. Dubrovsky's testimony, and certain checks from petitioner to Mr. Dubrovsky that petitioner contends represented repayments of the alleged $10,000 loan.[33] Based on the Court's evaluation of the testimony of petitioner and of Mr. Dubrovsky, we are not required to, and we shall not, rely on their testimony regarding the February 12, 1991 deposit in question. See Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159;

---

[32]Although petitioner claims that the $10,000 check in question was from Mr. Dubrovsky, the record shows that the payors of that check were Mr. Dubrovsky and Ms. Dubrovsky.

[33]We note that the various checks that petitioner contends represented repayments of the alleged $10,000 loan total $9,525.

Tokarski v. Commissioner, 87 T.C. at 77.[34]  As for the checks

that petitioner claims represented repayments by him to Mr.

Dubrovsky of the alleged $10,000 loan, on the instant record, we

find that petitioner has failed to carry his burden of showing

the purpose of those checks.[35]  On the record before us, we find

that petitioner has failed to carry his burden of establishing

that $10,000 of the February 12, 1991 deposit in question repre-

sented a personal loan from Mr. Dubrovsky.

With respect to the April 30, 1992 deposit at issue of

$15,000, petitioner contends that that deposit, which we have

found was derived from a $15,000 cashier's check issued by Great

Western Bank, represented a personal loan from Mr. Ferrer.  In

support of his contention that Mr. Ferrer's funds were used to

purchase that cashier's check, petitioner relies on his self-

serving testimony, on which we are not required to, and we shall

---

[34]The principle that we are not required to rely on testi-
mony, even if uncontradicted, that we find to be, inter alia, not
credible, questionable, unreasonable, general, and/or vague is so
well established that hereinafter we shall not cite the case law
supporting that principle.

[35]Petitioner could have issued those checks, which total
$9,525, to Mr. Dubrovsky for purposes other than as repayments of
the alleged $10,000 loan.  In this connection, petitioner failed
to offer into evidence any credible documentary evidence to
establish that $10,000 of the Feb. 12, 1991 deposit in question
represented a personal loan from Mr. Dubrovsky and Ms. Dubrovsky
and that the checks from petitioner to Mr. Dubrovsky on which
petitioner relies represented repayments of the alleged $10,000
loan.  We infer from petitioner's failure to proffer any such
documentary evidence that any such evidence does not exist and
that, if any such evidence does exist, it would not have substan-
tiated petitioner's position with respect to $10,000 of the Feb.
12, 1991 deposit in question.

not, rely.[36]  On the record before us, we find that petitioner has failed to carry his burden of establishing that the April 30, 1992 deposit at issue represented a personal loan from Mr. Ferrer.

With respect to the June 26, 1992 deposit at issue of $7,000, petitioner contends that that deposit, which we have found was derived from two checks from Amuke Business Association totaling $7,000, represented a personal loan from Amuke Business

---

[36]Assuming arguendo that petitioner had established that Mr. Ferrer's funds were used to purchase the $15,000 Great Western Bank cashier's check in question, on the instant record, we find that petitioner has failed to carry his burden of showing that that cashier's check represented a loan to petitioner from Mr. Ferrer.  To support his contention that that check represented a loan, petitioner relies on his self-serving testimony and the testimony of Mr. Vulis.  We are not required to, and we shall not, rely on petitioner's testimony.  Although Mr. Vulis testified that Mr. Ferrer made a $15,000 loan to petitioner and although we found Mr. Vulis to be credible on that point, his testimony does not establish the date of that loan, nor does his testimony show that the $15,000 Great Western Bank cashier's check that was used to make the Apr. 30, 1992 deposit at issue represented the loan from Mr. Ferrer to which Mr. Vulis was referring in his testimony.  As stated above, the only evidence in the record as to whether that deposit was made with the proceeds of a $15,000 loan from Mr. Ferrer is petitioner's self-serving testimony, on which we are not required to, and we shall not, rely.  We note that petitioner did not call Mr. Ferrer as a witness and did not offer into evidence any credible documentary evidence regarding the alleged loan from Mr. Ferrer.  We infer from petitioner's failure to call Mr. Ferrer that Mr. Ferrer's testimony would not have been favorable to petitioner's contention that the $15,000 Great Western Bank cashier's check that was used to make the Apr. 30, 1992 deposit at issue represented a loan from Mr. Ferrer.  We infer from petitioner's failure to proffer any credible documentary evidence regarding the alleged $15,000 loan from Mr. Ferrer that any such evidence does not exist and that, if any such evidence does exist, it would not have substantiated petitioner's position regarding that alleged loan.

Association that he later repaid.  In support of that contention, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely.[37]  On the record before us, we find that petitioner has failed to carry his burden of establishing that the June 26, 1992 deposit at issue represented a personal loan from Amuke Business Association.

With respect to the August 28, 1992 deposit at issue of $15,896, petitioner contends that $3,000 of that deposit, which we have found was derived from a $3,000 check from Commonwealth Enterprises dated August 27, 1992, represented a personal loan from Mr. Averbach who, along with Mr. Ferrer, participated with Mr. Vulis in operating Amuke Group.  In support of that contention, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely.[38]  On the record

---

[37]We note that, when questioned about the two checks totaling $7,000 from Amuke Business Association to petitioner, Mr. Vulis, who at all relevant times was familiar with the activities of that association, was unable to recall the purpose for which Amuke Business Association issued those checks.

Petitioner failed to offer into evidence any credible documentary evidence regarding the alleged $7,000 loan from Amuke Business Association.  We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if any such evidence does exist, it would not have substantiated petitioner's position regarding that alleged loan.

[38]We note that petitioner did not call Mr. Averbach as a witness and did not elicit any testimony from Mr. Vulis, who at all relevant times was associated with Commonwealth Enterprises, with respect to the purpose for which Commonwealth Enterprises issued the $3,000 check to petitioner.  Nor did petitioner offer into evidence any credible documentary evidence regarding the
(continued...)

before us, we find that petitioner has failed to carry his burden of establishing that $3,000 of the August 28, 1992 deposit at issue represented a personal loan from Mr. Averbach.

With respect to the December 15, 1992 deposit at issue of $20,000, petitioner contends that that deposit, which we have found was derived from a $20,000 check from Mr. Syelsky, represented a personal loan from Mr. Syelsky.[39]  In support of that contention, petitioner relies on his self-serving testimony and Mr. Syelsky's testimony.  We are not required to, and we shall not, rely on petitioner's testimony.  Mr. Syelsky testified that he lent $20,000 to petitioner.  Although Mr. Syelsky was unable to remember whether he had made that loan to petitioner in 1991

---

[38](...continued)
alleged $3,000 loan from Mr. Averbach.  We infer from petitioner's failure to call Mr. Averbach and to elicit any such testimony from Mr. Vulis that their testimony would not have been favorable to petitioner's position with respect to that alleged loan.  We infer from petitioner's failure to proffer any credible documentary evidence regarding the alleged $3,000 loan from Mr. Averbach that any such evidence does not exist and that, if any such evidence does exist, it would not have substantiated petitioner's position regarding the alleged $3,000 loan from Mr. Averbach.

[39]On brief, respondent raises a question as to how Mr. Syelsky could have issued a $20,000 check to petitioner in December 1992, since during that month Mr. Syelsky was involved in bankruptcy proceedings that he had commenced earlier during 1992 and had represented to the Bankruptcy Court on Sept. 15, 1992, that he had only $100 in assets.  However, the parties stipulated that Mr. Syelsky gave petitioner his $20,000 check that was used to make the Dec. 15, 1992 deposit at issue.  To the extent that respondent is arguing that we should disregard that stipulation, we decline to do so because we do not find it to be clearly contrary to the facts that we have found are established by the record.  See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. at 195.

or 1992, he testified that the only transactions in which he had engaged with petitioner consisted of a $20,000 loan and a $30,000 advance. Moreover, as discussed supra note 39, the parties stipulated that Mr. Syelsky gave petitioner his $20,000 check that was used to make the December 15, 1992 deposit at issue. Based on Mr. Syelsky's testimony with respect to a $20,000 loan to petitioner, which we found to be credible, and that stipulation, we are persuaded that Mr. Syelsky lent $20,000 to petitioner that was used to make the December 15, 1992 deposit at issue. On the record before us, we find that the December 15, 1992 deposit at issue represented a personal loan from Mr. Syelsky.

With respect to the May 25, 1993 deposit at issue consisting of a $30,000 cash payment against the balance due on petitioner's equity line account, petitioner contends that that deposit represented a personal loan from Roman Kirdan (Mr. Kirdan)[40] for the purchase of electronic equipment such as TVs and VCRs. Petitioner also contends inconsistently that the $30,000 used to

---

[40]Petitioner contends that the source of the May 25, 1993 deposit at issue was Mr. Kirdan, who petitioner claims operated East-West at all relevant times and who used that business' bank account to withdraw the funds used in making that deposit. However, the parties stipulated, and we have found, that on May 25, 1993, petitioner deposited $30,000 into petitioner's equity line account as a payment against the balance due on that account and that the sources of that payment were East-West and Mr. Guterman. To the extent that petitioner is arguing that we should disregard that stipulation, we decline to do so because we do not find it to be clearly contrary to the facts that we have found are established by the record. See Cal-Maine Foods, Inc. v. Commissioner, supra at 195.

make the May 25, 1993 deposit at issue was from East-West and that those funds represented a gross receipt of MZ Trading. In support of his contentions, petitioner relies on his self-serving testimony and Mr. Guterman's testimony. We are not required to, and we shall not, rely on petitioner's testimony regarding the May 25, 1993 deposit at issue.[41] Based on the Court's evaluation of Mr. Guterman's testimony, we are not required to, and we shall not, rely on his testimony with respect to that deposit. On the record before us, we find that petitioner has failed to carry his burden of establishing that the May 25, 1993 deposit at issue represented either a personal loan from Mr. Kirdan or a gross receipt of MZ Trading that it reported in its Form 1065 for 1993.

Alleged Business Loans to UVW

Petitioner contends that, of the following total deposits, including total payments against the balance due on petitioner's equity line account, and total cash that he received in connection with three of those deposits, the amounts set forth below represented business loans to him:

---

[41]Petitioner failed to call Mr. Kirdan as a witness. We infer from petitioner's failure to call Mr. Kirdan that his testimony would not have been favorable to petitioner's position regarding the May 25, 1993 deposit at issue. Petitioner also failed to offer into evidence any credible documentary evidence to establish that the May 25, 1993 deposit represented either a personal loan to petitioner from Mr. Kirdan to purchase electronic equipment or a gross receipt of MZ Trading. We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if it does exist, it would not have substantiated either of petitioner's inconsistent positions with respect to that deposit.

| Date of Deposit | Account | Total Deposit | Amount of Cash Received | Amount of Alleged Loan | Alleged Lender |
|---|---|---|---|---|---|
| 3/23/92 | Petitioner's UVW account | $50,000 | --- | $50,000 | Mr. Kroma |
| 5/12/92 | Petitioner's equity line account | 36,000 | --- | 31,167.50 | Amuke Business Association |
| 6/30/92 | Petitioner's equity line account | 26,000 | $250 | 26,250 | Amuke Business Association |
| 8/7/92 | Petitioner's UVW account | 7,720 | 150 | 7,870 | Amuke organizations |
| 9/11/92[1] | Petitioner's UVW account | 3,850 | --- | 3,850 | Mr. Vulis |
| 9/23/92 | Petitioner's equity line account | 30,000 | [2]375 | 30,375 | Amuke organizations |
| 12/15/92 | Petitioner's UVW account | 30,100 | --- | 30,000 | Mr. Syelsky |
| 12/16/92 | Petitioner's UVW account | 10,500 | --- | 10,500 | Commonwealth Enterprises |
| 1/14/93 | Petitioner's equity line account | 5,000 | --- | 5,000 | Amuke organizations |

[1]Petitioner contends that the date on which the $3,850 check was deposited into petitioner's UVW account was Sept. 1, 1992. However, the record shows that a $3,850 check from Commonwealth Enterprises was deposited into petitioner's UVW account on Sept. 11, 1992, and not on Sept. 1, 1992. We presume that petitioner's reference to Sept. 1, 1992, was unintentional.

[2]Although the record does not establish that the difference between the amount of the alleged loan claimed by petitioner ($30,375) and the amount of the Sept. 23, 1992 payment against the balance due on petitioner's equity line account ($30,000) was cash received by petitioner, petitioner appears to take that position, and respondent does not dispute it.

Petitioner also contends that a $15,000 cashier's check payable to him that was issued by Home Savings of America and that he cashed on December 4, 1991, represented a business loan from Mr. Reingatch.

With respect to the March 23, 1992 deposit at issue of $50,000, petitioner contends that that deposit, which we have found was derived from a $50,000 check from Mr. Kroma, repre-

sented a business loan from Mr. Kroma.  In support of that contention, petitioner relies on (1) his self-serving testimony, (2) a copy of the front side of the purchaser's copy of a $20,000 Bank of America cashier's check dated June 30, 1992, that petitioner purchased and that was payable to Mr. Kroma, which petitioner claims was a repayment of the alleged $50,000 loan, and (3) a copy of the front side of a $1,250 check dated July 13, 1992, that was payable to Mr. Kroma, which petitioner contends was a payment of 2 months' interest on that alleged loan.  We are not required to, and we shall not, rely on petitioner's testimony regarding the alleged $50,000 loan from Mr. Kroma.  Moreover, on the instant record, we are not satisfied that Mr. Kroma[42] received the proceeds of the $20,000 Bank of America cashier's check dated June 30, 1992, and the $1,250 check dated July 13, 1992.[43]  That is because the record contains only the front sides

---

[42]We note that petitioner did not call Mr. Kroma as a witness with respect to the Mar. 23, 1992 deposit at issue.  We infer from petitioner's failure to call Mr. Kroma that Mr. Kroma's testimony would not have been favorable to petitioner's position with respect to that deposit.  We also note that petitioner did not offer into evidence any credible documentary evidence regarding the Mar. 23, 1992 deposit at issue.  We infer from petitioner's failure to offer any such documentary evidence that any such evidence does not exist and that, if any such evidence does exist, it would not have substantiated petitioner's position with respect to the alleged loan from Mr. Kroma.

[43]Assuming arguendo that petitioner had established that Mr. Kroma received the proceeds of the $20,000 Bank of America cashier's check dated June 30, 1992, and the $1,250 check dated July 13, 1992, on the instant record, we find that petitioner has failed to carry his burden of showing that the proceeds of those two checks constituted a repayment of the alleged $50,000 loan in question and 2 months' interest on that alleged loan, respec-
(continued...)

of those checks.[44]  On the record before us, we find that petitioner has failed to carry his burden of establishing that the March 23, 1992 deposit represented a business loan from Mr. Kroma.

With respect to the May 12, 1992 deposit in question of $36,000, petitioner contends that $31,167.50 of that deposit, which we have found was derived from Amuke Business Association, represented a business loan from that association.  Petitioner failed to raise as an issue in petitioner's further trial memorandum that $31,167.50 of the May 12, 1992 deposit in question represented a business loan from Amuke Business Association.  Accordingly, pursuant to the Court's March 31, 2000 Order, we shall not address that matter.[45]

_____

[43](...continued)
tively.  See our discussion supra note 42.

[44]For example, Mr. Kroma could have endorsed both the $20,000 cashier's check and the $1,250 check to petitioner, who in turn deposited and/or cashed them.  In this connection, the record shows that on Apr. 28, 1992, petitioner deposited into one of petitioner's accounts a Bank of America cashier's check for $12,000 that was payable to Marcel Feldberg.

[45]Assuming arguendo that petitioner's further trial memorandum had raised as an issue that $31,167.50 of the May 12, 1992 deposit in question represented a business loan from Amuke Business Association, on the instant record, we find that petitioner has failed to carry his burden of establishing that that amount did in fact represent such a loan.  On that record, we have found that the May 12, 1992 deposit was made with a $36,000 Bank of America cashier's check payable to Star Electronics that petitioner purchased with, inter alia, a $31,167.50 check dated May 11, 1992, from Amuke Business Association.  According to petitioner, the $31,167.50 check represented a business loan that Amuke Business Association made to him for the purchase of certain jewelry from Star Electronics, but that purchase did not
(continued...)

With respect to the June 30, 1992 transaction at issue
consisting of a $26,000 deposit and $250 in cash that petitioner
received, petitioner contends that that deposit and that cash,
which we have found were derived from a $26,250 check from Amuke
Business Association, represented a business loan from that
association with respect to his purchase of certain cigarette
lighters on July 20, 1992, when he tendered $16,000 to Carvey's
Discount. In support of that contention, petitioner relies on
(1) his self-serving testimony, (2) a document entitled "COMMER-

---

[45](...continued)
occur, and he repaid Amuke Business Association $31,167.50 as
evidenced by a check dated May 19, 1992. To support petitioner's
contentions, petitioner relies on his self-serving testimony and
on an entry in a statement for petitioner's equity line account,
which shows that on May 19, 1992, a check for $31,167.50 was
drawn on that account (May 19, 1992 withdrawal). We are not
required to, and we shall not, rely on petitioner's testimony
regarding the May 12, 1992 deposit in question. On the instant
record, we find that petitioner has failed to carry his burden of
showing that Amuke Business Association received the May 19, 1992
withdrawal that is reflected in a statement for petitioner's
equity line account. Even if petitioner had made such a showing,
we find on the record before us that petitioner has failed to
carry his burden of establishing that that withdrawal represented
a repayment to Amuke Business Association of a business loan that
it had made to petitioner. We note that petitioner did not
elicit any testimony from Mr. Vulis regarding petitioner's
contention that Amuke Business Association made a $31,167.50
business loan to petitioner on May 11, 1992. We infer from
petitioner's failure to elicit any such testimony with respect to
the alleged business loan that any such testimony would not have
been favorable to petitioner's position regarding that alleged
loan. We also note that petitioner did not offer into evidence
any credible documentary evidence supporting his position that
$31,167.50 of the May 12, 1992 deposit in question represented a
business loan from Amuke Business Association. We infer from
petitioner's failure to proffer any such documentary evidence
that any such evidence does not exist and that, if any such
evidence does exist, it would not have substantiated petitioner's
position regarding that alleged loan.

CIAL INVOICE" dated July 11, 1992, that shows "AMUKE Group of Companies" under the heading "Importer/Exporter" and the sale of, inter alia, 12,144 "Lighters" for $24,288, and (3) a copy of the front side of the purchaser's copy of a $16,000 Bank of America cashier's check dated July 20, 1992, that was payable to Carvis Discount. We are not required to, and we shall not, rely on the testimony of petitioner regarding the alleged $26,250 business loan.[46] Moreover, we find that the document entitled "COMMERCIAL INVOICE" does not show (1) that petitioner (or UVW) was involved in the purchase of the lighters reflected in that document and (2) that Amuke Business Association lent money to petitioner to purchase such lighters. Nor do we find that the copy of the front side of the purchaser's copy of the $16,000 Bank of America cashier's check dated July 20, 1992, that was payable to Carvis Discount,[47] establishes petitioner's position with respect to the

[46]We note that Mr. Vulis testified that he had no recollection of the purpose of the $26,250 check from Amuke Business Association to petitioner. We also note that petitioner did not offer into evidence any credible documentary evidence showing that the $26,250 check from Amuke Business Association represented a business loan from that association. We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if any such evidence does exist, it would not have substantiated petitioner's position with respect to that alleged loan.

[47]We are not satisfied from that copy, inter alia, that Carvis Discount deposited and/or cashed the $16,000 Bank of America cashier's check payable to it dated July 20, 1992. For example, Carvis Discount could have endorsed that cashier's check to petitioner, who in turn deposited and/or cashed it. In this regard, as noted above, the record shows that on Apr. 28, 1992, petitioner deposited into petitioner's UVW account a $12,000 Bank of America cashier's check that was payable to Marcel Feldberg.
(continued...)

alleged $26,250 business loan from Amuke Business Association.
On the record before us, we find that petitioner has failed to
carry his burden of establishing that the June 30, 1992 transac-
tion at issue represented a business loan from Amuke Business
Association.

With respect to the August 7, 1992 transaction at issue
consisting of a $7,720 deposit and $150 in cash that petitioner
received, petitioner contends that that deposit and that cash,
which we have found were derived from a $7,870 check from Amuke
Group, represented a business loan from that organization for the
purchase of certain candy.  In support of that contention,
petitioner relies on his self-serving testimony, on which we are
not required to, and we shall not, rely.[48]  On the record before

_____

[47](...continued)
Assuming arguendo that the record had established that
Carvis Discount deposited and/or cashed the $16,000 Bank of
America cashier's check payable to it, on that record, we find
that petitioner has failed to carry his burden of establishing
that Carvis Discount received the proceeds of that check in
connection with the purchase of certain cigarette lighters with
respect to which Amuke Business Association allegedly lent
petitioner $26,250.

[48]We note that petitioner failed to elicit from Mr. Vulis,
who at all relevant times was involved in the operations of Amuke
Group, any testimony with respect to the alleged $7,870 loan from
Amuke Group.  We infer from petitioner's failure to elicit any
such testimony that any such testimony would not have been
favorable to petitioner's position regarding that alleged loan.
We also note that petitioner did not offer into evidence any
credible documentary evidence supporting his position regarding
the alleged $7,870 loan from Amuke Group.  We infer from peti-
tioner's failure to proffer any such documentary evidence that
any such documentary evidence does not exist and that, if any
such evidence does exist, it would not have substantiated peti-
tioner's position with respect to that alleged loan.

us, we find that petitioner has failed to carry his burden of establishing that the August 7, 1992 transaction at issue represented a business loan from Amuke Group.

With respect to the September 11, 1992 deposit at issue of $3,850, petitioner contends that that deposit, which we have found was derived from a $3,850 check from Commonwealth Enterprises, represented a business loan from Mr. Vulis. In support of that contention, petitioner relies on Mr. Vulis' general and conclusory testimony regarding the general business practice between Commonwealth Enterprises and petitioner, namely, generally Commonwealth Enterprises advanced petitioner the funds needed for petitioner to purchase merchandise that he had located on its behalf and that it wanted to acquire for resale. We are not persuaded by that testimony of Mr. Vulis on which petitioner relies that the $3,850 check from Commonwealth Enterprises represented a business loan from Mr. Vulis.[49] On the record before us, we find that petitioner has failed to establish that the September 11, 1992 deposit at issue represented a business loan from Commonwealth Enterprises.

---

[49]We note that petitioner failed to question Mr. Vulis specifically with respect to the alleged $3,850 loan at issue. We infer from petitioner's failure to elicit any such testimony that any such testimony would not have been favorable to petitioner's position regarding that alleged loan. We also note that petitioner failed to introduce any credible documentary evidence showing that the $3,850 check from Commonwealth Enterprises represented a business loan from Mr. Vulis. We infer from petitioner's failure to offer any such documentary evidence that any such documentary evidence does not exist and that, if any such evidence does exist, it would not have substantiated petitioner's position with respect to that alleged loan.

With respect to the September 23, 1992 transaction at issue consisting of a $30,000 deposit and $375 in cash that petitioner received, petitioner contends that that deposit and that cash, which we have found were derived from a $30,375 check from Amuke Group, represented a business loan from that organization for the purchase of certain water filters. In support of that contention, petitioner relies on the testimony of Mr. Vulis. Mr. Vulis identified the $30,375 check from Amuke Group and testified that that check represented a loan to petitioner for the purchase of water filters. We found that testimony of Mr. Vulis to be credible. On the record before us, we find that petitioner has satisfied his burden of showing that the September 23, 1992 transaction at issue represented a business loan from Amuke Group.

With respect to the December 15, 1992 deposit in question of $30,100, petitioner contends that $30,000 of that deposit, which we have found was derived from a $30,000 check from Mr. Syelsky, represented a business loan from Mr. Syelsky. In support of that contention, petitioner relies on his self-serving testimony and the testimony of Mr. Syelsky and of Mr. Vulis. We are not required to, and we shall not, rely on petitioner's testimony regarding the $30,000 alleged loan. Mr. Syelsky testified that the $30,000 check that he issued to petitioner constituted a business loan, which Mr. Vulis guarantied and the proceeds of which petitioner was to use to purchase certain candy on behalf of Mr. Syelsky. Mr. Syelsky further testified that, after he

issued the $30,000 check to petitioner, he canceled his order for the candy in question and requested petitioner to repay the $30,000 loan.  According to Mr. Syelsky, because petitioner did not have the money with which to repay that loan, Mr. Vulis repaid it pursuant to Mr. Vulis' guaranty of that loan.  Mr. Vulis confirmed during his testimony at the further trial that he paid $30,000 to Mr. Syelsky on petitioner's behalf.  We found the testimony of Mr. Syelsky and of Mr. Vulis with respect to the alleged $30,000 business loan from Mr. Syelsky to petitioner to be credible.  On the record before us, we find that the petitioner has satisfied his burden of establishing that $30,000 of the December 15, 1992 deposit in question represented a business loan from Mr. Syelsky.

With respect to the December 16, 1992 deposit at issue of $10,500, petitioner contends that that deposit, which we have found was derived from a $10,500 check from Commonwealth Enterprises, represented a business loan from Commonwealth Enterprises for the purchase of certain unspecified merchandise.  In support of that contention, petitioner relies on the general and conclusory testimony of Mr. Vulis with respect to the general business practice of Commonwealth Enterprises and petitioner, namely, generally Commonwealth Enterprises advanced petitioner the funds needed for petitioner to purchase merchandise that he had located on its behalf and that it wanted to acquire for resale.  We are not persuaded by that testimony of Mr. Vulis on which petitioner relies that the $10,500 check from Commonwealth

Enterprises represented a business loan from Commonwealth Enter-
prises.[50]  On the record before us, we find that petitioner has
failed to carry his burden of establishing that the December 16,
1992 deposit at issue represented a business loan from Common-
wealth Enterprises.

With respect to the January 14, 1993 deposit of $5,000,
petitioner contends that that deposit, which we have found was
derived from a $5,000 check from Amuke Group, represented a
business loan from Amuke Group for the purchase of certain
cordless telephones.  Petitioner failed to raise as an issue in
petitioner's further trial memorandum that the January 14, 1993
deposit in question represented a business loan from Amuke Group.
Accordingly, pursuant to the Court's March 31, 2000 Order, we
shall not address that matter.[51]

_____

[50]We note that petitioner failed to question Mr. Vulis
specifically with respect to the alleged $10,500 loan at issue.
We infer from petitioner's failure to elicit any such testimony
that any such testimony would not have been favorable to peti-
tioner's position regarding that alleged loan.  We also note that
petitioner failed to offer into evidence any credible documentary
evidence showing that the $10,500 from Commonwealth Enterprises
represented a business loan from that company.  We infer from
petitioner's failure to proffer any such documentary evidence
that any such documentary evidence does not exist and that, if
any such evidence does exist, it would not have substantiated
petitioner's position with respect to that alleged loan.

[51]Assuming arguendo that petitioner's further trial memoran-
dum had raised as an issue that the Jan. 14, 1993 deposit repre-
sented a business loan from Amuke Group, we find on the record
before us that petitioner has failed to establish that that
deposit constituted a business loan from that organization.  To
support his position on that matter, petitioner relies on his
self-serving testimony, on which we are not required to, and we
shall not, rely.  We note that petitioner did not elicit any
                                        (continued...)

With respect to the $15,000 cashier's check issued by Home Savings of America cashed by petitioner on December 4, 1991, petitioner contends that that check represented a business loan from Mr. Reingatch.[52]  In support of that contention, petitioner relies on his self-serving testimony and three checks in the respective amounts of $7,500, $5,000, and $1,742, which he issued to Mr. Reingatch and which he contends represented repayments of the alleged $15,000 business loan from Mr. Reingatch.  We are not required to, and we shall not, rely on petitioner's testimony regarding the $15,000 cashier's check in question.  On the instant record, we are not persuaded that Mr. Reingatch provided the funds used to purchase that cashier's check and that the three checks from petitioner to Mr. Reingatch, which total $14,242, represented repayments of the alleged $15,000 business loan from Mr. Reingatch.[53]  On the record before us, we find that

---

[51](...continued)
testimony from Mr. Vulis regarding the $5,000 check from that organization that petitioner contends represented a business loan from it.  We infer from petitioner's failure to elicit any such testimony that any such testimony would not have been favorable to petitioner's position with respect to that alleged business loan.  We also note that petitioner did not offer into evidence any credible documentary evidence establishing that the Jan. 14, 1994 deposit of $5,000 represented a business loan from Amuke Group.  We infer from petitioner's failure to proffer any such documentary evidence that any such documentary evidence does not exist and that, if any such documentary evidence did exist, it would not have substantiated petitioner's position with respect to that alleged loan.

[52]According to petitioner, Mr. Reingatch was deceased as of the time of the further trial in this case.

[53]Petitioner could have issued the three checks to Mr.
(continued...)

petitioner has failed to satisfy his burden of establishing that the $15,000 cashier's check issued by Home Savings of America and payable to him represented a business loan from Mr. Reingatch.

Alleged Reimbursements

Petitioner contends that during 1993 $27,474 of the deposits into petitioner's accounts, including payments against the balances due on petitioner's credit accounts and cash received in connection with certain of those deposits, represented reimbursements from MZ Trading for certain expenses that he had paid on its behalf. According to petitioner, $25,362 of the $27,474 at issue related to 15 checks from MZ Trading,[54] and the balance of that total amount at issue ($2,112) related to five checks from Mr. Guterman.[55]

---

[53](...continued)
Reingatch for purposes other than as repayments of a loan. In this connection, petitioner failed to offer into evidence any credible documentary evidence, such as a promissory note, showing that the $15,000 cashier's check issued by Home Savings of America and payable to petitioner represented a business loan from Mr. Reingatch. We infer from petitioner's failure to proffer any such evidence that any such documentary evidence does not exist and that, if it does exist, it would not have substantiated petitioner's position regarding that check.

[54]With respect to the 15 checks from MZ Trading totaling $25,362, petitioner contends in the alternative that those checks represented nontaxable returns of his capital in MZ Trading. On the instant record, we find that petitioner has failed to carry his burden of showing that MZ Trading issued those checks to him as returns of his capital therein. Nor has petitioner established on the record before us his adjusted basis in his partnership interest in MZ Trading immediately before he received each of those checks. See sec. 731(a)(1).

[55]Petitioner failed to offer into evidence any credible documentary evidence supporting his position with respect to the
(continued...)

With respect to the checks totaling the $27,474 at issue, the only evidence in the record about the purpose of any of those checks is petitioner's self-serving testimony as to 14 of them and Mr. Guterman's testimony as to 1 of those 14 checks. We are not required to, and we shall not, rely on their testimony regarding those checks.[56] On the record before us, we find that petitioner has failed to carry his burden of establishing that during 1993 $27,474 of the deposits into petitioner's accounts, including payments against the balances due on petitioner's credit accounts and cash received in connection with certain of those deposits, represented reimbursements from MZ Trading for certain expenses that he had paid on its behalf.

Alleged Advances To Purchase Personal Items

Petitioner contends that the individuals shown below advanced him the following amounts that were part of the following deposits, including the payment against the balance due on

---

[55](...continued)
$27,474 at issue. We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if it does exist, it would not have substantiated petitioner's position with respect to those deposits.

[56]With respect to the five checks from Mr. Guterman totaling $2,112, petitioner testified that he never purchased anything for Mr. Guterman. We presume that petitioner wants us to infer from that testimony that the $2,112 in checks that he received during 1993 from Mr. Guterman represented reimbursements by Mr. Guterman for certain expenses that petitioner had paid on behalf of MZ Trading. Even if we had believed petitioner's testimony that he never purchased anything for Mr. Guterman, we would not draw any such inference from any such testimony. In any event, we are not required to, and we shall not, rely on petitioner's testimony that he never purchased anything for Mr. Guterman.

petitioner's equity line account shown below:

| Date of Deposit | Account | Total Deposit | Amount of Alleged Advance | Alleged Payor of Alleged Advance |
| --- | --- | --- | --- | --- |
| 3/11/91 | Petitioner's UVW account | $2,515 | $975 | Mr. Dubrovsky |
| 3/19/91 | Petitioner's equity line account | 20,119 | 119 | Mr. Reingatch |
| 8/22/91 | Petitioner's UVW account | 2,734 | 1,224 | Mr. Dubrovsky |

With respect to the March 11, 1991 deposit of $2,515, petitioner contends that $975 of that deposit, which we have found was derived from a $975 money order from Mr. Dubrovsky, represented an advance from Mr. Dubrovsky for the purchase at cost of a facsimile machine for Mr. Dubrovsky. In support of that contention, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely.[57] On the record before us, we find that petitioner has failed to carry his burden of establishing that $975 of the March 11, 1991 deposit represented an advance from Mr. Dubrovsky for the purchase of a facsimile machine on Mr. Dubrovsky's behalf.

With respect to the March 19, 1991 deposit of $20,119, petitioner contends that $119 of that deposit represented an advance from Mr. Reingatch for the purchase at cost of a walkman

---

[57]We note that the record does not establish through credible documentary evidence that petitioner purchased a facsimile machine for Mr. Dubrovsky. Furthermore, petitioner did not question Mr. Dubrovsky about whether Mr. Dubrovsky had advanced $975 to petitioner for the purchase of a facsimile machine. We infer from petitioner's failure to do so that any such testimony would not have been favorable to petitioner's position regarding that alleged advance. In any event, we would not have been required to rely on any of Mr. Dubrovsky's testimony with respect to the alleged $975 advance in question.

for Mr. Reingatch's daughter.  In support of that contention, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely.[58]  On the record before us, we find that petitioner has failed to satisfy his burden of establishing that $119 of the March 19, 1991 deposit represented an advance from Mr. Reingatch for the purchase of a walkman for Mr. Reingatch's daughter.

With respect to the August 22, 1991 deposit of $2,734, petitioner contends that $1,224 of that deposit, which we have found was derived from a $1,224 check from S&J Co., represented an advance from Mr. Dubrovsky for the purchase at cost of a television for Mr. Dubrovsky.[59]  In support of that contention, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely.  On the record before

---

[58]The record contains no credible documentary evidence showing that any portion of the Mar. 19, 1991 deposit of $20,119 was made with funds received from Mr. Reingatch or that petitioner purchased a walkman for Mr. Reingatch's daughter.  We infer that no such documentary evidence exists and that, if any such evidence does exist, it would not have substantiated petitioner's claims regarding the alleged $119 advance in question.

[59]Although the record establishes that, during 1986 and as of the time of the further trial in this case, Mr. Dubrovsky was a part owner of S&J Co., the record does not disclose whether Mr. Dubrovsky owned any part of that company on Aug. 22, 1991.  We note that, when questioned about the $1,224 check in question, Mr. Dubrovsky did not remember any such check.  The record contains no credible documentary evidence showing that petitioner purchased a television for Mr. Dubrovsky.  We infer that no such documentary evidence exists and that, if any such evidence does exist, it would not have substantiated petitioner's claim that $1,224 of the Aug. 22, 1991 deposit of $2,734 represented an advance from Mr. Dubrovsky for the purchase of a television for Mr. Dubrovsky.

us, we find that petitioner has failed to carry his burden of establishing that $1,224 of the August 22, 1991 deposit represented an advance from Mr. Dubrovsky for the purchase of a television on his behalf.

Alleged Rental Payments

Petitioner contends that the following deposits consisting of payments against the balance due on petitioner's equity line account and the following cash that he received in connection with one of those deposits, which we have found were derived from two checks issued by First Marin Realty, Inc. (First Marin), are not taxable.

| Date of Deposit | Payor of Item Deposited | Amount of Deposit | Amount Negotiated for Cash |
|---|---|---|---|
| 6/1/93 | First Marin | $3,344 | $70 |
| 6/11/93 | First Marin | 2,025 | --- |

According to petitioner, the two checks that First Marin issued to him that were the source of the foregoing deposits and cash represented rent paid on Mr. Reingatch's house that petitioner collected, pursuant to a power of attorney, on behalf of Mr. Reingatch while Mr. Reingatch was out of the United States and that petitioner used to make payments on Mr. Reingatch's mortgage loan. In support of those contentions, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely.[60] On the record before us, we

---

[60]Petitioner failed to offer into evidence any credible documentary evidence to support his contentions regarding the checks issued to him by First Marin, such as a power of attorney from Mr. Reingatch authorizing petitioner to act on Mr.

(continued...)

find that petitioner has failed to carry his burden of establishing that the June 1, 1993 transaction at issue and the June 11, 1993 deposit at issue represented rent on Mr. Reingatch's house that petitioner used to pay Mr. Reingatch's mortgage loan.

Alleged Items of MZ Trading

Petitioner contends that the following deposits consisting of payments during 1993 against the balance due on petitioner's equity line account represented certain gross receipts of MZ Trading that MZ Trading had reported in its Form 1065 for 1993, certain loans to MZ Trading, or a reimbursement with respect to a transaction of MZ Trading:

| Date of Deposit | Amount of Deposit | Payor |
|---|---|---|
| 2/10/93 | $23,891 | Commonwealth Enterprises |
| 4/26/93 | 22,500 | Mr. Vulis |
| 4/26/93 | 77,580 | East-West |
| 5/3/93 | 37,680 | Mr. Vulis |
| 5/3/93 | 30,000 | East-West |
| 5/12/93 | 41,950 | East-West |
| 7/9/93 | 6,450 | Commonwealth Enterprises |
| 8/30/93 | 22,000 | East-West |
| 9/14/93 | [1]17,700 | Mr. Kirdan |

[1]Prior to the trial in this case, respondent conceded that $16,700 of the $17,700 deposit is not taxable to petitioner.

(We shall sometimes refer to the foregoing deposits as alleged MZ Trading-related deposits.)

---

[60](...continued)
Reingatch's behalf with respect to Mr. Reingatch's funds and canceled checks showing that petitioner made any payments on Mr. Reingatch's mortgage loan.  We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if it does exist, it would not have substantiated petitioner's position with respect to the two checks issued to him by First Marin.

In support of petitioner's claims regarding the alleged MZ Trading-related deposits, petitioner relies on his self-serving testimony, Mr. Guterman's testimony, Mr. Jordan's testimony including his expert report and the addendum to that report, MZ Trading's purported 1993 transaction summary, and Mr. Oliveras' summary of MZ Trading's deposits during 1993. We are not required to, and we shall not, rely on the testimony of petitioner and of Mr. Guterman regarding those alleged deposits. Based on the Court's evaluation of the testimony of Mr. Jordan, we also are not required to, and we shall not, rely on his testimony, including his expert report and the addendum to that report,[61] regarding certain of the alleged MZ Trading-related deposits.

The testimony of petitioner, of Mr. Guterman, and of Mr. Jordan with respect to certain of the alleged MZ Trading-related deposits referred to and relied on MZ Trading's purported 1993 transaction summary. MZ Trading's purported 1993 transaction summary is a handwritten document dated August 5, 1999, most, if not all, of which petitioner and Mr. Guterman prepared, which listed a series of transactions in which petitioner claims MZ Trading engaged during 1993. For each transaction listed in MZ

---

[61]In violation of the Court's March 31, 2000 Order, which required each party to submit to the Court and to serve on the opposing party a copy of any expert report on or before June 30, 2000, petitioner did not proffer the addendum to Mr. Jordan's expert report to the Court until Aug. 21, 2000, the first day of the further trial in this case, and did not provide a copy of that addendum to respondent until about 5 minutes before it was marked for identification at that further trial. On the record before us, we find that respondent was prejudiced by that violation by petitioner of the Court's March 31, 2000 Order.

Trading's purported 1993 transaction summary, entries appeared under columns headed "cost", "sold", "profit", and "expenses". Numbers and handwriting that is largely illegible appeared in that purported summary under each of those columns. We are not satisfied that MZ Trading's purported 1993 transaction summary is a credible document reflecting transactions in which MZ Trading engaged during 1993. At trial, we admitted MZ Trading's purported 1993 transaction summary into the record solely for the limited purpose that it was a document which showed what the preparers of that document claimed to be transactions of MZ Trading during 1993. Based on the Court's evaluation of MZ Trading's purported 1993 transaction summary, including the Court's evaluation of the testimony of petitioner and of Mr. Guterman, both of whom prepared most, if not all, of that purported summary and both of whom we did not find to be credible, we are not required to, and we shall not, rely on it.

With respect to petitioner's reliance on Mr. Oliveras' summary of MZ Trading's deposits during 1993 in support of his position regarding the alleged MZ Trading-related deposits, as we stated above, even if we were to have admitted that summary into the record for the truth of its content, it does not establish petitioner's claim that certain of MZ Trading's gross receipts for 1993, which it reported in its Form 1065 for 1993 and which petitioner claims were not deposited during that year into MZ Trading's bank account, were deposited into petitioner's equity line account.

We turn now to petitioner's contentions with respect to each of the alleged MZ Trading-related deposits.[62]  With respect to the first such deposit at issue on February 10, 1993 of $23,891, petitioner contends that that deposit, which we have found was derived from a $23,891 check from Commonwealth Enterprises, represented a gross receipt of MZ Trading that MZ Trading reported in its Form 1065 for 1993 and that "relates to MZ Trading trade number 2 [a transaction for the purchase of shoes reflected in MZ Trading's purported 1993 transaction summary], less shipping costs".  In support of that contention, petitioner relies on Mr. Guterman's testimony, on which we are not required to, and we shall not, rely.[63]  On the record before us, we find that petitioner has failed to carry his burden of establishing that that

---

[62]In considering petitioner's contentions with respect to each of the alleged MZ Trading-related deposits, we shall not restate that we are not required to, and we shall not, rely on Mr. Jordan's testimony, including his expert report and the addendum to that report, and MZ Trading's purported 1993 transaction summary.  Nor shall we restate that Mr. Oliveras' summary of MZ Trading's deposits during 1993 does not establish petitioner's claim that certain of MZ Trading's gross receipts for 1993, which it reported in its Form 1065 for 1993 and which petitioner claims were deposited during that year into MZ Trading's bank account, were deposited into certain of petitioner's accounts.

[63]Mr. Vulis, who at all relevant times was associated with Commonwealth Enterprises, did not recall the purpose of the $23,891 check that Commonwealth Enterprises issued to petitioner.

Petitioner failed to offer into evidence any credible documentary evidence that supports petitioner's contention that the purpose of the $23,891 check from Commonwealth Enterprises was to pay MZ Trading for a transaction relating to shoes.  We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if it does exist, it would not have substantiated petitioner's position with respect to the Feb. 10, 1993 deposit at issue.

deposit represented a gross receipt of MZ Trading that it reported in its Form 1065 for 1993.

With respect to the April 26, 1993 alleged MZ Trading-related deposit at issue of $22,500, petitioner contends that that deposit, which we have found was derived from a $22,500 check from Mr. Vulis, represented a loan to MZ Trading for the purchase of beer. Petitioner failed to raise the April 26, 1993 alleged MZ Trading-related deposit of $22,500 as an issue in petitioner's further trial memorandum. Accordingly, pursuant to the Court's March 31, 2000 Order, we shall not address that matter.[64]

With respect to the April 26, 1993 alleged MZ Trading-related deposit at issue of $77,580, petitioner contends that that deposit, which we have found was derived from a $77,580 check from East-West, represented a gross receipt of MZ Trading

---

[64]Assuming arguendo that petitioner had raised as an issue in petitioner's further trial memorandum the Apr. 26, 1993 alleged MZ Trading-related deposit of $22,500, on the instant record, we find that petitioner has failed to carry his burden of showing that that deposit represented a loan from Mr. Vulis to MZ Trading. Petitioner relies on Mr. Guterman's testimony to support that contention, on which we are not required to, and we shall not, rely. We note that petitioner did not question Mr. Vulis specifically about the $22,500 loan that he allegedly made to MZ Trading. We infer from petitioner's failure to elicit any such testimony from Mr. Vulis that any such testimony would not have been favorable to petitioner's position regarding that alleged loan. Petitioner failed to offer into evidence any credible documentary evidence supporting his position that the $22,500 check from Mr. Vulis represented a loan to MZ Trading. We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if it does exist, it would not have substantiated petitioner's position with respect to that alleged loan.

for 1993 that it reported in its Form 1065 for 1993 and that relates to trade number 11, a transaction for candies, reflected in MZ Trading's purported 1993 transaction summary. In support of that contention, petitioner relies on his self-serving testimony and Mr. Guterman's testimony, on which we are not required to, and we shall not, rely.[65] On the record before us, we find that petitioner has failed to carry his burden of establishing that the April 26, 1993 alleged MZ Trading-related deposit at

---

[65]We note that the testimony of petitioner and of Mr. Guterman that the $77,580 check from East-West was a gross receipt of MZ Trading relating to trade number 11 reflected in MZ Trading's purported 1993 transaction summary is inconsistent with their testimony regarding the May 3, 1993 alleged MZ Trading-related deposit. Petitioner and Mr. Guterman testified (1) that the $77,580 check from East-West that was used to make the Apr. 26, 1993 alleged MZ Trading-related deposit of $77,580 represented a gross receipt of MZ Trading for the transaction for "candies" shown as trade number 11 in MZ Trading's purported 1993 transaction summary and (2) that the May 3, 1993 alleged MZ Trading-related deposit of $37,680 represented a loan for that alleged transaction. In addition to the internal inconsistencies in the respective testimony of petitioner and of Mr. Guterman, their testimony is contradicted by certain entries for trade number 11 reflected in MZ Trading's purported 1993 transaction summary, which show what appear to be the amount "$47,976" under the column headed "cost" and the amount "$58,500" under the column headed "sold".

Petitioner failed to call as a witness Mr. Kirdan, who petitioner contends operated East-West at all relevant times, and failed to offer into evidence any credible documentary evidence regarding the Apr. 26, 1993 alleged MZ Trading-related deposit. We infer from petitioner's failure to call Mr. Kirdan that his testimony would not have been favorable to petitioner's position regarding that deposit. We infer from petitioner's failure to proffer any credible documentary evidence regarding the Apr. 26, 1993 alleged MZ Trading-related deposit that any such evidence does not exist and that, if it does exist, it would not have substantiated petitioner's position regarding that alleged deposit.

issue represented a gross receipt of MZ Trading for 1993 that it reported in its Form 1065 for that year.

With respect to the May 3, 1993 alleged MZ Trading-related deposit at issue of $37,680, petitioner contends that that deposit, which we have found was derived from a $37,680 check from Mr. Vulis, represented a loan to MZ Trading relating to trade number 11, a transaction for candies, reflected in MZ Trading's purported 1993 transaction summary. According to petitioner, on May 4, 1993, the day after the May 3, 1993 alleged MZ Trading-related deposit, a $37,680 check payable to PNH International in New York was posted on petitioner's equity line account in order to acquire on behalf of MZ Trading the candies reflected in that purported summary. In support of those contentions, petitioner relies on his self-serving testimony and the testimony of Mr. Guterman, on which we are not required to, and we shall not, rely.[66] As for the evidence showing a $37,680 check payable to PNH International in New York on petitioner's equity line account on May 4, 1993, the only evidence in the record with respect to that check, except for petitioner's testimony, is a copy of the statement for petitioner's equity line account. The copy of that statement in the record does not establish the payee or the purpose of the $37,680 check which was

---

[66]See our discussion supra note 65. We note that, when asked at the further trial in this case, Mr. Vulis was unable to remember the purpose of the $37,680 check that was used to make the May 3, 1993 alleged MZ Trading-related deposit of $37,680.

posted on that statement on May 4, 1993.[67]  On the record before us, we find that petitioner has failed to carry his burden of establishing that the May 3, 1993 alleged MZ Trading-related deposit at issue represented a loan to MZ Trading.

With respect to the May 3, 1993 alleged MZ Trading-related deposit at issue of $30,000, petitioner contends that that deposit, which we have found was derived from a $30,000 check from East-West, represented a gross receipt of MZ Trading that MZ Trading reported in its Form 1065 for 1993 and that related to a transaction for Miller beer (Miller beer transaction).  In support of that contention, petitioner relies on his self-serving testimony and Mr. Guterman's testimony, on which we are not required to, and we shall not, rely.[68]  On the record before us, we find that petitioner has failed to carry his burden of establishing that the May 3, 1993 alleged MZ Trading-related deposit

---

[67]Petitioner failed to offer into evidence any credible documentary evidence establishing his contentions with respect to the May 3, 1993 alleged MZ Trading-related deposit at issue.  We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if it does exist, it would not have substantiated petitioner's position with respect to that deposit.

[68]Petitioner failed to call as a witness Mr. Kirdan and failed to offer into evidence any credible documentary evidence in support of his position with respect to the May 3, 1993 alleged MZ Trading-related deposit of $30,000.  We infer from petitioner's failure to call Mr. Kirdan that his testimony would not have been favorable to petitioner's position regarding that deposit.  We infer from petitioner's failure to proffer any credible documentary evidence regarding the May 3, 1993 alleged MZ Trading-related deposit of $30,000 that any such evidence does not exist and that, if it does exist, it would not have substantiated petitioner's position with respect to that deposit.

at issue represented a gross receipt of MZ Trading for 1993 that it reported in its Form 1065 for that year.

With respect to the May 12, 1993 alleged MZ Trading-related deposit at issue of $41,950, petitioner contends that that deposit, which we have found was derived from a $41,950 check from East-West, represented (1) a gross receipt of MZ Trading relating to the balance for the Miller beer transaction to which petitioner claims the May 3, 1993 alleged MZ Trading-related deposit of $30,000 pertained and (2) a gross receipt of MZ Trading relating to trade number 14, a transaction for lollipop "candies", reflected in MZ Trading's purported 1993 transaction summary, both of which MZ Trading reported in its Form 1065 for 1993. In support of that contention, petitioner relies on his self-serving testimony and Mr. Guterman's testimony, on which we are not required to, and we shall not, rely.[69] On the record before us, we find that petitioner has failed to carry his burden of establishing that the May 12, 1993 alleged MZ Trading-related deposit at issue represented gross receipts of MZ Trading for 1993 that it reported in its Form 1065 for that year.

_____

[69]Petitioner failed to call as a witness Mr. Kirdan, who petitioner claims operated East-West at all relevant times, and failed to offer into evidence any credible documentary evidence in support of his position with respect to the May 12, 1993 alleged MZ Trading-related deposit at issue. We infer from petitioner's failure to call Mr. Kirdan that his testimony would not have been favorable to petitioner's position regarding that deposit. We infer from petitioner's failure to proffer any credible documentary evidence regarding the May 12, 1993 MZ Trading-related deposit that any such evidence does not exist and that, if it does exist, it would not have substantiated peti- tioner's position with respect to that deposit.

With respect to the July 9, 1993 alleged MZ Trading-related deposit at issue of $6,450, petitioner contends that that deposit, which we have found was derived from a $6,450 check from Commonwealth Enterprises, represented "a reimbursement for the shipping of candies to Mr. Ivenin relating to MZ Trading trade number 6" reflected in MZ Trading's purported 1993 transaction summary.[70]  In support of that contention, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely.[71]  On the record before us, we find that

_____

[70]The nature of the alleged transaction number 6 reflected in MZ Trading's purported 1993 transaction summary is not legible.

[71]Petitioner failed to offer into evidence any credible documentary evidence regarding the July 9, 1993 alleged MZ Trading-related deposit at issue.  We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if it does exist, it would not have substantiated petitioner's position with respect to that deposit.

Petitioner questioned Mr. Vulis about the $6,450 check from Commonwealth Enterprises that was the source of the July 9, 1993 alleged MZ Trading-related deposit at issue.  Mr. Vulis testified as follows with respect to that check:

A      * * * It's a check drawn on Commonwealth Enter-
       prise [sic] checkbook.  I have very bad copy, but
       it's for $6,450, I guess.

Q      And was payable to whom?

A      To Mr. Brodsky.

Q      For what purpose?

A      Well, as far as I can recall, looking at that
       check, it says J.B., 25 percent 25,000, which
       means jelly-beans, 25 percent out of $25,000.

                                        (continued...)

petitioner has failed to carry his burden of establishing that the July 9, 1993 alleged MZ Trading-related deposit at issue represented a reimbursement for the shipping of candies to a Mr. Ivenin relating to a transaction of MZ Trading.

With respect to both the August 30 and September 14, 1993 alleged MZ Trading-related deposits of $22,000 and $17,700, respectively, petitioner contends that those deposits, which we have found were derived from East-West and from Mr. Kirdan,[72] respectively, represented gross receipts of MZ Trading that it reported in its Form 1065 for 1993 and that related to trade number 14, a transaction for "coffee", reflected in MZ Trading's purported 1993 transaction summary.

---

[71](...continued)

Q    And so what does that represent?

A    That to the best of my ability to recall it, it's just after the deal was concluded it was a distribution.

Q    Distribution of what?

A    Of the entire funds, of the initial investment, plus most probably, interest and/or profit.

The foregoing testimony of Mr. Vulis regarding the $6,450 check from Commonwealth Enterprises that was the source of the July 9, 1993 alleged MZ Trading-related deposit at issue does not support petitioner's contention that that deposit represented a reimbursement for the cost of shipping certain candies to a Mr. Ivenin relating to a transaction of MZ Trading.

[72]Petitioner contends that the $22,000 received from East-West was paid by check as was the $17,700 received from Mr. Kirdan. The record does not support petitioner's contention. We have found that the $22,000 received from East-West and the $17,700 received from Mr. Kirdan were paid in cash.

With respect to the August 30, 1993 alleged MZ Trading-related deposit at issue of $22,000, petitioner relies on his self-serving testimony and Mr. Guterman's testimony, on which we are not required to, and we shall not, rely.[73]  On the record before us, we find that petitioner has failed to carry his burden of establishing that the August 30, 1993 alleged MZ Trading-related deposit at issue represented a gross receipt of MZ Trading for 1993 that it reported in its Form 1065 for that year.

With respect to the September 14, 1993 alleged MZ Trading-related deposit of $17,700, as noted above, prior to the trial in this case, respondent conceded that $16,700 of that deposit is not taxable to petitioner.  Prior to that trial, petitioner conceded that the remaining $1,000 of the September 14, 1993 alleged MZ Trading-related deposit of $17,700 constituted a taxable commission to him.  Petitioner reaffirmed at the further trial in this case that he had made that concession.  Despite his concession, petitioner contends on brief that no portion of the September 14, 1993 alleged MZ Trading-related deposit is taxable to him.  On the record before us, we conclude that petitioner

_____

[73]Petitioner failed to call as a witness Mr. Kirdan regarding the Aug. 30, 1993 alleged MZ Trading-related deposit at issue.  We infer from petitioner's failure to call Mr. Kirdan that his testimony with respect to that deposit would not have been favorable to petitioner's position with respect to that alleged deposit.  Petitioner also failed to offer into evidence any credible documentary evidence in support of his position regarding the Aug. 30, 1993 alleged MZ Trading-related deposit. We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if it does exist, it would not have substantiated petitioner's contention with respect to that deposit.

conceded that he is taxable on $1,000 of that deposit and that that concession, taken together with respondent's concession of $16,700 of that deposit, leaves no portion of the September 14, 1993 alleged MZ Trading-related deposit that remains at issue in this case.[74]

Alleged Repayments of Loans

Petitioner contends that $20,000 of the March 19, 1991 deposit of $20,119 and the entire September 7, 1993 deposit at issue of $3,000 represented repayments of certain loans that he had made to certain individuals.

With respect to the March 19, 1991 deposit of $20,119, petitioner contends that $20,000 of that deposit constituted a repayment by Mr. Reingatch of a loan that petitioner had made to him. In support of that contention, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely. Petitioner also relies on a copy of the front side of a $20,000 check dated May 20, 1990, that was signed by petitioner and payable to Mr. Reingatch. Petitioner claims that that check represented the $20,000 that he lent Mr. Reingatch. Although we are satisfied from the copy of the front side of the May 20, 1990 check on which petitioner relies that that check was negotiated, we are not satisfied from that copy, inter alia, that

---

[74]Even if we had not concluded that, prior to the trial in this case, petitioner conceded $1,000 of the Sept. 14, 1993 alleged MZ Trading-related deposit, on the instant record, we find that petitioner has failed to carry his burden of establishing that $1,000 of that deposit is not taxable to him.

Mr. Reingatch deposited and/or cashed that check. For example, Mr. Reingatch could have endorsed the check in question to petitioner, who in turn deposited and/or cashed it. Nor are we satisfied from the instant record what the purpose of the May 20, 1990 check was.

Assuming arguendo that we had found on the instant record that Mr. Reingatch deposited and/or cashed the $20,000 check in question, the only evidence in the record supporting petitioner's position that that check represented a loan to Mr. Reingatch is petitioner's self-serving testimony, on which we are not required to, and we shall not, rely.[75] On the record before us, we find that petitioner has failed to carry his burden of establishing that $20,000 of the March 19, 1991 deposit represented a repayment by Mr. Reingatch of a loan that petitioner had made to him.

With respect to the September 7, 1993 deposit at issue of $3,000, petitioner contends that that deposit, which we have found was derived from a $3,000 check from Mr. Guterman, represented a repayment by Mr. Guterman of a loan that petitioner had made to Mr. Guterman's wife. In support of that contention, petitioner relies on his self-serving testimony, on which we are

_____

[75]Petitioner failed to offer into evidence any credible documentary evidence showing that he lent $20,000 to Mr. Reingatch in 1990 or at any other time prior to the date on which petitioner claims Mr. Reingatch repaid that alleged loan. We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if any such evidence does exist, it would not have substantiated petitioner's position with respect to $20,000 of the Mar. 19, 1991 deposit at issue.

not required to, and we shall not, rely.[76]  On the record before us, we find that petitioner has failed to carry his burden of establishing that the September 7, 1993 deposit at issue represented a repayment of a loan that petitioner had made to Mr. Guterman's wife.

Claimed Cost of Goods Sold

In the notice for 1991 and 1992 and the notice for 1993, respondent disallowed for those three years claimed Schedule C cost of goods sold of $12,849, $113,935, and $54,337, respectively.

Petitioner contends that respondent erred in disallowing $12,130 and $57,084 of claimed Schedule C cost of goods sold for 1991 and 1992, respectively.[77]

---

[76]Petitioner failed to question Mr. Guterman about why he made the $3,000 payment to petitioner, which was the source of the Sept. 7, 1993 deposit at issue.  Even if petitioner had questioned Mr. Guterman about that payment, we would not have been required to rely on Mr. Guterman's testimony.  Petitioner failed to call Mr. Guterman's wife regarding petitioner's allegation that he lent her $3,000.  We infer from petitioner's failure to call Mr. Guterman's wife that her testimony would not have been favorable to petitioner's position.  Petitioner failed to offer into evidence any credible documentary evidence showing that he lent $3,000 to Mr. Guterman's wife prior to the date on which petitioner claims Mr. Guterman repaid that alleged loan. We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if any such evidence does exist, it would not have substantiated petitioner's position with respect to the Sept. 7, 1993 deposit at issue.

[77]Petitioner also argues that respondent failed to sustain respondent's burden of proof with respect to the additional $42,913 of the cost of goods sold for 1993 that respondent alleged should be disallowed in respondent's amendment to answer.
(continued...)

In order to compute gross income, gross receipts are reduced by cost of goods sold.  Sec. 1.61-3(a), Income Tax Regs.  A taxpayer must show his entitlement to the cost of goods sold claimed and keep sufficient records to substantiate such cost. See sec. 1.6001-1(a), Income Tax Regs.; see also Rule 142(a).

In support of petitioner's position with respect to the cost of goods sold at issue, petitioner contends that the following canceled checks, cashier's checks, and credit card charges represented amounts paid to the payees shown below in order to acquire certain merchandise for resale in UVW's business:

---

[77](...continued)
We disagree.  We have found that, pursuant to Rule 37(c), petitioner is deemed to have admitted the affirmative allegations in that amendment to answer relating to the claimed cost of goods sold for 1993.

Petitioner did not raise as an issue in petitioner's further trial memorandum, presented no evidence at trial and at further trial, and makes no argument on brief as to certain amounts of claimed cost of goods sold disallowed for 1991, 1992, and 1993 that petitioner placed in dispute in the petition and that respondent has not conceded.  We conclude that petitioner has abandoned contesting those disallowed amounts of claimed cost of goods sold.  See Rybak v. Commissioner, 91 T.C. at 566 n.19.

| Date | Description | Payee | Amount |
|------|-------------|-------|--------|
| 8/27/91 | Check drawn on petitioner's UVW account | Fashions store | $212 |
| 8/28/91 | Check drawn on petitioner's UVW account | Fashions store | 584 |
| 9/2/91 | Check drawn on petitioner's UVW account | Fashions store | 1,100 |
| 9/5/91 | Check drawn on petitioner's UVW account | Fashions store | 334 |
| 12/17/91 | Bank of America cashier's check | Circuit City | 9,900 |
| 2/10/92 | Charge on acct. No. 5273-0298-0010-0917 | Carvis Discount | 2,134 |
| 3/2/92 | Charge on acct. No. 5273-0298-0010-0917 | Carvis Discount | 2,550 |
| 3/3/92 | Bank of America cashier's check | Macy's California | 10,000 |
| 4/15/92 | Check drawn on petitioner's UVW account | Cash | 12,000 |
| 4/21/92 | Bank of America cashier's check | M.P. Electronics | 11,400 |
| 4/22/92 | Check drawn on petitioner's UVW account | M.P. Electronics | 5,000 |
| 5/18/92 | Bank of America cashier's check | Macy's California | 14,000 |

In support of petitioner's contention regarding the foregoing items, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely. Petitioner also relies on the testimony of Mr. Raja.[78] Based on the Court's evaluation of Mr. Raja's testimony, we are not required to, and we shall not, rely on his testimony regarding the items listed above. We found Mr. Raja's testimony to have been based largely on his general business practices with petitioner, as opposed to

---

[78]Petitioner failed to offer into evidence any credible documentary evidence, such as receipts, invoices, or any other credible business records of UVW, that establishes petitioner's position regarding the claimed cost of goods sold at issue for 1991 and 1992. We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if it does exist, it would not have substantiated petitioner's position regarding that claimed cost of goods sold.

his personal knowledge of the facts with respect to a particular
transaction or activity about which he testified.  We also found
Mr. Raja's testimony to be vague and/or inconsistent at times.

On the record before us, we find that petitioner has failed
to carry his burden of establishing that, in computing his gross
income from UVW's business, he is entitled to reduce gross
receipts by the respective amounts of cost of goods sold to which
he claims he is entitled for 1991 and 1992.

Claimed Schedule C Deductions

In the notice for 1991 and 1992, respondent disallowed for
those two years claimed Schedule C deductions of $24,796 and
$16,278, respectively.

Petitioner contends that he is entitled to the following
amounts of Schedule C deductions for interest and telephone
expenses that respondent disallowed in the notice for 1991 and
1992:[79]

---

[79]Petitioner did not raise as an issue in petitioner's
further trial memorandum, presented no evidence at trial and at
further trial, and makes no argument on brief as to certain
amounts of claimed Schedule C deductions disallowed for 1991 and
1992 that petitioner placed in dispute in the petition and that
respondent has not conceded.  We conclude that petitioner has
abandoned contesting those disallowed amounts of claimed Schedule
C expenses.  See Rybak v. Commissioner, supra at 566 n.19.

Although petitioner raised as an issue in petitioner's
further trial memorandum that he is entitled to certain Schedule
C deductions for 1993, petitioner indicates on brief that there
are no Schedule C deductions in dispute for that year.

| Year | Claimed Interest Deduction | Claimed Telephone Expense Deduction |
|------|---------------------------|-------------------------------------|
| 1991 | $1,632.18 | $2,122.52 |
| 1992 | 2,426.48 | 1,963.19 |

Petitioner further contends for the first time in petitioner's further trial memorandum and on brief that he is entitled to a Schedule C deduction for 1992 for his payment in that year of an alleged loan guaranty of $20,000.[80]

Section 162(a) generally allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. The determination of whether an expenditure satisfies the requirements for deductibility under section 162 is a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943). In general, an expense is ordinary if it is considered normal, usual, or customary in the context of the particular business out of which it arose. Deputy v. du Pont, 308 U.S. 488, 495 (1940). Ordinarily, an expense is necessary if it is appropriate and helpful to the operation of the taxpayer's trade or business. Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Carbine v. Commissioner, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985).

Section 212(1) allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year, inter alia,

---

[80]In petitioner's further trial memorandum and on brief, petitioner claims that he deducted the $20,000 payment at issue for 1992 in Schedule C of the joint return for that year. The record does not support petitioner's claim. The 1992 joint return of petitioner and Ms. Brodsky does not claim any $20,000 deduction relating to an alleged payment on a loan guaranty in Schedule C or anywhere else in that return.

for the production or collection of income.

Section 163(a) generally allows a deduction for all interest paid or accrued during the taxable year on indebtedness. However, in the case of a taxpayer other than a corporation, section 163(h) generally disallows any deduction for "personal interest". The term "personal interest" is defined to mean any interest allowable as a deduction under chapter 1 of the Code other than, inter alia, interest paid or accrued on indebtedness properly allocable to a trade or business (other than the trade or business of performing services as an employee), any investment interest, and any interest which is taken into account under section 469 in computing income or loss from a passive activity of the taxpayer. Sec. 163(h)(2)(A), (B), and (C). The term "investment interest" means, in general, any interest allowable as a deduction under chapter 1 of the Code which is paid or accrued on indebtedness properly allocable to property held for investment. See 163(d)(3)(A). Investment interest does not include, inter alia, any interest which is taken into account under section 469 in computing income or loss from a passive activity of the taxpayer. Sec. 163(d)(3)(B)(ii). Although investment interest and interest which is taken into account under section 469 in computing income or loss from a passive activity of the taxpayer are excepted from the definition of the term "personal interest", the deductibility of the first two types of interest is subject to certain other limitations. See secs. 163(d)(1), 469(a).

Section 166 allows a taxpayer to deduct any business debt which becomes wholly or partially worthless during the taxable year. Sec. 166(a), (d)(1)(A). Section 166 also allows a taxpayer who guaranties a debt and makes a payment pursuant to that guaranty to deduct that payment, provided that the taxpayer satisfies the requirements of section 1.166-9, Income Tax Regs.

<u>Claimed Interest Deductions</u>

Petitioner contends that he is entitled to deduct for 1991 and 1992 interest payments that he made on petitioner's equity line account during those years in the amounts of $1,632.18 and $1,176.48, respectively. Petitioner also contends that he is entitled to deduct for 1992 interest of $1,250 that he claims he paid on an alleged business loan from Mr. Kroma.

With respect to the interest payments on petitioner's equity line account that are at issue, we have found that petitioner paid interest in the respective amounts of $1,632.18 and $1,176.48 on that account during 1991 and 1992. Prior to the filing of petitioner's opening brief, petitioner took the position that he is entitled to deduct 50 percent of those interest payments because he "incurred these expenses in conducting his business". On brief, petitioner contends that he is entitled to deduct all of the interest payments that he made during 1991 and 1992 on petitioner's equity line account because that account "was used primarily for business and the production of income." We infer, and we conclude, from petitioner's argument that he used petitioner's equity line account "primarily" for business

and the production of income that petitioner concedes that he used that account at least partially for personal purposes.

In support of his contention that he used petitioner's equity line account primarily for business and the production of income, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely. Assuming arguendo that petitioner had established that he used peti- tioner's equity line account primarily for business and the production of income, on the instant record, we find that peti- tioner has failed to carry his burden of showing that he is entitled to deduct the respective amounts of interest payments on petitioner's equity line account that he made during 1991 and 1992. In this connection, we find on that record that petitioner has failed to establish the portion, if any, of petitioner's equity line account that he used during 1991 and 1992 for busi- ness and/or income-producing activities and to allocate the interest payments at issue for purposes of applying sections 163(d) and (h) and 469. See sec. 1.163-8T, Temporary Income Tax Regs., 52 Fed. Reg. 24999 (July 2, 1987).

With respect to the $1,250 of alleged interest that remains at issue, petitioner contends that his $1,250 check dated July 13, 1992, which was payable to Mr. Kroma, drawn on petitioner's equity line account, and signed by petitioner (petitioner's July 13, 1992 check), represented a payment of 2 months' interest on a $50,000 loan from Mr. Kroma to UVW. In support of that conten- tion, petitioner relies on his self-serving testimony, on which

we are not required to, and we shall not, rely. We have found that petitioner has failed to carry his burden of establishing (1) that Mr. Kroma made a $50,000 loan to UVW, (2) that Mr. Kroma received the proceeds of petitioner's July 13, 1992 check, and (3) that, even if Mr. Kroma had received the proceeds of that check, those proceeds represented 2 months' interest on the alleged $50,000 loan from Mr. Kroma to UVW.

On the record before us, we find that petitioner has failed to carry his burden of establishing that he is entitled under section 163 to deduct (1) for 1991 and 1992 interest payments of $1,632.18 and $1,176.48, respectively, that he made during those years on petitioner's equity line account and (2) for 1992 the claimed interest payment of $1,250.

Claimed Telephone Expense Deductions

Petitioner contends that he is entitled to deduct for 1991 and 1992 certain telephone expenses that he paid during those years. During 1991 and 1992, petitioner maintained (1) separate home telephone lines, one of which was supposed to be used for personal purposes and one of which was supposed to be used for business purposes, and (2) separate cellular telephone lines, one of which was supposed to be used for personal purposes and one of which was supposed to be used for business purposes. With respect to petitioner's home telephone lines, petitioner claims that he is entitled to deduct for 1991 and 1992 telephone ex- penses of $1,393.24 and $1,059.27 that he paid during those respective years, which he contends are the amounts of telephone

expenses for his home telephone line that was supposed to be used for business purposes. With respect to petitioner's cellular telephone lines, petitioner claims that he is entitled to deduct for 1991 and 1992 telephone expenses of $729.28 and $903.92 that he paid during those respective years, which he contends are the amounts of telephone expenses for his cellular telephone line that was supposed to be used for business purposes.

With respect to the home telephone expenses at issue for 1991 and 1992, the only dispute between the parties with respect to the deductibility of those expenses is whether petitioner, who we have found paid those expenses during those years, has established that those expenses are ordinary and necessary expenses paid in carrying on his Schedule C business. Petitioner contends that they are. In support of that contention, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely. On the instant record, we find that petitioner has failed to carry his burden of showing that the telephone expenses of $1,393.24 and $1,059.27 that he paid during 1991 and 1992, respectively, for his home telephone lines represented expenses paid solely for his home telephone line that was supposed to be used for business purposes. Even if petitioner had made such a showing, on the instant record, we find that petitioner has failed to carry his burden of showing that he used his home telephone line that was supposed to be used for business purposes solely in carrying on his Schedule C business, and not for personal purposes. On the record before us, we find that

petitioner has failed to carry his burden of establishing that the home telephone expenses of $1,393.24 and $1,059.27 that he paid during 1991 and 1992, respectively, constitute ordinary and necessary business expenses paid in carrying on his Schedule C business.

With respect to the cellular telephone expenses at issue for 1991 and 1992, the disputes between the parties with respect to the deductibility of those expenses are whether petitioner, who we have found paid those expenses during those years, has established (1) that he paid those expenses during those years in carrying on his Schedule C business and (2) that he satisfies the substantiation requirements of section 274(d)(4). As to the parties' first dispute, petitioner relies on his self-serving testimony to support his contention that the cellular telephone expenses at issue are ordinary and necessary expenses paid in carrying on his Schedule C business. We are not required to, and we shall not, rely on that testimony. On the instant record, we find that petitioner has failed to carry his burden of showing that the telephone expenses of $729.28 and $903.92 that he paid during 1991 and 1992, respectively, for his cellular telephone lines represented expenses paid solely for his cellular telephone line that was supposed to be used for business purposes. Even if petitioner had made such a showing, on the instant record, we find that petitioner has failed to carry his burden of showing that he used his cellular telephone line that was supposed to be used for business purposes solely in carrying on his Schedule C

business, and not for personal purposes.  On the record before us, we find that petitioner has failed to carry his burden of establishing that the cellular telephone expenses of $729.28 and $903.92 that he paid during 1991 and 1992, respectively, constitute ordinary and necessary business expenses paid in carrying on his Schedule C business.

As to the parties' second dispute with respect to the cellular telephone expenses at issue, which we address only because we assume arguendo that petitioner had established that the cellular telephone expenses at issue constitute ordinary and necessary expenses paid in carrying on his Schedule C business, as pertinent here, section 274(d)(4) operates to disallow any deduction otherwise allowable under section 162(a) with respect to any "listed property", unless the taxpayer satisfies the substantiation requirements of section 274(d)(4).[81]  The term

---

[81]Sec. 274(d) provides in pertinent part:

SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC.,
          EXPENSES.

(d)  Substantiation Required.--No deduction or credit
shall be allowed--

           *     *     *     *     *     *     *

     (4) with respect to any listed property (as de-
fined in section 280F(d)(4)),

unless the taxpayer substantiates by adequate records
or by sufficient evidence corroborating the taxpayer's
own statement (A) the amount of such expense or other
item, (B) the time and place of the * * * use of the
facility or property * * *, (C) the business purpose of
                                        (continued...)

"listed property" is defined in section 280F(d)(4) to include cellular telephones. Sec. 280F(d)(4)(A)(v). Although, as required by section 274(d)(4), petitioner substantiated the respective amounts of the cellular telephone expenses that he paid during 1991 and 1992, on the instant record, we find that petitioner has failed to show that he satisfies the remaining substantiation requirements of section 274(d)(4) and the regulations thereunder. Petitioner did not introduce into evidence adequate records to satisfy those requirements. Consequently, petitioner may satisfy those requirements only by introducing into the record in this case sufficient evidence corroborating his own statements. Sec. 274(d)(4); sec. 1.274-5T(c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46016-46017 (Nov. 6, 1985). As discussed above, petitioner relies on his self-serving testimony to support his contention that the cellular telephone expenses at issue constitute ordinary and necessary expenses paid in carrying on his Schedule C business. We are not required to, and we shall not, rely on that testimony. On the instant record, we find that petitioner has failed to carry his burden of introducing into the record in this case sufficient evidence corroborating his statements with respect to his alleged business use of his cellular telephone lines during 1991 and 1992. On the record before us, we find that petitioner has failed to carry his burden of establishing that he satisfies all of the substantiation

---

[81](...continued)
the expense or other item * * *.

requirements of section 274(d)(4).

On the record before us, we find that petitioner has failed to carry his burden of establishing that he is entitled under section 162(a) to deduct for 1991 and 1992 any of the telephone expenses that he paid during those years.[82]

Claimed Bad Debt Deduction

Petitioner contends that he is entitled to deduct for 1992 the $20,000 payment that he made to Commonwealth Enterprises, which he claims he made pursuant to an alleged loan guaranty. According to petitioner, he guarantied a $20,000 loan from Mr. Vulis to MP Electronics, and the $20,000 check dated December 18, 1992, which was payable to Commonwealth Enterprises, drawn on petitioner's UVW account, and signed by petitioner (UVW's December 18, 1992 check), represented petitioner's payment of that loan pursuant to his guaranty. In support of his contentions, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely.[83] On the instant re

---

[82]Although not altogether clear, it appears that petitioner contends in the alternative to deducting the telephone expenses at issue for 1991 and 1992 under sec. 162(a) that those expenses are deductible under sec. 212. On the instant record, we find that petitioner has failed to carry his burden of showing that the respective telephone expenses that he paid during 1991 and 1992 are ordinary and necessary expenses paid during those years for the production or collection of income. On the record before us, we find that petitioner has failed to carry his burden of establishing that he is entitled under sec. 212 to deduct for 1991 and 1992 any of the telephone expenses that he paid during those years.

[83]Petitioner failed to offer into evidence any credible documentary evidence to establish that Mr. Vulis made a loan to

(continued...)

cord, we find that petitioner has failed to carry his burden of showing that UVW's December 18, 1992 check was paid pursuant to a guaranty that petitioner provided on a loan from Mr. Vulis to MP Electronics.[84]  On the record before us, we find that petitioner has failed to carry his burden of establishing that he is entitled for 1992 to a $20,000 deduction under section 166 for the payment of a loan guaranty.

---

[83](...continued)
MP Electronics and that petitioner was a guarantor on any such loan.  We infer from petitioner's failure to proffer any such documentary evidence that any such evidence does not exist and that, if it does exist, it would not have substantiated petitioner's position with respect to UVW's December 18, 1992 check. We also note that, when Mr. Raja was questioned about the claimed loan and guaranty in question, he gave inconsistent testimony. We further note that, when Mr. Vulis was questioned about UVW's December 18, 1992 check, he had no recollection of either that check or the name MP Electronics.  Nor could Mr. Vulis recall whether Commonwealth Enterprises had entered into any transactions with Mr. Raja.

[84]Assuming arguendo that petitioner had established that UVW's December 18, 1992 check was paid to satisfy his guaranty of a loan from Mr. Vulis to M.P. Electronics, on the record before us, we find that petitioner has failed to carry his burden of establishing that he satisfies the requirements of sec. 1.166-9, Income Tax Regs., and that therefore he is entitled under sec. 166 to a business bad debt deduction for 1992 with respect to that payment.

Although not altogether clear, it appears that petitioner contends in the alternative to deducting the $20,000 payment under sec. 166 that that payment is deductible under sec. 162(a). On the instant record, we find that petitioner has failed to carry his burden of showing that the $20,000 payment at issue is an ordinary and necessary expense paid during 1992 in carrying on his Schedule C business.  On the record before us, we find that petitioner has failed to carry his burden of establishing that he is entitled under sec. 162(a) to a deduction for 1992 for the $20,000 payment at issue.

Claimed Capital Loss:  Church Street Property

In the notice for 1991 and 1992, respondent determined that, instead of the $27,000 loss which petitioner and Ms. Brodsky reported in their 1992 joint return with respect to the sale of the Church Street property, they have a gain of $23,000, all of which they must recognize for 1992.[85]  Respondent made those determinations because petitioner had not established his basis in the Church Street property at the time of its sale in 1992.

Petitioner contends on brief that in 1992 he sold a 25-percent interest in the Church Street property for $23,000, that his basis in that property at the time of that sale was $47,600,[86] and that he realized a capital loss of $24,600 on that sale.[87]

---

[85]Respondent also disallowed in the 1991 and 1992 notice a claimed capital loss carryover to 1993 that was attributable to the $27,000 loss that petitioner and Ms. Brodsky claimed for 1992.

[86]In the 1992 Schedule D, petitioner and Ms. Brodsky claimed a $50,000 basis in the Church Street property as of the date of the sale of that property.

[87]Petitioner contends in the alternative that, because there are no documents establishing that petitioner was in fact a legal owner of the Church Street property at the time of its sale in 1992, "petitioner is not obligated or required to report any capital gain or loss on the sale of" that property.  On the record before us, we reject petitioner's alternative contention that he was not a legal owner of the Church Street property.  We have found on that record that, at least during part of 1991 and 1992 until the date of the sale of the Church Street property, petitioner owned an interest in that property, although the extent of that interest is not disclosed by credible evidence in the record.  In this connection, in addition to other evidence in the record, the 1991 and 1992 joint returns filed by petitioner

(continued...)

The gain from the sale or other disposition of property is the excess of the amount realized over the adjusted basis of the property provided in section 1011 for determining gain, and the loss is the excess of the adjusted basis provided in that section for determining loss over the amount realized. Sec. 1001(a). Petitioner must establish his adjusted basis in the Church Street property for purposes of determining the gain or the loss that he realized, and must recognize, on its sale. O'Neill v. Commissioner, 271 F.2d 44, 50 (9th Cir. 1959), affg. T.C. Memo. 1957-193; see Burnet v. Houston, 283 U.S. 223, 227-228 (1931). As pertinent here, (1) petitioner's adjusted basis in determining the gain or the loss from the sale of the Church Street property is his basis in that property determined under section 1012, adjusted as provided in section 1016,[88] see sec. 1011(a); and

---

[87](...continued)
and Ms. Brodsky support that finding. Petitioner and Ms. Brodsky included Schedule E in each of those returns. In each such Schedule E, they reported the Church Street property as rental property. In the 1991 Schedule E, they claimed rental expenses with respect to that property, in the 1992 Schedule E, they listed the Church Street property as a rental property, and in the 1992 Schedule D they claimed a capital loss with respect to that property. We find that the 1991 and 1992 returns contain admissions by petitioner and Ms. Brodsky that one or both of them had an ownership interest in the Church Street property at least during part of 1991 and 1992 until the date of the sale of that property. Those admissions may not be overcome without cogent evidence that they are wrong. See FRE 801(d)(2); Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam T.C. Memo. 1968-126; Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989).

[88]With respect to the adjustments to basis under sec. 1016 that are required by sec. 1011(a), petitioner testified at the
(continued...)

(2) his basis in the Church Street property is the cost of such property, sec. 1012.

Petitioner contends that the copies of the front sides of two checks totaling $47,600 dated May 2 and May 18, 1990, respectively, which show that they were payable to Markfel Realty (petitioner's two checks to Markfel Realty), represented "petitioner's cost basis in the [Church Street] property." We are not persuaded by those copies, which the Court admitted into the record in this case solely as the front sides of those two checks,[89] that they are the front sides of two checks that

---

[88](...continued) trial in this case that the Church Street property was land that was to be developed. Petitioner also described the Church Street property in petitioner's answering brief as a "vacant lot". However, in the 1991 and 1992 joint returns filed by petitioner and Ms. Brodsky, they reported the Church Street property as rental property. Petitioner also took the position that the Church Street property was rental property at the further trial in this case and in petitioner's opening brief. If we were to accept petitioner's position at the trial that the Church Street property was land to be developed and not rental property, on the instant record, we find that petitioner has failed to carry his burden of showing what, if any, adjustments to basis under sec. 1016 petitioner is required to make under sec. 1011(a) in order to determine his adjusted basis in that property. If we were to accept petitioner's position in Schedules E of the 1991 and 1992 joint returns and at the further trial that the Church Street property was rental property and not land to be developed, on the instant record, we find that petitioner has failed to carry his burden of showing the decrease required by sec. 1016(a)(2) in his basis in that property, determined under sec. 1012 (i.e., the cost), for depreciation allowed or allowable, whichever is greater, under sec. 167(a). See Reithmeyer v. Commissioner, 26 T.C. 804, 815 (1956).

[89]Although we are satisfied from the copy of the front side of petitioner's check to Markfel Realty dated May 2, 1990, that that check was negotiated, we are not satisfied from that copy or
(continued...)

Markfel Realty negotiated.[90]  On the instant record, we find that petitioner has failed to carry his burden of establishing his basis in the Church Street property within the meaning of section 1012 and his adjusted basis in that property within the meaning of section 1011(a).  On the record before us, we find that petitioner has failed to carry his burden of establishing

---

[89](...continued)
from any other evidence in the record that Markfel Realty deposited and/or cashed that check, nor do we know from the record the date on which that check was negotiated.  For example, Markfel Realty could have endorsed that check to petitioner, who in turn deposited and/or cashed it.  We are not satisfied from the copy of the front side of petitioner's check to Markfel Realty dated May 18, 1990, or from any other evidence in the record that that check was ever negotiated.

[90]Assuming arguendo that we had been persuaded that petitioner's two checks to Markfel Realty were negotiated by Markfel Realty, on the instant record, we find that petitioner has failed to carry his burden of showing that those checks represented funds paid by petitioner with respect to the Church Street property.  We have found that during the course of petitioner's dealings with Markfel Realty petitioner invested in several real properties and that any checks which petitioner wrote to Markfel Realty were for one or more of the following purposes:  Initial respective investments in certain real properties, respective increases in his investment interests in certain real properties, and/or respective payments of his proportionate share of any expenditures with respect to such interests.  Assuming arguendo that we had found that the copies of the front sides of petitioner's two checks to Markfel Realty were negotiated by Markfel Realty, petitioner could have paid the proceeds of those checks to Markfel Realty with respect to real properties other than the Church Street property.  Even if we had been satisfied from the instant record that the copies of the front sides of petitioner's two checks to Markfel Realty were negotiated by Markfel Realty and that the proceeds of those checks were paid to Markfel Realty with respect to the Church Street property, petitioner could have paid those proceeds in order to invest in, to increase his investment in, and/or to pay his proportionate share of any expenditures with respect to that property.

(1) that he is entitled to the capital loss that he claimed for 1992 with respect to the sale of the Church Street property and (2) that he is not required to recognize for that year the gain of $23,000 that respondent determined in the notice for 1991 and 1992.[91]

Claimed Capital Gain:  Sanchez Street Property

In the notice for 1993, respondent determined that, instead of the $11,315 gain that petitioner and Ms. Brodsky reported in their 1993 return with respect to the sale of the Sanchez Street property, they have a gain from that sale of $48,000, all of which they must recognize for 1993.  Respondent made that determination because petitioner and Ms. Brodsky had not established their basis in the Sanchez Street property when it was sold.[92]

In the 1993 joint return, petitioner and Ms. Brodsky reported that they sold their interest in the Sanchez Street property for $48,000, that their adjusted basis in that property at the time of that sale was $36,685, and that they realized a gain of $11,315 on that sale.

On brief, petitioner abandons the position that he and Ms. Brodsky took in the 1993 joint return.  Instead, petitioner advances the following contentions on brief with respect to the

_____

[91]On the record before us, we further find that petitioner has failed to carry his burden of establishing that he is entitled to the capital loss carryover to 1993 that he claimed in the 1993 joint return and that respondent disallowed.

[92]Respondent also determined in the 1993 notice, as respondent had determined in the 1991 and 1992 notice, that petitioner and Ms. Brodsky are not entitled to the $27,000 capital loss carryover from 1992 that they claimed in their 1993 joint return. We sustain that determination.  See supra note 91.

Sanchez Street property:[93]

 Joseph Dubrovsky testified that petitioner invested $57,000 in 1987, in property located on El Camino del Mar, San Francisco. * * *

 Mr. Dubrovsky testified that he returned $30,000 of petitioner's investment to him on June 3, 1988.[1] Therefore, petitioner's adjusted basis was $27,000 at that point in time.  Thereafter, it is unclear whether there was a sale or like-kind exchange for the property located at 287 Sanchez Street.  What is clear is Joseph Dubrovsky testified that all the owners of El Camino del Mar remained the owners of 287 Sanchez Street, including petitioner.  Edward Sutton, the tax return preparer, testified that his records reflected a purchase price of $400,000 for 287 Sanchez Street in 1989, which would be the cost basis.  Joseph Dubrovsky testified that petitioner was a 10% owner of the property.

 Edward Sutton, the tax return preparer, reported that petitioner's gain on a sale of the property in

---

[93]Petitioner contends in the alternative that, because there are no documents establishing that petitioner was in fact a legal owner of the Sanchez Street property at the time of its sale in 1993, "petitioner is not obligated or required to report any capital gain or loss on the sale of" that property.  On the record before us, we reject petitioner's contention that he was not a legal owner of the Sanchez Street property.  We have found on that record that, at least during the period beginning in 1991 and ending on the date of the sale of the Sanchez Street property in 1993, petitioner and Ms. Brodsky owned an interest in that property, although the extent of that interest is not disclosed by credible evidence in the record.  In this connection, in addition to other evidence in the record, the 1991, 1992, and 1993 joint returns filed by petitioner and Ms. Brodsky support that finding.  Petitioner and Ms. Brodsky included Schedule E in each of those returns.  In each such Schedule E, they reported the Sanchez Street property as rental property, and they claimed rental expenses with respect to that property.  In Schedule D and Form 4797 that petitioner and Ms. Brodsky included in the 1993 joint return, they claimed a capital gain with respect to the Sanchez Street property.  We find that the 1991, 1992, and 1993 joint returns contain admissions by petitioner and Ms. Brodsky that they had an ownership interest in the Sanchez Street property at least during the period beginning in 1991 and ending on the date of the sale of that property in 1993.  Those admissions may not be overcome without cogent evidence that they are wrong. See FRE 801(d)(2); Waring v. Commissioner, 412 F.2d at 801; Estate of Hall v. Commissioner, 92 T.C. at 337-338.

1992 was $48,000.[3]  However, at trial Mr. Sutton testified that the property was not sold until 1995. If petitioner sold his interest in the property in 1992 for $48,000, then with an adjusted basis of $27,000, petitioner would have a gain of $21,000. * * *

However, petitioner did not receive any cash or proceeds on any sale. * * * Petitioner only reported a gain as a result of being relieved from the assumption of the debt by the buyer.

[1]Contrary to petitioner's claim on brief, Mr. Dubrovsky did not testify that he distributed $30,000 to petitioner on June 3, 1988, as a return of petitioner's investment in the Camino property.  Mr. Dubrovsky testified that he distributed $63,000 to petitioner on June 3, 1988, as a return of petitioner's investment in that property.  The record contains a copy of a check dated June 3, 1988, from Mr. Dubrovsky to petitioner in the amount of $63,000, which petitioner negotiated.  Although we are not required to, and we shall not, rely on Mr. Dubrovsky's testimony to establish the purpose of that check, the parties do not dispute that the $63,000 check from Mr. Dubrovsky to petitioner represented a distribution with respect to the Camino property.  Even if we were to rely on Mr. Dubrovsky's testimony and/or accept the parties' agreement as to the purpose of that check, neither that testimony nor that agreement establishes petitioner's basis in the Sanchez Street property.

[3]Contrary to petitioner's claim on brief, petitioner and Ms. Brodsky reported the sale of the Sanchez Street property in the 1993 joint return, Mr. Sutton did not prepare that return or calculate the gain on the sale of that property that they reported in that return, and $48,000 was the gross sales price, not the gain, that they reported from that sale in that return.

Although not altogether clear, it appears from the foregoing excerpt that petitioner takes the position on brief (1) that he held a 10-percent ownership interest in the Sanchez Street property since the date of the purchase of that property, (2) that his basis at all times in that ownership interest was $27,000, and (3) that that property (a) was sold in 1993 for $48,000 as reported in the 1993 joint return or (b) in the alternative was sold in 1995 for an undisclosed amount.  In support of petitioner's position regarding his ownership interest

and basis in the Sanchez Street property, petitioner relies on the testimony of Mr. Dubrovsky, on which we are not required to, and we shall not, rely.  In support of petitioner's alternative position regarding the sale of the Sanchez Street property, petitioner relies on the testimony of Mr. Sutton.  Based on the Court's evaluation of Mr. Sutton's testimony, we are not required to, and we shall not, rely on his testimony regarding the sale of the Sanchez Street property.

On the instant record, we find that petitioner has failed to carry his burden of establishing his basis in the Sanchez Street property within the meaning of section 1012 and his adjusted basis in that property within the meaning of section 1011(a).[94] We further find on that record that petitioner has failed to carry his burden of establishing that he did not sell his interest in that property in 1993 for $48,000.[95]  On the record before us, we find that petitioner has failed to carry his burden of establishing that he is not required to recognize for 1993 the gain of $48,000 that respondent determined in the 1993 notice.

Claimed Schedule E Deductions

---

[94]Because petitioner does not dispute that the Sanchez Street property was rental property, on the instant record, we find that petitioner has failed to carry his burden of showing the decrease required by sec. 1016(a)(2) in his basis in that property, determined under sec. 1012 (i.e., the cost), for depreciation allowed or allowable, whichever is greater, under sec. 167(a).  See Reithmeyer v. Commissioner, 26 T.C. at 815.

[95]On the instant record, we find that petitioner has failed to carry his burden of showing in the alternative that the Sanchez Street property was sold in 1995.

In the notice for 1991 and 1992, respondent disallowed
(1) for 1991 all of the claimed Schedule E expenses with respect
to the Church Street property and the Sanchez Street property and
(2) for 1992 all of the claimed Schedule E expenses with respect
to the Sanchez Street property.  Respondent made that determina-
tion because, inter alia,[96]

> it has not been established that * * * [the claimed
> Schedule E expenses] were ordinary and necessary busi-
> ness expenses or were expended for the purpose desig-
> nated. * * * nor has it been established that you were
> at risk per section 465 of the Internal Revenue Code.
> * * *

As an alternative ground for disallowing the claimed Schedule E
expenses for 1991 and 1992, respondent determined that

> the claimed losses are not allowable per Section 469 of
> the Internal Revenue Code because you did not actively
> participate in the management of the rental properties
> and because you have no other passive income to offset
> the passive losses.

> With respect to $1,611.10 of the claimed Schedule E expenses

---

[96]An additional ground set forth by respondent in the notice
for 1991 and 1992 for disallowing all of the claimed Schedule E
expenses for those years was that petitioner and Ms. Brodsky had
not established an ownership interest in the Church Street
property and the Sanchez Street property.  On the record before
us, we reject that ground.  On that record, we have found that at
least during part of 1991 and 1992 until the date of the sale of
the Church Street property, petitioner owned an interest in that
property, although the extent of that interest is not disclosed
by credible evidence in the record.  We have further found on the
record before us that at least during the period beginning in
1991 and ending on the date of the sale of the Sanchez Street
property in 1993, petitioner and Ms. Brodsky owned an interest in
that property, although the extent of that interest is not
disclosed by credible evidence in the record.

for 1991 relating to the Church Street property,[97] petitioner
contends that he has substantiated those expenses.  In support of
that contention, petitioner relies on a copy of the front side of
a check for $1,611.10 dated September 27, 1990, that was payable
to Markfel Realty and that petitioner signed (petitioner's
September 27, 1990 check to Markfel Realty).  We are not satis-
fied from that copy that that check was ever negotiated, let
alone negotiated by Markfel Realty.[98]  Even if we were to find
that petitioner's September 27, 1990 check to Markfel Realty was
negotiated by Markfel Realty, on the instant record, we find that
petitioner has failed to carry his burden of showing that that
check represented an amount that petitioner paid in 1991 for
expenses relating to the Church Street property.  On the record
before us, we find that petitioner has failed to carry his burden
of establishing that he is entitled to deduct for 1991 any of the
claimed Schedule E expenses relating to the Church Street prop-

---

[97]Petitioner makes no argument on brief as to $503.90 of the
disallowed claimed Schedule E expenses for 1991 relating to the
Church Street property that petitioner placed in dispute in the
petition and that respondent has not conceded.  We conclude that
petitioner has abandoned contesting $503.90 of the claimed
Schedule E expenses for 1991 that respondent disallowed in the
notice for 1991 and 1992.  See Rybak v. Commissioner, 91 T.C. at
566 n.19.

[98]Assuming arguendo that we had been satisfied from the copy
of the front side of petitioner's September 27, 1990 check to
Markfel Realty that that check was negotiated, we are not satis-
fied from that copy or from any other evidence in the record that
Markfel Realty deposited and/or cashed that check, nor do we know
from the record the date on which that check was negotiated.  For
example, Markfel Realty could have endorsed that check to peti-
tioner, who in turn deposited and/or cashed it.

erty.[99]

With respect to the claimed Schedule E expenses for 1991 and 1992 relating to the Sanchez Street property, petitioner contends that respondent conceded prior to the further trial that petitioner had substantiated the total amounts of expenses with respect to that property that were paid during those respective years. Petitioner claims that respondent's counsel made that concession during a meeting held less than a week before the further trial in this case (meeting in question), which petitioner's counsel Martin A. Schainbaum, Mr. Sutton, respondent's counsel, and Mr. Oliveras attended. At the meeting in question, respondent's counsel and Mr. Oliveras reviewed certain documents (petitioner's documents) that petitioner's representatives brought to that meeting, which petitioner contends substantiate the total amounts of expenses relating to the Sanchez Street property that were paid during 1991 and 1992, respectively.

During the testimony of Mr. Sutton at the further trial in this case, petitioner attempted to introduce into the record

---

[99]Because we have found that petitioner has failed to carry his burden of establishing that he is entitled to deduct for 1991 any of the claimed Schedule E expenses relating to the Church Street property, petitioner does not have a loss for that year relating to that property. Assuming arguendo that we had found that petitioner did have a loss for 1991 relating to the Church Street property, we find on the record before us that petitioner has failed to carry his burden of establishing the amount with respect to which he was at risk under sec. 465 for that property for that year. See sec. 465(a) and (b). We further find on that record that petitioner has failed to carry his burden of establishing that any loss relating to the Church Street property for 1991 did not constitute a passive activity loss under sec. 469 for that year. See sec. 469(a), (c).

petitioner's documents for the purpose of establishing that
respondent, through respondent's counsel, conceded prior to the
further trial that petitioner had substantiated the total amounts
of expenses relating to the Sanchez Street property that were
paid during 1991 and 1992, respectively, and that the only issue
remaining for the further trial with respect to those expenses
was the extent of petitioner's ownership interest in that prop-
erty.[100]  Petitioner's documents consisted primarily of bank
statements and canceled checks from two different bank
accounts,[101] as well as a spreadsheet prepared by Mr. Sutton on a
date not disclosed by the record that purported to summarize the

---

[100]On brief, petitioner changes the position that he took at
the further trial regarding the purpose for admitting peti-
tioner's documents into evidence.  Petitioner claims on brief
that those documents substantiate the total amounts of expenses
with respect to the Sanchez Street property that were paid during
1991 and 1992, respectively.  Petitioner does not claim on brief,
as he contended at the further trial, that petitioner's documents
establish that respondent conceded at the meeting in question
that petitioner had substantiated that those amounts of expenses
were paid.  We do not know why petitioner abandons on brief the
purpose that he advanced at the further trial for the admission
of petitioner's documents into the record.  In this regard, it is
noteworthy that Mr. Sutton testified at the further trial that
neither respondent's counsel nor Mr. Oliveras stated at the
meeting in question that petitioner's documents established that
petitioner was entitled to deduct the claimed Schedule E expenses
for 1991 and 1992 relating to the Sanchez Street property.

[101]The first set of bank statements and canceled checks were
statements and checks dated between December 1990 and September
1992 with respect to an account owned by Mr. Dubrovsky and two
other individuals who were identified on such statements and such
checks as Anatoly Kosoy (Mr. Kosoy) and Simon Khachatrian.  The
second set of bank statements and canceled checks were statements
and checks dated between August 1992 and January 1993 with
respect to an account owned by Mr. Kosoy and an association
identified as the "287 Sanchez St Association".

information set forth in those statements and checks.  Respondent
objected to petitioner's attempt to establish through peti-
tioner's documents that respondent conceded prior to the further
trial that petitioner had substantiated the total amounts of
expenses relating to the Sanchez Street property that were paid
during 1991 and 1992, respectively.  As grounds for that objec-
tion, respondent's counsel indicated that any such attempt would
prejudice respondent.  That was because, in order to refute
petitioner's position that respondent's counsel made such a
concession at the meeting in question, respondent's counsel would
have to testify at the further trial and consequently would be
prohibited under the applicable rules of professional responsi-
bility, see Rule 24(g), from representing respondent at the
further trial, thereby leaving respondent with no counsel to
represent respondent at that further trial.

The Court did not admit petitioner's documents into the
record because (1) in violation of the Court's March 31, 2000
Order, petitioner did not provide those documents to respondent
on or before July 20, 2000;[102] (2) the Court found that petitioner
had not shown good cause for that violation of the Court's March
31, 2000 Order;  and (3) the Court found that admitting peti-
tioner's documents into the record would cause substantial
prejudice to respondent.

Assuming arguendo that the Court had admitted petitioner's

---

[102]Petitioner first provided those documents to respondent on
or about Aug. 17, 2000.

documents into evidence, we find that those documents do not show that respondent conceded at the meeting in question that petitioner substantiated the total amounts of expenses relating to the Sanchez Street property that were paid during 1991 and 1992, respectively. We further find that petitioner's documents do not establish such amounts, and consequently we reject petitioner's position on brief that those documents substantiate the total amount of expenses relating to the Sanchez Street property that were paid during 1991 and 1992, respectively. Although petitioner's documents establish that certain amounts were paid during 1991 and 1992, respectively, and although it appears that some of those amounts were paid with respect to the Sanchez Street property, we find that petitioner's documents do not establish (1) that any of the amounts reflected in those documents were paid by petitioner[103] and (2) that all of those amounts constitute deductible expenses, as opposed to expenditures (e.g., capital improvements) that must be capitalized.[104]

---

[103]In this connection, all of the canceled checks that are included in petitioner's documents were drawn on accounts owned by persons other than petitioner and were signed by individuals other than petitioner. On the instant record, we find that petitioner has failed to carry his burden of showing that any of his funds were deposited during 1991 and 1992 into the bank accounts on which those checks were drawn or that he otherwise provided during those years the funds to pay certain of any expenditures relating to the Sanchez Street property.

[104]In support of his position that he is entitled to deduct for 1991 and 1992 the respective claimed Schedule E expenses relating to the Sanchez Street property, petitioner relies, inter alia, on Mr. Dubrovsky's testimony that petitioner was liable for his share of the expenses on the Sanchez Street property. We are not required to, and we shall not, rely on Mr. Dubrovsky's testimony. In this connection, Mr. Dubrovsky gave conflicting

(continued...)

On the record before us, we find that petitioner has failed to carry his burden of establishing that he is entitled to deduct any of the claimed Schedule E expenses for 1991 and 1992 relating to the Sanchez Street property.[105]

Fraud Penalty Under Section 6663(a)

Respondent determined that petitioner is liable for each of

---

[104](...continued)
testimony regarding the method by which the expenditures relating to the Sanchez Street property were paid. Mr. Dubrovsky initially testified that all of the investors in the Sanchez Street property gave him money, which he deposited into a bank account, and that he paid the expenses relating to that property from that account. Mr. Dubrovsky later testified that the rent collected from the Sanchez Street property was used to pay all of the expenses relating to that property. In this regard, petitioner and Ms. Brodsky claimed in each of the 1991 and 1992 Schedules E with respect to the Sanchez Street property a total amount of deductions, excluding depreciation, that exceeded the total amount of rent that they reported. Even if we were to rely on Mr. Dubrovsky's testimony that petitioner was liable for his share of the expenses on the Sanchez Street property, that testimony does not establish the extent of petitioner's ownership in that property, the amount, if any, of expenditures relating to that property for which petitioner was responsible during those years, and that petitioner paid the expenditures that he and Ms. Brodsky claimed in the 1991 and 1992 Schedules E with respect to that property.

[105]Because we have found that petitioner has failed to carry his burden of establishing that he is entitled to deduct any of the claimed Schedule E expenses for 1991 and 1992 relating to the Sanchez Street property, petitioner does not have a loss for either of those years relating to that property. Assuming arguendo that we had found that petitioner did have a loss for 1991 and 1992 relating to the Sanchez Street property, we find on the record before us that petitioner has failed to carry his burden of establishing the amount with respect to which he was at risk under sec. 465 for that property for those years. See sec. 465(a) and (b). We further find on that record that petitioner has failed to carry his burden of establishing that any loss relating to the Sanchez Street property for 1991 and 1992 did not constitute a passive activity loss under sec. 469 for those years. See sec. 469(a), (c).

the years at issue for the fraud penalty under section 6663(a) on the entire amount of the underpayment for each of those years.

Section 6663(a) imposes a penalty equal to 75 percent of the portion of any underpayment that is attributable to fraud.  For purposes of section 6663(a), if the Commissioner establishes that any portion of an underpayment is attributable to fraud, the entire underpayment is to be treated as attributable to fraud, except with respect to any portion of the underpayment that the taxpayer establishes by a preponderance of the evidence is not attributable to fraud.  Sec. 6663(b).  In order for the fraud penalty to apply, the Commissioner must prove by clear and convincing evidence, sec. 7454(a); Rule 142(b), that an underpayment exists and that some portion of such underpayment is attributable to fraud.  Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992).

Underpayment

To prove the existence of an underpayment, the Commissioner may not rely on a taxpayer's failure to carry his or her burden of proof with respect to the underlying deficiency.  Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).  The Commissioner must prove only that an underpayment exists, and not the precise amount of such underpayment.  DiLeo v. Commissioner, 96 T.C. at 873; Petzoldt v. Commissioner, supra at 699.  When an allegation of fraud is intertwined with reconstructed unreported income, as it is in the present case, the Commissioner may satisfy the burden

of establishing an underpayment by either:  (1) Proving a likely source of the unreported income or (2) disproving the nontaxable source(s) that the taxpayer alleges for the unreported income. Parks v. Commissioner, supra at 661.

On the instant record, we find that respondent has established by clear and convincing evidence a likely source of petitioner's unreported income for each of the years at issue, viz., the various Schedule C and other income-producing activities in which petitioner engaged during each of those years.[106] On the record before us, we find that respondent has established by clear and convincing evidence that there was an underpayment of petitioner's tax for each of the years 1991 through 1993.

Fraudulent Intent

To prove fraudulent intent, the Commissioner must prove by clear and convincing evidence that the taxpayer intended to evade tax, which he or she believed to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax.  Laurins v. Commissioner, 889 F.2d 910, 913 (9th Cir. 1989), affg. Norman v. Commissioner, T.C. Memo. 1987-265; Parks v. Commissioner, supra at 661.  The existence of fraud is a question of fact to be resolved upon consideration of the entire record. DiLeo v. Commissioner, supra at 874; Gajewski v. Commissioner, 67

---

[106]Petitioner's failure to contest certain amounts of unreported income determined for 1991 and 1993, certain amounts of claimed cost of goods sold disallowed for 1991, 1992, and 1993, and certain amounts of claimed Schedule C expenses disallowed for 1991 and 1992, which we have found constitutes an abandonment by petitioner of those items, also establishes by clear and convincing evidence that an underpayment exists for each of the years at issue.

T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud is never presumed or imputed and should not be found in circumstances which create at most only suspicion.  Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; Petzoldt v. Commissioner, supra at 700.  Direct evidence of the requisite fraudulent intent is seldom available.  Petzoldt v. Commissioner, supra at 699; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).  Consequently, the Commissioner may prove fraud by circumstantial evidence. Toussaint v. Commissioner, supra at 312; Rowlee v. Commissioner, supra at 1123; see Marsellus v. Commissioner, 544 F.2d 883, 885 (5th Cir. 1977), affg. T.C. Memo. 1975-368.

The courts have identified a number of badges of fraud from which fraudulent intent may be inferred, including (1) consistent and substantial understatement of income, (2) failure to maintain adequate records, (3) incomplete and erroneous information provided to tax return preparer or bookkeeper, (4) destruction of books and records, (5) implausible explanation of behavior, (6) failure to cooperate with tax authorities, and (7) lack of credibility of the taxpayer's testimony.  See Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Parks v. Commissioner, supra at 664-665.  In addition, the taxpayer's background and the context of the events in question may be considered circumstantial evidence of fraud. Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274; Niedringhaus v. Commissioner, supra at

211.  Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia constitutes persuasive circumstantial evidence of fraud.  Bradford v. Commissioner, supra at 307; Petzoldt v. Commissioner, supra at 700.

In support of respondent's position that petitioner intended to evade tax for each of the years at issue, which he believed to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax, respondent relies on the following factors:  Petitioner's consistent and substantial understatement of income for the years at issue; petitioner's failure to maintain adequate books and records; petitioner's failure to cooperate with respondent's agents during the examination of the years at issue, including his lack of credibility in certain of his dealings with those agents.

Although we agree with respondent that the factors on which respondent relies to prove fraudulent intent are present in the instant case, based on our examination of the entire record before us, we find that petitioner's actions raise only a suspicion, albeit a strong suspicion, of fraud for each of those years.  See Toussaint v. Commissioner, supra at 312; Petzoldt v. Commissioner, supra at 700.  We are not persuaded by clear and convincing evidence that petitioner's actions of substantially underreporting his income for each of the years at issue and failing to maintain adequate books and records for each of those years were attributable to his fraudulent intent to evade tax when he filed the joint return for each such year, as opposed to his negligence and his disregard of tax rules and regulations.

Nor are we persuaded by clear and convincing evidence that petitioner's actions of failing to cooperate with respondent's agents and his lack of credibility in certain of his dealings with those agents, as well as with the Court, were attributable to petitioner's fraudulent intent to evade tax when he filed the joint return for each of the years at issue, as opposed to his desire to conceal his negligence and his disregard of tax rules and regulations. Based on our examination of the entire record before us, we find that respondent has failed to carry respondent's burden of establishing by clear and convincing evidence that petitioner intended to evade tax for each of the years at issue, which he believed to be owing, by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax.

On the record before us, we find that petitioner is not liable for any of the years at issue for the fraud penalty under section 6663(a).

Accuracy-Related Penalty Under Section 6662(a)

Respondent determined in the alternative to the fraud penalty under section 6663(a) that petitioner is liable for each of the years at issue for the accuracy-related penalty under section 6662(a) because of negligence or disregard of rules or regulations under section 6662(b)(1).

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment resulting from, inter alia, negligence or disregard of rules or regulations. Sec.

6662(b)(1). For purposes of section 6662(a), the term "negligence" includes any failure to make a reasonable attempt to comply with the Code, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). Negligence has also been defined as a lack of due care or failure to do what a reasonable person would do under the circumstances. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990). Failure to maintain adequate books and records or to substantiate items properly constitutes negligence. Sec. 1.6662-3(b)(1), Income Tax Regs.

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith. Sec. 6664(c)(1). The determination of whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs. In the case of claimed reliance on the accountant who prepared the taxpayer's tax return, the taxpayer must establish that correct information was provided to the accountant and that the item incorrectly omitted, claimed, or reported in the return was the result of the accountant's error.

Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978).

Petitioner contends that he is not liable for the accuracy-related penalty under section 6662(a) because he relied on Mr. Sutton, who prepared the joint returns of petitioner and Ms. Brodsky for 1991 and 1992, and on Mr. DiBernardo, who prepared their joint return for 1993, to whom he provided all of his financial information.  On the instant record, we reject that contention.  On that record, we find that petitioner has failed to carry his burden of establishing (1) that he provided correct and complete information to Mr. Sutton and Mr. DiBernardo in connection with their return preparation on his behalf and (2) that any item incorrectly omitted, claimed, or reported in the joint returns for the years at issue was the result of the error of one of those return preparers.  On the instant record, we also find that petitioner failed to maintain adequate books and records and to substantiate properly items claimed on the joint returns for the years at issue.

On the record before us, we find that petitioner has failed to carry his burden of showing (1) that the underpayment for each of the years at issue was not due to negligence or disregard of rules or regulations and (2) that he acted with reasonable cause and in good faith with respect to the underpayment for each of those years.  On that record, we find that petitioner has failed to carry his burden of establishing that he is not liable for each of the years at issue for the accuracy-related penalty under section 6662(a).

Addition to Tax Under Section 6651(a)(1)

Respondent determined that petitioner is liable for 1993 for the addition to tax under section 6651(a)(1) because respondent did not receive the 1993 joint return of petitioner and Ms. Brodsky until May 14, 1995.

Section 6651(a)(1) imposes an addition to tax for failure to file timely a tax return. The addition to tax does not apply if the failure is due to reasonable cause and not to willful neglect. Sec. 6651(a)(1).

Petitioner contends that respondent erred in determining that he is liable for 1993 for the addition to tax under section 6651(a)(1) because he had reasonable cause for not timely filing the joint return for that year. According to petitioner, reasonable cause existed because at the time that he was preparing that joint return: (1) He was engaged in his various business activities; (2) respondent was conducting an examination of his joint returns for 1987 through 1990; (3) he was in the process of changing representatives during the course of that examination,[107]

---

[107]Mr. Sutton, who was shown on the joint returns of petitioner and Ms. Brodsky for 1991 and 1992 as return preparer, represented petitioner with respect to respondent's examination of those years and certain prior years. In December 1994, respondent received a power of attorney authorizing Ms. Schwiff to represent petitioner and Ms. Brodsky with respect to respondent's examination of their taxable years 1991 and 1992. Sometime between the end of May 1995 and the beginning of July 1995, respondent received a power of attorney authorizing Mr. DiBernardo, who was shown in the joint return of petitioner and Ms. Brodsky for 1993 as return preparer, to represent petitioner and Ms. Brodsky with respect to respondent's examination of their
(continued...)

and one or more of his representatives advised him not to file the joint return for 1993 until the conclusion of the examination of taxable years 1987 through 1990; and (4) he was caring for his sick mother.

In support of his position regarding the late filing of the 1993 joint return in question, petitioner relies on his self-serving testimony, on which we are not required to, and we shall not, rely.[108] Even if we had believed the excuses offered by petitioner for his failure to file timely that return, on the record before us, we find that those excuses are not adequate to show reasonable cause for petitioner's failure to file timely.[109]

---

[107](...continued) taxable years 1991 and 1992.

[108]With respect to petitioner's claim that he relied on one or more of his representatives, who advised him not to file the 1993 joint return until after the completion by respondent of the examination of certain prior taxable years, petitioner did not question Mr. Sutton and Mr. DiBernardo, or call Ms. Schwiff as a witness, regarding what they advised him with respect to the filing of that return. We infer from petitioner's failure to question Mr. Sutton and Mr. DiBernardo and to call Ms. Schwiff in that regard that their testimony would not have been favorable to petitioner's contention that one or more of them advised him not to file the 1993 joint return until after the conclusion of respondent's examination of certain prior taxable years. We also note that Mr. DiBernardo first met petitioner in 1995, sometime prior to the date (May 14, 1995) on which respondent received the 1993 joint return in question.

[109]With respect to petitioner's claim that he did not file timely the 1993 joint return because he was caring for his sick mother, petitioner testified that his mother passed away on Aug. 20, 1994. However, respondent did not receive the 1993 joint return until May 14, 1995. Petitioner did not explain how his caring for his sick mother contributed to his not filing the 1993 joint return until almost 9 months after she died.

See <u>United States v. Boyle</u>, 469 U.S. 241 (1985).

On the record before us, we find that petitioner has failed to satisfy his burden of establishing that he had reasonable cause for his failure to file timely the 1993 joint return in question. On that record, we find that petitioner is liable for 1993 for the addition to tax under section 6651(a)(1).

We have given due consideration to all of the parties' contentions and arguments, even though we have not addressed each of them herein.

To reflect the foregoing, the concessions of respondent, and the matters abandoned by petitioner,

<u>Decision will be entered under Rule 155</u>.